ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FILED
HARRISBURG, PA

APR 3 0 2002

MARY E. D'ANDREA, CLERK
Per _____

LINDA F. WEABER,             :
                 Plaintiff   :
                             :
        v.                   :        CIVIL ACTION NO: 1:01-CV-856
                             :
HERSHEY FOODS CORP.,         :
                 Defendant   :

---

**APPENDIX TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

McNEES WALLACE & NURICK LLC

By _____

**Brian F. Jackson**
**Elizabeth A. Magaschak**
**100 Pine Street**
**P.O. Box 1166**
**Harrisburg, PA  17108**
**(717) 232-8000**

**Attorneys for Defendant**
**Hershey Foods Corporation**

**Dated:  April 30, 2002**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LINDA F. WEABER,                     :
              Plaintiff      :
                           :

        v.                         :       CIVIL ACTION NO:  1:01-CV-956
                           :

HERSHEY FOODS CORP.,                 :
              Defendant      :

## APPENDIX

Tab 1      Linda Weaber Deposition Transcript and Exhibits (February 22, 2002)

Tab 2      Larry Weinsheimer Deposition Transcript (excerpts) (April 5, 2002)

Tab 3      Thomas Soles Deposition Transcript (excerpts) (April 1, 2002)

Tab 4      Carolyn Haskell Deposition Transcript (excerpts) (April 1, 2002)

Tab 5      Document D1391-1392:  Hershey Plant Production Supervisors 1/1/99

Tab 6      Plaintiff's Answers to Interrogatories

①

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . .
LINDA F. WEABER,            .
            Plaintiff    .
                           . Civil Action
            vs.            . Number 1:01-CV-856
                           .
HERSHEY FOODS CORPORATION,.
            Defendant    .
. . . . . . . . . . . . . . .


Deposition  of:  LINDA F. WEABER

Taken by      :  Defendant

Date          :  February 22, 2002, 10:08 a.m.

Place         :  McNees Wallace & Nurick LLP
                 100 Pine Street
                 Harrisburg, Pennsylvania

Reporter      :  Glenda S. Travitz
                 Registered Professional Reporter
                 Notary Public


APPEARANCES:

        ANDREW J. OSTROWSKI, ESQUIRE

            For - Plaintiff

        McNEES WALLACE & NURICK LLP
        By:  ELIZABETH A. MAGUSCHAK, ESQUIRE
             BRIAN F. JACKSON, ESQUIRE

            For - Defendant

2

1                          I N D E X

2                          WITNESS

3  LINDA F. WAEBER                          Examination

4       By Ms. Maguschak                        3

5                          EXHIBITS

6
   Weaber
7  Exhibit Number                           Marked

8  1    March 3, 1998 Interoffice Correspondence
        to L. Weaber from D. Bentz, one page        54
9
10 2    Confidential Separation Agreement, five
        pages                                       79

11 3    Document entitled Severance Benefits,
        one page                                    81
12
13 4    May 26, 1999 letter to Dear Fellow
        Employee from K. Wolfe, two pages           93

14 5    June 24, 1999 PA Human Relations
        Commission Complaint, three pages          122
15
16 6    2/15/2000 PA Human Relations Commission
        Amended Complaint, three pages             123

17 7    2/13/01 EEOC Notice of Right to Sue,
        one page                                   124
18
19 8    Document entitled Performance Management,
        January 1998 to December 1998, 11 pages    129

20 9    Document entitled Performance Management,
        January 1997 to December 1997, 10 pages    133
21

22

23

24

25

Exam./Maguschak - Weaber                    3

1           STIPULATION

2       It is hereby stipulated by and among

3   counsel for the respective parties that

4   reading, signing, sealing, certification and

5   filing are hereby waived; and all objections

6   except as to the form of the question are

7   reserved to the time of trial.

8

9       LINDA F. WEABER, called as a witness, being

10  duly sworn, testified as follows:

11          EXAMINATION

12  BY MS. MAGUSCHAK:

13  Q.  Ms. Weaber, my name is Liz Maguschak.  I'm an

14      attorney with McNees Wallace & Nurick.

15          I'm here today to take your deposition in

16      a lawsuit that you started against Hershey

17      Foods in federal court here in Harrisburg.  Do

18      you understand that's why we're here today?

19  A.  Yes, I do.

20  Q.  You just took an oath.  That's the same oath

21      that you would take in court.  It has the same

22      legal significance.  Do you understand that it

23      requires you to tell the truth and to give

24      responses that are not misleading?

25  A.  Yes, I do.

4

Exam./Maguschak - Weaber

1   Q.   Do you understand your obligation to tell the

2        truth here today?

3   A.   Yes, I do.

4   Q.   Because we need to get to the truth, we must

5        ensure that you understand my questions.  So as

6        we go forward, please tell me if you don't

7        understand any part of a question.  I can

8        rephrase or explain what I mean if it's not

9        clear.

10  A.   Thank you.

11  Q.   Okay?

12  A.   Yes.

13  Q.   As you know, the stenographer is here.  She can

14       only take one person speaking at a time.  So

15       it's important that you wait until I'm finished

16       with my question before you give an answer.

17       Often you'll know what I'm going to say and

18       you'll try to jump on the answer.  Try to

19       remember to wait until I finish my question

20       before you give an answer.  Okay?

21  A.   Yes, ma'am.

22  Q.   You have to give verbal responses.  Nods of the

23       head or uh-huhs or uh-uhs don't come out very

24       clearly on the record.

25  A.   Sure.

5

Exam./Maguschak - Weaber

1   Q.   At any time if you need another soda or need a

2        drink or need to take a break, let us know and

3        we can do that.  The only time that you can't

4        take a break is if there's a pending question.

5        I'll want an answer to the question before we

6        take a break.  If you need to take a break at

7        any time, just let us know.

8   A.   Okay.

9   Q.   If the temperature is not good --  Actually, I

10       don't think there's much I can do about that.

11       But if there's any kind of a problem, let us

12       know, and we'll try to make you comfortable.

13  A.   All right.

14  Q.   Are you on any medication that would impair

15       your ability to think or remember or give

16       truthful answers this morning?

17  A.   No, I'm not.  I'm on medication, but none of

18       that type of medication.

19  Q.   Good.

20            MS. MAGUSCHAK:  Andy, is it correct that

21       --  I mean we just received the discovery

22       responses yesterday.  I think you agreed with

23       Brian that if we would need to get back

24       together at a later date that we could do that.

25            MR. OSTROWSKI:  Right.  Yes.

6

Exam./Maguschak - Weaber

1              MS. MAGUSCHAK:  Hopefully, we won't need

2        to do that.

3    BY MS. MAGUSCHAK:

4    Q.    Have you ever given a deposition before?

5    A.    Yes, I have.

6    Q.    How often?

7    A.    Once.

8    Q.    What did that deposition have to do with?

9    A.    It had to do with our land at South Forge Road

10       in Palmyra.

11   Q.    Was that a lawsuit that you initiated?

12   A.    Yes, it was.

13   Q.    And how long ago was that?

14   A.    That was in --  When I gave the deposition?

15   Q.    Yes.

16   A.    Gee.

17   Q.    Approximately.

18   A.    I would say approximately '97, ninety --  It

19       happened in '96.  I would say approximately '97

20       or maybe early '98.  I don't exactly remember.

21   Q.    When you say it happened in '96, what did the

22       lawsuit have to do with?

23   A.    What had happened was 84 Lumber Company had

24       built a building on Airport Road and South

25       Forge Road in Palmyra, Pennsylvania.  They did

7

Exam./Maguschak - Weaber

1    not put the proper drain system in, and we got

2    rain, and the rain was like a real downpour

3    rain.  Well, it didn't take their water away.

4        What it did, the water actually ran up the

5    road and across a property and went over in our

6    property, and it flooded everything.

7    Q.   Okay.  Has that matter been resolved?

8    A.   No, it has not.

9    Q.   It's still pending?

10   A.   It's still pending.

11   Q.   What court is that in?

12   A.   Lebanon County.

13   Q.   I think you said that was the only other

14       deposition you've given.

15   A.   Yes.

16   Q.   Have you given testimony in any court or

17       administrative agency before?

18   A.   No, I haven't.

19   Q.   Other than that case that you just described,

20       have you been a party to any other legal

21       action?

22   A.   No.  The only thing that -- And I don't even

23       remember if I spoke or not.  It was at my

24       husband --  My husband had a disk operation

25       through his job.  He was hurt at Sauder

8

Exam./Maguschak - Weaber

1    Brothers.

2        When he got hurt the first time, they had

3    one insurance.  When he got hurt the second

4    time, they had different insurance.  So they

5    were debating who was going to pay him

6    workmen's comp.  That's the only other time

7    that I was ever in a courtroom.

8  Q.  Have you ever been convicted of a crime?

9  A.  No, ma'am.

10  Q.  Have you ever been accused of dishonesty?

11  A.  No, ma'am.

12  Q.  Were you ever the subject of any kind of

13      governmental investigation?

14  A.  No, ma'am.

15  Q.  Did you review any documents prior to this

16      deposition here today about this case?

17  A.  Just what Andy has sent me, my papers.

18  Q.  Did you review any of those documents

19      specifically to prepare for the deposition?

20  A.  No, I did not.

21  Q.  Other than Mr. Ostrowski, did you discuss your

22      testimony with anyone?

23  A.  No, I have not, besides my husband.  Just that

24      I was going for the deposition today.  I mean

25      we didn't go into any details.

9

Exam./Maguschak - Weaber

1   Q.   Do you mean with your husband?

2   A.   Right.

3   Q.   Just a little bit of personal background.

4       What's your birth date?

5   A.   July the 9th, 1947.

6   Q.   And where did you grow up?

7   A.   In Palmyra, Pennsylvania.

8   Q.   Are you married?

9   A.   Yes, I am.

10   Q.   And when did you get married?

11   A.   I got married in 1973, November the 24th.

12   Q.   And what's your husband's name?

13   A.   Lloyd Eugene Weaber.

14   Q.   Lloyd?

15   A.   Lloyd.

16   Q.   And do you have any children from that

17       marriage?

18   A.   Yes, I do.

19   Q.   Can you tell me their names and ages?

20   A.   I have one from him, and her name is Terry,

21       T-E-R-R-Y, Terry Marie Haag.  Her last name is

22       Haag.  She is 27 years old.

23   Q.   And does Terry live with you?

24   A.   No.  Terry is married.  Terry was married, but

25       she's a widow now.

10

Exam./Maguschak - Weaber

1  Q.  Did she live with you in 1999?

2  A.  No.

3  Q.  Do you have any previous marriages?

4  A.  Yes, I do.

5  Q.  Who was your husband?

6  A.  That's to George Stover.

7  Q.  Did that marriage end in divorce?

8  A.  Yes, it did.

9  Q.  What were the dates of that marriage,

10       approximately?

11 A.  I got married to him in, I think, 1963, I think

12       it was.  It ended in 1972.

13 Q.  Do you have any children from that marriage?

14 A.  Yes, I do.  I have two daughters--Judy Fogleman

15       and Crystal Christ.

16 Q.  And do you have any --  Were you married any

17       other times?

18 A.  No.

19 Q.  Do you have any other children?

20 A.  No.

21 Q.  Where did you go to high school?

22 A.  Palmyra High School.

23 Q.  Did you complete high school?

24 A.  No.

25 Q.  Do you have a GED?

Exam./Maguschak - Weaber

1   A.   Yes, I do.

2   Q.   When did you get the GED, approximately?

3   A.   I think it was approximately about 1974.

4   Q.   Did you ever take any college courses?

5   A.   Just through Hershey.  Penn State came to the

6        Hershey factory, and we took courses there.

7   Q.   Do you remember any of the courses you took?

8   A.   It was in management.

9   Q.   And you took the courses right at the plant?

10  A.   Yes.

11  Q.   Did you receive any sort of certificate or

12       diploma from those courses?

13  A.   No, we didn't.  It was just like after-work

14       classes.  You just attended so many classes.

15       Penn State came down there, and you just did so

16       many classes.  No.

17  Q.   Do you have any military experience?

18  A.   No.

19  Q.   Do you have any hobbies?

20  A.   Yes.

21  Q.   What are your hobbies?

22  A.   I like to hunt.  I like to fish.  I like to

23       sew, exercise, crochet, and do crafts.

24  Q.   When you say exercise, what kind of exercise?

25  A.   I just exercise at home to, like, videotapes

12

Exam./Maguschak - Weaber

1      and --

2  Q.  How often would you say you go hunting?

3  A.  I only go hunting once a year.  That's deer

4      hunting.

5  Q.  What about fishing, how often would you say you

6      go fishing?

7  A.  Fishing, I couldn't really give you a number on

8      that.  We take our grandchildren fishing quite

9      a bit in the summer.  Whenever we have a

10     chance, we take them.

11  Q.  What about sewing, how often do you sew?

12  A.  Once in a great while now.

13  Q.  Do you exercise every day?

14  A.  At least about four times a week.

15  Q.  Did you have any jobs prior to Hershey?

16  A.  When I worked at Hershey?

17  Q.  Prior to Hershey, did you have any employment?

18  A.  Oh, prior to Hershey.  I worked as a waitress

19     when I was 16 at Andy's Diner.  That was it.

20  Q.  I want to ask you some questions about after

21     your termination from Hershey and your efforts

22     to find a job.  You were terminated on May 21st

23     of 1999; is that right?

24  A.  That's right, yes.

25  Q.  What did you do initially to go about finding a

Exam./Maguschak - Weaber

1    job?

2  A.  The first thing I did, I went down to the

3      unemployment office in Lebanon County, and they

4      helped me make a resume.

5          I went to classes there.  They set up

6      classes for us.  It was a group of us that got

7      picked for classes because of the type of job

8      we had.  I guess only a certain number of

9      people get picked.  We went to classes for

10     several weeks one day a week to learn how to go

11     in and interview for a job and everything like

12     that.

13         I went to job fairs.  I used my computer

14     and sent a lot of applications over the

15     computer in.  I applied at ASK in Palmyra for a

16     supervisor's job.  I worked for a temp service,

17     Austin Staffing Service, for two months at

18     Bayer Aspirin in Myerstown.

19  Q.  Let's hold up a second.  Before we get into the

20     jobs that you actually got, I want to just talk

21     a little bit more about your search for a job.

22  A.  Okay.

23  Q.  You said you took some classes through the

24     unemployment comp office.

25  A.  Yes, I did.

14

Exam./Maguschak - Weaber

1   Q.   When were those classes?  Were they in the

2        summer of '99?

3   A.   Yes, they were.

4   Q.   And they were to help you learn how to

5        interview?

6   A.   Right.

7   Q.   And I think you said that they helped you make

8        a resume.  Is that right?

9   A.   They made my resumes down there too, yes.

10   Q.   Do you have a copy of that resume?

11   A.   I do at home, yes.

12          MS. MAGUSCHAK:  Did we get that?

13          MR. OSTROWSKI:  I don't think I have it.

14          Get me a copy of that.

15 BY MS. MAGUSCHAK:

16   Q.   If you could get a copy of that to your

17        attorney, and he will get us a copy.

18   A.   Yes, I will.

19   Q.   Then you also said, I believe, you went to job

20        fairs.

21   A.   Yes, I did.

22   Q.   Where was that?  Did you go to more than one

23        job fair?

24   A.   Yes, I did.

25   Q.   When did you go to job fairs and where?

15

Exam./Maguschak - Weaber

1  A.   They were down at the Holiday -- I think it's

2       the Holiday Inn on Quentin Road in Lebanon.  I

3       don't remember exactly the dates, but anytime I

4       seen something like --  And I went to one in

5       Reading.

6  Q.   A job fair in Reading?

7  A.   A job fair.  I drove down to Reading.  That was

8       in the winter, I know, because I had to drive

9       through the snow.

10 Q.   You also said you used your computer to do some

11      applications on-line?

12 A.   Yes, I did.

13 Q.   Do you have a record of where you applied and

14      when?

15 A.   No.  I just went on-line and applied to them.

16 Q.   How did you select who you were applying to?

17      How did you get the information about where to

18      apply?

19 A.   On the computer it tells you what different

20      jobs is available.  You just go in and click on

21      that, and I would read over it.  It would say,

22      Do you want to apply, send your resume?  And I

23      would send my resume to them.

24 Q.   Was this a job search web site?

25 A.   Yes, it is.

16

Exam./Maguschak - Weaber

1  Q.  Do you remember what the name of it is, was?

2  A.  It was through the unemployment office, their

3      job --  It was called Pennsylvania --  I don't

4      know.  I probably still have copies of the web

5      site that I went in on, though, at home.

6  Q.  If you do, if you could provide that to --

7  A.  Give it to Andy.  Yes, I will.  It was through

8      the unemployment office.  They had given us the

9      paper to go in.  All the jobs that was on there

10     is the jobs that were in at the unemployment

11     office.  That's what they told us.

12         So you could pick different counties.  I

13     picked Dauphin County.  I picked Lebanon

14     County.  I picked Lancaster County.  All the

15     counties around us that I could drive to, yes.

16 Q.  Did you review the newspapers, the want ads in

17     the newspapers?

18 A.  Yes, I did.

19 Q.  What newspaper did you normally refer to?

20 A.  Normally the <u>Patriot</u>.

21 Q.  Harrisburg <u>Patriot</u>?

22 A.  Yes.

23 Q.  Did you respond to any want ads in the paper?

24 A.  Sent my resumes in.

25 Q.  Do you have any record as to where you sent

17

Exam./Maguschak - Weaber

1        your resumes in response to want ads?

2   A.   No, I don't.

3   Q.   Did you send cover letters with the resumes?

4   A.   Yes.

5   Q.   Do you have like a form cover letter that you

6        used?

7   A.   Yes, I think I do have one on my computer yet.

8        Yes.

9   Q.   Again, if you could provide that.

10  A.   Okay.

11  Q.   The computer that you used, do you have the

12       same computer now that you had then?

13  A.   Yes, I do.

14  Q.   Were these applications on a disk anywhere that

15       you applied to?

16  A.   No.  I just went directly into the web site.

17  Q.   You didn't print out what you were sending in?

18  A.   No.

19  Q.   Like print out the application?

20  A.   No, I didn't.  I did do some of them, but I

21       don't know if I have them anymore.

22  Q.   To the extent you can find anything, any

23       documentation of anything, please provide it to

24       --

25  A.   Anything, because I cleaned house.

18

Exam./Maguschak - Weaber

1  Q.  And you said the unemployment comp office

2      helped you prepare a resume.

3  A.  Yes.

4  Q.  Did you use the same resume all the time?

5  A.  I've used that resume, yes.

6  Q.  Do you have more than one resume, I guess is my

7      question?

8  A.  No, I do not.

9  Q.  Now, I think you said you applied at some place

10     in Palmyra, AS --

11 A.  ASK Kettering.

12 Q.  What does that company do?

13 A.  What that company does is make salads and

14     stuff.

15 Q.  When did you apply there?

16 A.  It was in the summer of '99.  I don't know

17     exactly what date it was.

18 Q.  Did you have an interview there?

19 A.  Yes, I did.

20 Q.  Were you offered a position?

21 A.  No, I wasn't.

22 Q.  Did you have any other interviews?  Other than

23     jobs that you actually have had, which we'll

24     talk about in a little bit, did you have any

25     other interviews and then not get a job?

19

Exam./Maguschak - Weaber

1  A.    Yes.  For the Palmyra post office.

2  Q.    When was that interview?

3  A.    I can't remember if it was the end of '99 or

4        beginning of 2000.  That was delivering mail.

5        You used your own car and everything.  You

6        didn't have to take the test, but once you was

7        there so long, they would offer you the test

8        before they offer it to --  They only offer it,

9        I think -- don't say it's positively -- once or

10       twice a year to take the test.

11 Q.    Do you mean like a civil service test?

12 A.    Yeah.  But they would offer it more often to

13       the people that was working for them on like --

14       It was like a temporary thing.  But you worked

15       six days a week, and you used your own vehicle.

16 Q.    Were you offered a position?

17 A.    No, I wasn't.  I didn't hear nothing back from

18       them.

19 Q.    Again, other than jobs that you actually worked

20       at, were you given any offers of employment

21       that you declined?

22 A.    No, I did not decline no offers.

23 Q.    With respect to your job search, I think you

24       said you were looking in a certain geographical

25       area; is that correct?

Exam./Maguschak - Weaber

1  A.   Yeah, somewhere that I could drive close.  I

2       didn't mind driving 20, 25 miles to work or

3       whatever.  But I looked in Dauphin County,

4       under Dauphin County, Lancaster, the Reading

5       area, Lebanon County, of course.

6  Q.   Were you looking for a specific type of job?

7  A.   No.  I was just looking for any type of job.

8  Q.   Were you looking for a specific shift?

9  A.   No.  I didn't care what shift I worked.

10  Q.   Were you looking for a specific income level?

11  A.   On my paper I put $10 because it asks you on

12      the computer what's the lowest amount to the

13      highest amount you'd want, and I'd always put

14      10 to 15 dollars on it.

15  Q.   Ten to 15 dollars an hour?

16  A.   Ten to 15 dollars an hour.

17  Q.   Now, you were starting to tell me that one job

18      that you did have was you worked through a

19      temporary agency for Bayer Aspirin.

20  A.   That's the job fair I went to in Reading for

21      Austin Staffing.  I got that job down at Bayer

22      Aspirin in Myerstown, Pennsylvania.  It was a

23      two-month job.

24  Q.   Did you know going into it that it was going to

25      be for a short period of time?

Exam./Maguschak - Weaber

1  A.  No, I did not.

2  Q.  And why was it only a two-month job?  What

3      happened?

4  A.  That's all they needed us for.  It was just a

5      rush area and time I guess they needed.  They

6      laid off I don't know how many people that day.

7  Q.  Was that a full-time position?  During the time

8      that you were there, was it full time?

9  A.  Yes.  I worked 40 hours a week, some overtime.

10  Q.  That was $10 an hour?

11  A.  Yes, that was.

12  Q.  And you did receive some overtime?

13  A.  Yes, I did.  My checks came through Austin

14      Staffing, though.  They did not come from Bayer

15      Aspirin.

16  Q.  Did that job have any benefits?

17  A.  No.

18  Q.  You said that was in Myerstown?

19  A.  Yes.

20  Q.  Then that was your first employment since

21      Hershey?

22  A.  Yes.

23  Q.  And that was in February of 2000?

24  A.  Yes.

25  Q.  Through April of 2000?

22

Exam./Maguschak - Weaber

1  A.  Right.  Yes, ma'am.

2  Q.  And then what was your next position after

3      Bayer Aspirin?

4  A.  Next position --  Well, the job fair that I

5      went to down in Lebanon at the Holiday Inn, I

6      filled out several applications down there.  I

7      got called at Verdelli Farms in Hummelstown,

8      and I started there in September.

9  Q.  Of 2000?

10  A.  Of 2000.

11  Q.  And what did you do there at Verdelli?

12  A.  I ran a bagger, a spinach bagger.

13  Q.  Who was your supervisor at Verdelli?

14  A.  My supervisor was --  I can't think of his

15      name.  That's terrible.  My mind just went

16      blank on it.  Wendell was his last name.  Chris

17      Wendell.

18  Q.  Wendell?

19  A.  Uh-huh.

20  Q.  Then what shift did you work?

21  A.  I worked second shift.  I went out on a Sunday

22      at 2 o'clock in the afternoon, and you worked

23      to whenever they got done.  The latest you

24      could work is 2:30.

25          During the week I worked from 3:30, worked

Exam./Maguschak - Weaber

1   it Monday through Thursday.  You worked from

2   3:30 until whenever you get done with spinach.

3   Sometimes they would send us home at -- we'd be

4   done at 8:30.  Sometimes the operators, we

5   would tear our baggers and stuff down, and

6   sometimes I would get until 10:30, 11:30.

7       Usually on a Thursday night we always

8   worked late into the morning until about 2:30,

9   and then I had to tear my bagger down.  I never

10  pulled a paycheck that had 80 full hours every

11  two weeks on it.

12  Q.  I think in your interrogatory answers you said

13  approximately 68 hours a week, or every two

14  weeks.

15  A.  Every two weeks.  I don't think I have any

16  check stubs that has over 68 hours total.

17  Q.  Did you join the union at Verdelli?

18  A.  Yes, I did.

19  Q.  Do you know what union that was?

20  A.  It's Teamsters.  I don't know what the local

21  number was.  I do have a card that I paid 50

22  cents for so if I would ever get another job

23  with the union I wouldn't have to pay the dues.

24  So I can give you the number if you need the

25  number.

24

Exam./Maguschak - Weaber

1  Q.    You worked there for about a year; is that

2         correct?

3  A.    A year.

4  Q.    Why did you leave there?

5  A.    Because of Chris Wendell's management.  His

6         management, what it was --  I'll take, for

7         instance, like Labor Day weekend.  We were

8         allowed to work daylight that Sunday to have

9         Monday off.  We'd go in at 7 o'clock in the

10        morning and work until 6:30 at night.

11             One operator took off.  A bagger operator

12        took off.  He wanted vacation.  He couldn't get

13        vacation.  He took off.

14             So Monday we had off.  I went up, and I

15        thanked him for letting us work daylight.

16        Monday we had off.

17             Tuesday we went in, called us in the

18        office and threatened our jobs, took our

19        overtime away from us because of one operator

20        taking off.  Management doesn't operate like

21        that.  If one person does something, that's the

22        person that should be punished, not everybody.

23        Out on the floor he would holler at you and

24        scream at you.  You didn't breathe.

25             There was no water fountains inside the

25

Exam./Maguschak - Weaber

1    place.  You couldn't get a drink.  If your

2    bagger went down, you had to run to the next

3    person to help them out or whatever.

4        It was just the punishment.  It was like

5    you were treated like a child.  The management

6    was not good.

7        When I quit there, what happened there,

8    they built a new part onto the building.  When

9    we got done working that night, three of us

10   operators--myself, Jeremiah Brown, and Dave; I

11   don't know what Dave's last name is--we went

12   home.

13       The other operators and the team leaders

14   of the lines, which was something like a

15   working foreman, they went over in the new part

16   of the building, which we were not allowed to

17   go over there because it was under

18   construction.

19       What I understand, they spun a forklift

20   around and put marks on the floors and stuff

21   like that.  Got called in and threatened our

22   jobs, even said that Dan Verdelli was going to

23   fire us all.  I mean we weren't even there.  We

24   went home.  They stayed.

25       At my break time, I went to go in the

26

Exam./Maguschak - Weaber

1     office to give my quitting notice for a week

2     because I had already applied where I'm working

3     now.

4          When I opened the door to go in the

5     office, he told me to get out to my line but

6     not in them words.  He wouldn't even talk to

7     me.  So that was it.  That was my last night.

8          So I started on Monday morning at Warrell

9     Corporation in Camp Hill.

10  Q.  And did you already have that --  Did you

11      already have an offer from Warrell Corporation

12      when you quit Verdelli?

13  A.  Yes, I did.  I was a manager for all them

14      years, and you do not treat employees like they

15      were treated.

16  Q.  Were you disciplined at all at Verdelli?

17  A.  No, I was not.  Just by everybody in a group

18      being punished, not one on one like it should

19      have been.

20          Now, one time he did call me in because he

21      didn't give me a raise.  I asked about a raise

22      and got laughed at.  So I went over his head

23      and asked Dan about it, and he called me in the

24      office, and he was mad about that.

25  Q.  He was mad that you went over his head?

27

Exam./Maguschak - Weaber

1   A.   Yeah.  But, you know, he would just laugh at

2        you.  I mean we're human beings.  We're not

3        children working.

4   Q.   Did you have any performance evaluations while

5        you were there?

6   A.   There?  No, I did not.  I have at Warrell

7        Corporation since I've been there.

8   Q.   And you started there in September of 2001?

9   A.   Yes, I did.

10  Q.   Let me back up.  Did you have any benefits at

11       Verdelli?

12  A.   Yes.  They had good benefits after 90 days.

13       They had Blue Cross and Blue Shield.  They had

14       excellent benefits.

15  Q.   How did the benefits at Verdelli compare to

16       those that you had at Hershey?

17  A.   They were the same.

18  Q.   Back to Warrell Corporation, what does that

19       company do?

20  A.   Warrell Corporation is Pennsylvania Dutch

21       Candies.

22  Q.   What do you do there?

23  A.   I run a bagger there.

24  Q.   And your answers to interrogatories indicate

25       that you make $11.70 an hour.

28

Exam./Maguschak - Weaber

1  A.  Right now I do, yes.

2  Q.  Is that what you started at?

3  A.  No, it is not.

4  Q.  What did you start at?

5  A.  I started at $11 an hour.

6  Q.  You have since gotten a raise?

7  A.  Yes.  I've gotten 70 cents since I've been

8      there.

9  Q.  Was that all at one time, or was that --

10 A.  No.  The first time we got three percent, and

11     then I --  When I had my evaluation in 90 days,

12     I went up to $11.70.

13 Q.  And that's a full-time position?

14 A.  Yes, it is.

15 Q.  Are you a member of a union there?

16 A.  No.

17 Q.  Is there a union?

18 A.  No, there is not.

19 Q.  Who is your supervisor there?

20 A.  My supervisor there is Brian Albert, and my

21     manager -- the ER, rather, is Brad Teahl.

22 Q.  What shift do you work?

23 A.  I work first shift there.

24 Q.  What time is that?

25 A.  I start at 5 o'clock in the morning, and I quit

29

Exam./Maguschak - Weaber

1     at four in the evening.

2  Q.  Do you have benefits there?

3  A.  I do now.  I just got my benefits.  Well, I

4     should have had them before, but I just got my

5     package and received my benefits, yes.  It's

6     just medical and prescription.  They don't have

7     any dental or eye care.

8  Q.  How does the medical and prescription plan at

9     Warrell compare to the plan that you had at

10    Hershey?

11 A.  It don't compare at all.  It's not none of the

12    best, but it's some insurance anyhow.

13 Q.  And did you have eye coverage at Hershey?

14 A.  Yes, we did.

15 Q.  Did you have dental at Hershey?

16 A.  Yes, we did.

17 Q.  At Warrell do you have any -- is there a

18    pension plan?

19 A.  There is after you're there six month as far as

20    what I've heard from other people talking.  I

21    have not been offered that yet.

22 Q.  Do you have any brochures or information about

23    the insurance plans there that you're covered

24    by?

25 A.  Yes, I do.

30

Exam./Maguschak - Weaber

1  Q.  If you could provide those to your attorney so

2      we can look at those.

3  A.  Okay.

4  Q.  If you get any information about the pension --

5  A.  Yeah.  That won't come until I'm there six

6      month.

7          I pay $28 and a couple cents every week

8      for my insurance now, though.  I have to pay

9      for it.

10 Q.  Does that come out of your paycheck?

11 A.  Yes, it does.

12 Q.  I think you said --  Did you have one

13     performance evaluation?

14 A.  Yes, I did.

15 Q.  Was that after 90 days?

16 A.  Yes, it was.

17 Q.  It was a good evaluation?

18 A.  Yes, it was.

19 Q.  Was it in writing?

20 A.  Yes, it is.

21 Q.  Do you have a copy of it?

22 A.  I don't have a copy of it.  I can get a copy of

23     it if you want.

24 Q.  Yes, that would be great.

25 A.  I'll try to get a copy.  Let me put it that

Exam./Maguschak - Weaber

1      way.

2   Q.   Are there yearly salary increases, or what do

3        you expect as far as salary increases are

4        concerned?

5   A.   I'm told every 90 days you get an evaluation

6        there.  Once a year the company has a meeting,

7        and they'll let you know what raise -- how much

8        a percentage you get.  That's how I got my

9        first three percent this year.  Every year they

10       say they do that.  That's all I know.

11  Q.   Do you know whether you have any prospects for

12       promotion or moving into management or anything

13       like that?

14  A.   I haven't heard anything yet, no.

15  Q.   Do you like the job?

16  A.   I love my job.

17  Q.   Better than you liked Verdelli?

18  A.   Verdelli is a wonderful company, but the

19       management on second shift takes it all away.

20       If it wouldn't have been for the management, I

21       would still be at Verdelli.

22  Q.   You voluntarily left Verdelli; is that correct?

23  A.   Yes, I did.

24  Q.   Was there any period of time since your

25       termination from Hershey Foods that you were

Exam./Maguschak - Weaber

1         unable to work for any reason?

2  A.   No.

3  Q.   I think --

4  A.   When I worked at Verdelli's, yes, I was in the

5         hospital when I worked at Verdelli's.  On

6         December the 3rd, we went to the Country Buffet

7         in Harrisburg to eat, and it was on a Saturday

8         night, and I got food poisoning, and I winded

9         up in the hospital.  So I did lose some time

10        from Verdelli's from being in the hospital due

11        to food poisoning.

12  Q.   Do you know how many days you were out?

13  A.   No, I don't.

14  Q.   Was it more than a month?

15  A.   I don't think it was, no.

16  Q.   Other than that period of time then, there was

17        no other period of time since May of 1999 that

18        you were unable to work?

19  A.   Right.  I even worked at Verdelli's with broken

20        ribs.

21  Q.   How did you get broken ribs?

22  A.   Well, at Verdelli's you have to go maybe from

23        here --  I don't know how far you would say

24        from here.  But being across the building,

25        you'd have to get a roll of film, and a roll of

Exam./Maguschak - Weaber

1    film would weigh anywhere from maybe 65 to 71

2    pounds or whatever.

3        What you do, you have to put them up on

4    your shoulder and carry them clean across the

5    thing down to your bagger to put them on your

6    bagger if they changed over that you weren't

7    expecting it.

8        Normally we would go get them on a cart,

9    but sometimes we'd run out.  We'd have to go

10   back and grab one roll.  So we'd have to throw

11   it on our shoulder because you couldn't carry

12   it like this, or you had to go upstairs and

13   bring a roll like that down the steps and take

14   it out across the floor to your bagger.

15       I put a roll up, and I felt it in my ribs,

16   and I broke my ribs on my right side.

17   Q.  Did you file any kind of worker's comp claim as

18       a result of that?

19   A.  No.

20   Q.  Did you seek medical attention as a result of

21       that?

22   A.  Yes.

23   Q.  And when was that?

24   A.  My family doctor.

25   Q.  When was that, approximately?

34

Exam./Maguschak - Weaber

1   A.   It was during the summer, last summer.

2   Q.   Of 2001?

3   A.   Yeah.  It was during the summer.  I don't know

4       exactly what dates it was.

5   Q.   And you weren't out of work for any period of

6       time as a result of that?

7   A.   No.

8   Q.   I'm sorry.  I didn't hear your answer.

9   A.   No.  I might have lost a couple days through

10      it.  That was it, if I remember right.

11  Q.   Have you missed any days at --  I'm sorry.

12      What's the name of the place you work now?

13      Warrell?

14  A.   Warrell Corporation.

15  Q.   Have you missed any days at Warrell

16      Corporation?

17  A.   No, I haven't.  No, I haven't.

18  Q.   Other than the three jobs that we just talked

19      about, have you had any other sources of income

20      from May of 1999 to the present?

21  A.   No.

22  Q.   Did you have any self-employment of any type?

23  A.   No.  Last week I signed up to sell Mary Kay to

24      try to make up some more money.

25  Q.   Last week, you said?

Exam./Maguschak - Weaber

1    A.    Yes.

2    Q.    Since May of 1999, did you apply for

3          unemployment compensation benefits?

4    A.    Since '99?

5    Q.    Yes, since your termination at Hershey.

6    A.    Yes.  Hershey paid me unemployment.  Then when

7          I went to Austin Staffing down at Bayer Aspirin

8          when I got laid off, I got unemployment again,

9          and that was through Hershey.

10   Q.    Do you know what periods of time you got the

11         unemployment for?

12   A.    Well, I got the unemployment from the time I

13         got laid off -- lost my job at Hershey.  I

14         guess they give you 26 weeks of it.  So I went

15         to Austin Staffing.  I have the copies there.

16         Both times they pulled my wages from Hershey

17         for the unemployment.

18   Q.    Do you mean right after May of '99 and then

19         after the temporary job?

20   A.    Yes.

21   Q.    Have you received any social security

22         disability type benefits --

23   A.    No.

24   Q.    -- since May of 1999?

25               How about any worker's compensation

36

Exam./Maguschak - Weaber

1  benefits --

2  A.  No.

3  Q.  -- since May of 1999?

4  A.  No.

5  Q.  I'm just going to remind you to try to wait

6  until the end of my question.

7  A.  I'm sorry.

8  Q.  That's okay.

9  Have you received any benefits under any

10  insurance policy since May of 1999?

11  A.  No.

12  Q.  Do you have any rental properties?

13  A.  Yes, I do.

14  Q.  Where is the rental property located?

15  A.  I have one at 221 North Railroad Street in

16  Palmyra.

17  I have one at 1710 South Forge Road, which

18  my mother lives there, which she pays nothing.

19  I have a rental property at 1728 South

20  Forge and 715 Airport Road.

21  I have a balloon mortgage which is up in

22  May that I have properties at 116 East Main

23  Street in Palmyra with James Owens.

24  Q.  Just looking at these, when did you purchase

25  the 1728 South Forge property?

37

Exam./Maguschak - Weaber

1   A.   1728, 1710, 1716 is all on one deed on three

2        different parcels.  They were my father's, and

3        he passed away in '88.  I'd say I purchased

4        them around '82, 1982, '83, somewhere in there.

5   Q.   What about 221 North Railroad Street?

6   A.   221 North Railroad Street I purchased May the

7        7th, 1999.

8   Q.   What about 116 East Main Street?

9   A.   May the 7th, 1999.

10  Q.   What about 715 Airport Road?

11  A.   I purchased that in '99.  Or did I purchase

12       that in '98?  I purchased that in 1998.  I

13       would say it was sometime in August of 1998.

14  Q.   Who takes care of the repairs and the upkeep of

15       the rental properties?

16  A.   I do myself.

17  Q.   Pardon?

18  A.   I do it myself.

19  Q.   You do the actual work or you arrange for it?

20  A.   No.  Actual work.  My husband and I do it.  We

21       can't afford to pay nobody to do it.

22  Q.   Who collects the rents, or how do you collect

23       the rents?

24  A.   Most of them come through the mail.  1728 South

25       Forge Road, James Hoffa lives there.  He brings

38

Exam./Maguschak - Weaber

1      it over to the house, his check.

2  Q.  How much time, say, per month do you devote to

3      the rental properties?

4  A.  Well, if something happens, you go in and take

5      care of it.  Usually when somebody moves out or

6      whatever I have to go in and paint them and

7      stuff like that.  It's just general repairs.  I

8      mean I couldn't really put a time schedule on

9      it.

10  Q.  When you left Hershey, you received a severance

11      payment; is that right?

12  A.  They offered it to me.

13  Q.  And did you get a severance pay?

14  A.  No, I did not.

15  Q.  And you had a balance in your pension account

16      when you left Hershey; is that right?

17  A.  Yes, I did.

18  Q.  Have you accepted any payment of that benefit?

19  A.  Yeah.  They automatically sent that to me, and

20      I had to roll it over to an IRA with Schwab.

21  Q.  Charles Schwab?

22  A.  Yes, Charles Schwab here in Harrisburg.  I have

23      used almost all of that up so far.  I think I

24      have about $1,000 left in it.

25  Q.  Did you exercise your COBRA rights?

39

Exam./Maguschak - Weaber

1   A.   No, I didn't.  I couldn't afford them.

2   Q.   Is your husband employed?

3   A.   Yes, he is.

4   Q.   Where is he employed?

5   A.   Right now he's employed at Pennsy Supply in

6        Annville, the quarry.  He drives a truck there.

7   Q.   How long has he been there?

8   A.   This is his third week.

9   Q.   Where was he employed before that?

10  A.   He was employed at Sauder Brothers concrete.

11  Q.   How long did he work there?

12  A.   He had worked there approximately, I would say,

13       13 years.

14  Q.   Was he employed at Sauder Brothers in May of

15       1999?

16  A.   Yes, he was.

17  Q.   Did he receive benefits at Sauder Brothers?

18  A.   He had to pay.  Once I lost my benefits, he had

19       to pay $110 a week for us to cover us.

20  Q.   So when you were with Hershey, was he covered

21       under your benefits?

22  A.   Yes, he was.

23  Q.   And then when --  Let me just make sure I

24       understand your testimony.  When you were

25       terminated from Hershey, you went under his --

40

Exam./Maguschak - Weaber

1          he took out benefits from Sauder Brothers then?

2    A.    Yes.

3    Q.    And he had to pay --

4    A.    He had to pay.  It was between 100 and 110

5          dollars a week for us.

6    Q.    When you were with Hershey, did you have to pay

7          for benefits at all?

8    A.    No, we did not.

9    Q.    As a result of this lawsuit, what do you want

10         out of this lawsuit?

11   A.    I want what's coming to me because I was

12         treated unfairly.

13   Q.    When you say what's coming to you, do you mean

14         money?

15   A.    Yes.

16   Q.    Do you want to return to work at Hershey?

17   A.    No, or you wouldn't be treated fairly.

18   Q.    Do you mean you don't think you'd be treated

19         fairly if you returned to work?

20   A.    Right.  Otherwise, I would love to work at

21         Hershey, yes.

22   Q.    Have you calculated what you believe you lost

23         monetarily?

24   A.    Well, just in my pension, just in my pension,

25         if I would have worked until I was 62 --  This

Exam./Maguschak - Weaber

1    is approximately.  I had gave it to Andy.  We

2    got a copy in the mail.  I think it would have

3    been three hundred sixtysome thousand just in

4    the pension alone, which I received a hundred

5    and eight.

6         As you can see on the papers I showed you

7    there, I was salaried at fifty-four,

8    fifty-three; and you can see that I worked a

9    lot of overtime.  I would make anywhere about

10   $64,000 a year, sixty-four, sixty-five.

11  Q.   If you were still at Hershey?

12  A.   Yes.  I was one of the highest paid

13   supervisors.  I was a 208.

14  Q.   I'm sorry.  You were a --

15  A.   Rated as a 208.  They had rates at Hershey of

16   205, 204, 206, 207.  208 was the highest paid

17   supervisor.

18  Q.   Why don't you feel you would be treated fairly,

19   or why do you feel you would be treated

20   unfairly if you returned to work for Hershey?

21  A.   That's a hard question to answer.  I've seen

22   them take supervisors out of supervision and

23   let them go back to normal labor, and I could

24   see how they were treated.  I guess that is the

25   reason I feel that I'd be treated differently.

42

Exam./Maguschak - Weaber

1          They're doing away with so many jobs right

2     now.  They're eliminating all these jobs and

3     stuff.

4  Q.  How have you come to learn that they're

5     eliminating jobs?

6  A.  My daughter is one of them.

7  Q.  She worked there?

8  A.  Yes, she does.  Two of my daughters worked

9     there.

10 Q.  I'm sorry.  Which two of your daughters worked

11    there?

12 A.  Crystal Christ works there, and Judy Fogleman

13    works there.  Judy Fogleman was a supervisor.

14    She went down into the training department.

15    May the 1st is her last day there.  She would

16    have had 20 years in this August.

17 Q.  It's your understanding that the job is being

18    eliminated?

19 A.  They're just eliminating jobs.  They're

20    downsizing.  I mean she's not the only one.  I

21    mean they're really --  They've been downsizing

22    for quite a while.  Ever since I was terminated

23    it's been stepping down, but now --  I don't

24    know how many.  There was quite a few of them

25    was told when she was told they have three

43

Exam./Maguschak - Weaber

1    months.  Either you take what they offer you in

2    severance pay or you can stay and take your

3    chances and try to find a job, but then if you

4    didn't find a job in three months, you would

5    get less severance pay and you'd be out the

6    door.

7  Q.    And you said that's your one daughter.  Is your

8         other daughter being --

9  A.    My other daughter is just a laborer.  She works

10        in wrapping room.  She's still working, yes.

11  Q.   Have you had any out-of-pocket medical expenses

12        that weren't covered by any insurance plan --

13  A.   Yes.

14  Q.   -- since May of 1999?

15  A.   Yes, I have.

16  Q.   Tell me about those.

17  A.   I have sugar diabetes, and I've had quite a few

18        different bills on different tests that they

19        had to run and stuff.

20  Q.   Have you calculated what those out-of-pocket

21        medical expenses are?

22  A.   No, I haven't calculated it.

23  Q.   Do you have receipts or documentation about

24        those?

25  A.   I have papers at home, yes.  Matter of fact,

44

Exam./Maguschak - Weaber

1    most of them aren't paid.  They're turned into

2    the credit.

3  Q.    I'm sorry.

4  A.    They're turned into the credit collection

5        thing.  Hershey did not pay one either that

6        they should have paid.

7  Q.    I'm sorry.  I don't understand what you mean by

8        they turned it into the credit collection

9        thing.

10 A.    Once you can't pay it, they turn it over to a

11       collection agency.  So some of them aren't even

12       paid.

13 Q.    When do you intend to retire?

14 A.    I hope to work until I'm at least 65.

15 Q.    In your complaint you claim that you've

16       suffered emotional anguish and aggravation.

17 A.    Yes.

18 Q.    Can you explain what you mean by that?

19 A.    We had a manager.  First he was a

20       superintendent, Darryl Bentz.  Then he became

21       my manager.  He just rode me and rode me and

22       rode me.  He was my ex-husband's best friend,

23       George Stover's.  I went from, I guess, a size

24       12 down to an eight and a six I lost so much

25       weight.

45

Exam./Maguschak - Weaber

1  Q.  And what period of time was this during?

2  A.  I don't know if he took over in --  I think he

3      took over as a manager in '97, if I'm right.  I

4      can't really give you the exact dates when he

5      took over.  But I worked second shift, and he

6      was the second shift superintendent too.

7  Q.  How long was he second shift superintendent,

8      approximately?

9  A.  I can't really give you approximately the date

10     because before that I was on third shift before

11     I had to go to second shift.

12 Q.  I guess my question is:  How long were you

13     under his supervision?

14 A.  I would say approximately two years.  Maybe a

15     little longer.

16 Q.  Then who became the supervisor, your

17     supervisor, after that?

18 A.  Tom soles.

19 Q.  And since Tom Soles became your supervisor

20     then, were you ever after that supervised by

21     Darryl Bentz?

22 A.  Yes.  He went back to superintendent.

23 Q.  For what period of time?

24 A.  Maybe six to eight month.  I wouldn't say it

25     was too long because they took him off of

46

Exam./Maguschak - Weaber

1    superintendent then.

2  Q.  Okay.  Let me see if I can get this.  You were

3      supervised by Darryl Bentz and then by Tom

4      Soles and then by Darryl Bentz again?

5  A.  He was just the superintendent of the shift.  A

6      superintendent is the shift superintendent that

7      takes care of the whole factory on second

8      shift.  If you have a problem or whatever, the

9      superintendent is there to help you out,

10     because your main manager --  Like when Tom

11     Soles was my main manager, he's there on day

12     shift.

13         But Darryl Bentz was a superintendent.  He

14     became the manager.  He went back to

15     superintendent, and then from superintendent he

16     had to go down front and write a supervisor's

17     manual until he was to the age to retire.  Then

18     he had to leave.

19 Q.  At the time of your termination in May of 1999,

20     was Darryl Bentz your supervisor?

21 A.  No, he was not.

22 Q.  Was he your superintendent?

23 A.  No, he was not.

24 Q.  Was he your manager at that time?

25 A.  No, he was not.

47

Exam./Maguschak - Weaber

1    Q.    I think you had --  When we started this

2          discussion, I asked you how you had suffered

3          emotional anguish and aggravation, and you

4          started to tell me about Darryl Bentz.  What

5          did he do that caused you emotional anguish and

6          aggravation?

7    A.    He didn't like me from the beginning because

8          years back he --  I was coming down the steps,

9          and he was coming up the steps.

10   Q.    This is at work?

11   A.    At work.  And he put his hands on me and said

12         some stuff, and I had a few choice words for

13         him.  Then --

14   Q.    When did this happen?

15   A.    That was years ago before he --  This was when

16         he was superintendent yet.

17               Then he just --  You know, I tried to get

18         along with the man.  I had some cases that

19         involved black.  The one woman, Lorraine Simms,

20         I brought him in on that case when he was the

21         superintendent because she thought we were

22         picking on her because she went back into the

23         slavery day.  I tried to bring him into

24         anything I could bring him into to try to make

25         a relationship with this man.

48

Exam./Maguschak - Weaber

1   Q.   Let me just make sure I understand.  When you

2        said you had some cases, meaning some issues

3        involving employees, is that what you mean?

4   A.   Yes, involving employees.  So I would bring him

5        in because he was a superintendent.  If

6        something happened on the floor or whatever, I

7        would inform him.  I would e-mail him.  I would

8        share it with him.  I tried to communicate in

9        every way I could.

10       Alexia Kniska was my manager, and she was

11       the manager before they made Darryl Bentz our

12       manager.  She called me in the office, and she

13       told me.  She said, Linda, you're going to have

14       a rough time with him.

15  Q.   Does this conversation take place before he

16       became the manager?

17  A.   Yes.

18  Q.   So he did not like Alexia either.  So Alexia

19       cleaned her book out the whole week, her

20       schedule for the whole week, so he could come

21       in and spend a week with her before she left

22       because she was going to Y&S down in Lancaster

23       so he would know what's going on in the

24       departments.

25       He called in and said he had to babysit,

49

Exam./Maguschak - Weaber

1     he couldn't spend no time with her.

2          So he came in --

3  Q.   He had to babysit?

4  A.   Yeah.  So he didn't come in to spend no time

5     with her to find out what was going on in the

6     departments, because he was responsible for

7     Kiss department and molding department.  So

8     when he came in, Alexia was gone and he sat

9     down in the chair.

10         Tried to share everything you could share

11    with him.  Tried to help him in every way.  I

12    collected for him at Christmastime myself, you

13    know, because none of the other supervisors

14    would do it.

15 Q.   When you say collected, do you mean for a gift?

16 A.   For a gift for him for Christmas.

17 Q.   You said that Alexia said you were going to

18    have problems with him.  Did she explain that,

19    why she thought that?

20 A.   Well, she said he told her about me.  She never

21    went into details, what it was about, but she

22    just told me that I'm going to have a rough

23    time with him.

24 Q.   She said you specifically, as opposed to other

25    employees?

Exam./Maguschak - Weaber

1  A.    Yes.  She was just talking to me personally.

2         So then what happened was I had a working

3         foreman, Karen Keeton.  Karen Keeton's husband

4         worked in the molding room, which his name was

5         Roy Keeton.  Karen Keeton was a good working

6         foreman.  But if something happened, she'd go

7         tell me; and if I called people in to go over

8         it with them to try to correct it, well, Karen

9         would not back herself up.  She wouldn't say --

10        She would start crying.

11        So her husband had --  I would go

12        downstairs at the end of the shift, and I would

13        get my time cards from molding room and go back

14        up the back steps.  He would come down from the

15        fifth floor, and through passing he would,

16        like, shove me with his shoulders and stuff.

17  Q.    Her husband?

18  A.    Yeah.  There was no I'm sorry.  I mean it was

19        done on purpose.  It wasn't done like I would

20        run into you on the steps or whatever and say,

21        Oh, I'm sorry. I didn't mean to do that or

22        something like that.

23        This continued.  So I took it to Darryl

24        Bentz, and Darryl Bentz was my manager.  Darryl

25        Bentz took it to Larry Weinsheimer, which he

Exam./Maguschak - Weaber

1      was the production manager over the managers

2      yet.  I got called a liar because it was

3      Karen's husband.

4   Q.   Who called you a liar?

5   A.   Larry and Darryl.

6   Q.   Did they specifically say you're a liar, or did

7      they say it in some other way?

8   A.   No, that I'm a liar.  Karen was always in

9      Darryl Bentz's office behind closed doors,

10     whatever.  I have no idea.  He did make her a

11     supervisor before he left there.  He made her a

12     supervisor.

13   Q.   Darryl made her a supervisor?

14   A.   Yes, Darryl made her a supervisor.  She's still

15     a supervisor at Hershey Foods.

16        It came to the point one of the molding

17     room guys, Richard Chase, stopped me down at

18     the chip line on second floor and told me.  He

19     said, Linda, be careful.  Roy is going to hurt

20     you.

21   Q.   Roy is --

22   A.   Roy Keeton.

23   Q.   The husband?

24   A.   Karen Keeton's husband.  He's going to hurt

25     you.  We talked, you know.

52

Exam./Maguschak - Weaber

1  Q.    When, approximately, was this?

2  A.    I can't really give you a date and time on it.

3  Q.    Was it before Tom Soles became the manager?

4  A.    Yes, uh-huh.  So I took this to --  I took this

5        to Darryl Bentz, who took it to Larry.

6              Larry said, Will Richard Chase talk to me?

7              I said, I don't know.

8              So I went down, and I asked Richard Chase.

9              And he said, The only way I'll talk to

10       Larry is if Darryl Bentz isn't there.  He said

11       because he's not to be trusted.  He said, I

12       will not have nothing to do with Darryl Bentz.

13             So Larry said, That's fine.

14             Well, when Chase walked into Darryl

15       Bentz's office, here Darryl Bentz was sitting

16       behind Larry.  He was there anyhow.

17 Q.    Do you mean when he walked into Larry --

18 A.    Larry Weinsheimer's office.  Larry

19       Weinsheimer's office.  Here he had Darryl Bentz

20       sitting there anyhow.  Chase was very, very

21       upset about it.

22             Well, next thing I knew Tom Soles became

23       our manager.  Tom Soles told me personally that

24       he's the one that said to Darryl Bentz, Why are

25       you going back to superintendent?  And Darryl

53

Exam./Maguschak - Weaber

1      Bentz got real mad.  He didn't know he was

2      losing his manager job.  Larry Weinsheimer

3      never told him.

4  Q.   And Tom Soles told you this?

5  A.   Yes, Tom Soles told me this.  Tom Soles told me

6      all Darryl Bentz did was throw the pager at

7      him.

8  Q.   Throw the pager at who?

9  A.   At Tom Soles.  Threw it on the desk, that he

10     didn't tell him anything, you know.

11         But the day that Tom Soles took off --

12     took over, I meant to say, the week before that

13     I called in and asked for a vacation day at

14     12:30.  My mother had three nervous breakdowns,

15     and she was really bad.  So I had a vacation

16     day.  Everybody would call in and take vacation

17     days like that.

18         The day that Tom Soles took over Darryl

19     Bentz brought a memo in on me for calling in

20     and asking to take a vacation day and that I

21     should have requested it ahead of time.  He

22     said that I should have done this and that.

23         So Tom Soles told me that Darryl Bentz

24     told me not to worry about it.  He had it in my

25     file, got a copy of it.

54

Exam./Maguschak - Weaber

1      Then Tom Soles and I had a talk, and then

2  Tom Soles told me to go down to Cindy Lighty

3  and tell Cindy Lighty what's been going on.  He

4  made an appointment.  I had to go down and see

5  Cindy Lighty.  She was like the lawyer or

6  whatever for us.

7      So from there --

8  Q.  Let me just stop you and just show you a

9  document.

10     MR. OSTROWSKI:  Can we take two minutes?

11  Do you mind, Liz?

12     MS. MAGUSCHAK:  Sure.

13     (Recess taken.)

14     (March 3, 1998 Interoffice Correspondence

15  to L. Weaber from D. Bentz, one page, was

16  produced and marked Weaber Exhibit 1.)

17 BY MS. MAGUSCHAK:

18 Q.  I've put in front of you a copy of a document

19  that we've marked Weaber Exhibit 1.  It's a

20  memo.  It says it's a memo from Linda Weaber to

21  Darryl Bentz dated March 3, 1998.  Is this the

22  memo you were talking about?

23 A.  Yes, it is.

24 Q.  Did I understand your testimony correctly that

25  it was at this time, right around this time

55

Exam./Maguschak - Weaber

1     that Tom Soles took over as manager?

2  A.   Yes.  Yes, it was.

3  Q.   And the date on this document is March 3, 1998?

4  A.   Yes.

5  Q.   From around March of 1998 through May of 1999,

6     was Tom Soles your direct or immediate

7     supervisor?

8  A.   Yes, he was.

9  Q.   I kind of interrupted your testimony.  You were

10    talking about you had a meeting with Cindy

11    Lighty; is that right?

12 A.   Yes.

13 Q.   Was that shortly after March of --  Was that in

14    March of 1998?  Do you know?

15 A.   I don't know.  It was shortly after that.

16 Q.   Was the meeting only with Cindy Lighty?  Was

17    she the only one in the room?

18 A.   Yes, she was.

19 Q.   What did you discuss with Cindy Lighty?

20 A.   Just about the things that was going on with

21    Darryl Bentz not believing me, about them

22    calling me a liar, about Richard Chase,

23    discussed --  I found out in between where

24    Darryl Bentz was going to my working foremen,

25    which they did not tell me until months later,

Exam./Maguschak - Weaber

1    that he -- One night he wanted to know where I

2    was at. And Greg said, Well, she worked third

3    shift last night.

4  Q.  Who is Greg?

5  A.  Greg Marks was one of my relief supervisors.

6    They got in a real heavy argument over me.

7    Greg never even told me about it until later.

8         So Cindy Lighty did some investigating.

9    Through the investigation, she pulled down both

10   of my relief supervisors, which was Greg Marks

11   and Ken Smith. The next thing we knew Darryl

12   Bentz was down front making a manual. So I

13   don't know if that had anything to do with it

14   or why he was taken off of superintendent then

15   or what. I don't know.

16        But I went over with Cindy Lighty about

17   what happened was they did -- What would you

18   call it? They talked with everybody about

19   things that was going on in the department. It

20   was a survey. In this survey they had a group

21   of employees that worked in that area that

22   talked with all the employees. They wrote

23   everything down. Then they itemized the most

24   important things, and I was in charge of that

25   group to solve these problems, the most

57

Exam./Maguschak - Weaber

1      important things.

2          Well, on the most important things, two of

3      the problems was the two superintendents, which

4      was Darryl Bentz for second shift and Sam

5      Selvey for third shift, which was sexual

6      harassment.

7   Q.  You lost me on that.  Two of the problems were

8      the superintendents?

9   A.  Uh-huh.

10  Q.  Darryl Bentz and Sam Selvey?

11  A.  Sam Selvey was the third shift superintendent

12     at that time, and Darryl Bentz was the second

13     shift superintendent.  All of these problems

14     that we had, my group that I had, we were

15     supposed to solve these problems and correct

16     them so we didn't have these problems.

17         So at the time that I had to do this,

18     Alexia Kniska was my manager.  When I took it

19     to Alexia, Alexia told me I had to go and talk

20     to Sam Selvey and I had to talk to Darryl Bentz

21     about this.  And there was one other supervisor

22     that was involved in sexual stuff too, which

23     was Edward Getz, and I had to talk to Ed Getz

24     about it.

25  Q.  Those three guys were accused of sexual

58

Exam./Maguschak - Weaber

1    harassment?

2  A.   Right.

3  Q.   By more than one employee?

4  A.   Yes, ma'am.  So I went to Sam Selvey, talked to

5       Sam Selvey about it, told him what they were

6       saying.  He took it very seriously.

7  Q.   Before you continue, let me just make sure I

8       understand.  These complaints were not made,

9       like, to human resources or something.  They

10      came out as part of this survey of problems in

11      the department.  Is that right?

12 A.   Yes, ma'am.  Yes.

13          So Sam Selvey took it very seriously.

14      When I went to Darryl Bentz and tried to talk

15      to Darryl Bentz, he laughed in my face and told

16      me --  They had a girl's name there.  He told

17      me, he said, If you want to accuse me of doing

18      anything, he said, why don't you accuse me of

19      your daughter Judy Stover, which Judy was

20      single at that time yet.  He just laughed about

21      it.  He didn't take it serious at all.

22 Q.   But she worked at the plant at the time?

23 A.   Yes.  And I talked to the other supervisor, Ed

24      Getz.  What that was about, he was pulling his

25      fly up and down in front of the employees.

59

Exam./Maguschak - Weaber

1  Q.   Did he take it seriously?  I mean did he accept
2       your comments or whatever?
3  A.   He was very angry.  He went after Alexia.
4          That made it some more bad feelings
5       between Darryl Bentz and I.  He didn't like
6       that either.  I kind of thought maybe --  My
7       personal thoughts was that's why Alexia said to
8       me that I'm going to have a hard time when
9       Darryl Bentz went over as my manager.
10 Q.   When you met with Cindy Lighty about the issues
11      --  Was your testimony that you went to Cindy
12      at the suggestion of Tom Soles?
13 A.   Yes.  Cindy Lighty was very upset about this.
14      She said to me, she said, Linda, do you have
15      any of this in writing yet?
16         I said, Yes, up in my files.  I said, I
17      have all of my papers.
18         So she said, Could you bring me the file?
19         I brought her the file down, and she made
20      copies of it.  She returned my file.  My file
21      was still in the drawer when I left there.
22         Shortly after that then that's when Darryl
23      was taken down front to write a manual until he
24      came to the age for retirement.
25 Q.   Did anyone ever tell you whether the fact that

60

Exam./Maguschak - Weaber

1       he was writing a manual was any relation to

2       your conversations with Cindy?

3  A.   No.  No, ma'am.

4  Q.   Did you ever have a follow-up meeting with

5       Cindy where she asked you any additional

6       questions or told you what she had done in

7       response to your conversation?

8  A.   No, ma'am.

9  Q.   How long after this meeting that you had with

10      Cindy was Mr. Bentz's job changed?

11  A.   I think Cindy --  Cindy did some investigating

12      like I told you.  She brought down Greg Marks

13      and Ken Smith.  It wasn't too long after that

14      because Darryl Bentz was gone before I was

15      terminated in '99.

16  Q.   Had you known Tom Soles or had you met Tom

17      Soles before he became your direct supervisor?

18  A.   No, ma'am.

19  Q.   Had he worked at Hershey before?  Do you know?

20  A.   He worked at west Hershey.

21  Q.   I think in your complaint you allege that you

22      suffered emotional distress or anguish as a

23      result of your termination.  Is that right?

24  A.   Yes.

25  Q.   Can you explain what you mean by that?

Exam./Maguschak - Weaber

1  A.    Okay.  What happened was in May or February --

2         I don't know the exact date anymore.  February,

3         it was the beginning of the month.  I kind of

4         think it was the 8th, but I'm not sure.

5              I had a lot of chest --  I got chest pain

6         so bad and stuff.  My working foremen, they

7         called the heart team.  What that was was a

8         group of people --  We didn't have a nurse or

9         anything on the shifts anymore.  They had

10        teams, heart teams.

11             They came out and took my blood pressure

12        and everything like that.  They were trained

13        for that.  They said I had to go to the medical

14        center.  They took me to the medical center.  I

15        didn't go in the ambulance.  The guards took me

16        over.  I didn't feel it was my heart.

17 Q.    Hershey Medical Center?

18 A.    Yes.  I didn't feel it was my heart, you know.

19        It was just it was so much pressure and pains

20        across my chest and stuff.

21             So they called my husband.  My husband

22        came up to the medical center.  They didn't

23        find nothing wrong with my heart, but they

24        found that my sugar was so high.

25             The next day at home --  I was working

62

Exam./Maguschak - Weaber

1     second shift, of course.  The next day at home

2     Tom Soles called me.  I told him, I'm coming

3     into work.

4          So I went back into work.  I don't

5     remember how many days I worked, and it

6     happened again.  Then the doctor said, You have

7     to go for a stress test.

8          I had to go to Dr. Dhaduk.  He said I had

9     a mild stroke.  I had to go to Dr. Deysher.  I

10    was under the care of Dr. Barton, my family

11    doctor.  So I was off of work for a while.

12         Carol Haskell, which is in charge of the

13    medical department --

14  Q.  At the plant?

15  A.  At the plant.  I did not want no more time off

16    as far as absenteeism, so I wanted FMLA.  So I

17    filed for FMLA.  Carol Haskell was the one that

18    had to approve it.  Well, she wouldn't approve

19    it.

20         So I called down, and I had to go down to

21    her office.  She told me that my medical

22    problems was in my mind and that I am fat and

23    that I need some help.  So she told me to keep

24    my job I had to go and get professional help.

25    I don't know what they call them, but it's just

Exam./Maguschak - Weaber

1          like a psychiatrist.

2     Q.   Counseling?

3     A.   Counseling or whatever, yeah.

4     Q.   When did this occur?

5     A.   This occurred --   It was after March.   So I --

6     Q.   After March?

7     A.   March of '99 when I had come back to work when

8          I was trying to get FMLA.   She told me the only

9          way I'm going to keep my supervisor's job was

10         if I go for counseling because everything was

11         in my head and I wasn't sick.   I was under four

12         doctors' care at that time.

13              I went to Dr. Hower.   I told Dr. Hower I

14         was bitter.   This --

15    Q.   I'm sorry.   Dr. Hower is --

16    A.   He is a counselor from Lebanon.   I was bitter

17         because this was crazy to me.   Why am I going

18         there to talk to him?   And I told him.   I said,

19         She's threatening my job, that I'll be

20         terminated if I don't go to you.

21              So I had to go there once a week, and I

22         was going there once a week like she wanted.   I

23         sat up for --   And she scheduled it over at the

24         health center.   I joined the health center for

25         $10.   I think it's $10 a pay every two weeks

Exam./Maguschak - Weaber

1    they took off me to join the health center that

2    Hershey has there to exercise and stuff.  If

3    that's what she wanted, I was going to do it.

4    I didn't want to lose my job.

5         She scheduled a girl to talk to me to put

6    me on a specific diet and everything, which I

7    never did to talk to her because they

8    terminated me before I got there.

9         Then she finally gave my FMLA to me the

10   beginning of May.  She gave that to me, but I

11   still had to follow through and keep going to

12   counseling, and I had to go over to the health

13   center or the gym or whatever you want to call

14   it over there to exercise and go through this

15   scheduling program that she had set up for me.

16   Q.   Before Carol Haskell told you that you should

17        get counseling, or whatever phrase she used,

18        did any doctor make that suggestion to you?

19   A.   No.

20   Q.   Dr. Hower was the counselor person that you

21        saw?

22   A.   Yes.

23   Q.   Did you choose Dr. Hower, or was that chosen

24        for you by Hershey?  How did you hook up with

25        Dr. Hower?

65

Exam./Maguschak - Weaber

1    A.    They had a hot line number to call.

2    Q.    Hershey had a hot line number?

3    A.    Yes.  You called that number, and they would

4          give you somebody in your area.

5    Q.    Was that the employee assistance program?

6    A.    Yes.  They offered that to all the employees.

7          It's all confidential.

8    Q.    You said you saw Dr. Hower once a week?

9    A.    Yes.

10   Q.    For how long?

11   A.    I was still seeing him.  I had to cancel my

12         appointment when I got fired.

13   Q.    So from sometime in March through sometime in

14         May?

15   A.    Yes.

16   Q.    Did you continue to go once a week?

17   A.    Not after I was terminated, no.

18   Q.    I'm sorry.  During that time frame that you

19         were going, was it once a week?

20   A.    Yes.

21   Q.    And how long did each session last?

22   A.    An hour.

23   Q.    Since your termination, have you seen any other

24         counselors or psychiatrists?

25   A.    No.

66

Exam./Maguschak - Weaber

1  Q.   In your complaint I believe you indicate that

2       you suffered stress-related illnesses and

3       exacerbation of existing medical conditions as

4       a result of your termination.  Is that right?

5  A.   Yes.

6  Q.   Can you explain what you mean by that or how --

7  A.   Well, it was very stressful working for a

8       manager that didn't like you and would ride you

9       all the time.  I mean --

10 Q.   You're referring to Darryl Bentz?

11 A.   Referring to Darryl Bentz, yes.  It was very,

12      very hard.  I have never had any problems with

13      any manager till Darryl Bentz became my

14      manager.

15           When I went in for my review, I had no

16      idea that Darryl Bentz put me in for no raise.

17      And Tom Soles said, Didn't he go over this with

18      you and tell you, Linda?

19           I said, No.

20           Tom Soles had taken over.  By April the

21      15th, we always got a raise at Hershey,

22      whatever our raise was going to be.  When I

23      went in for my review with Tom Soles, he told

24      me.  He said, Well, they have here ....  And he

25      read it to me.  He said, Didn't he go over this

67

Exam./Maguschak - Weaber

1    with you?

2        I said, No, he never went over this with

3    me.

4        Then Tom Soles comes back and tells me

5    that Larry never even knew this.  That's Larry

6    Weinsheimer, which was really Darryl Bentz's

7    manager yet, that he didn't know about it.  In

8    other words, I was on, like, a probationary

9    period for that year.  Didn't know nothing

10    about it.

11  Q.   For the year --  Which year would that have

12       been?

13  A.   That would have been from '98 to '99.

14  Q.   So you didn't know about that until Tom Soles

15       became your manager?

16  A.   That's right.

17  Q.   And Tom Soles told you that Larry Weinsheimer

18       didn't know about it either?

19  A.   That's what he told me, because he went to

20       Larry Weinsheimer and talked to Larry

21       Weinsheimer and called me back in and said

22       Larry Weinsheimer didn't know that either.

23       Larry Weinsheimer signed the paper.  I guess --

24       Well, I can't assume that.

25  Q.   You indicated that you never had any problems

68

Exam./Maguschak - Weaber

1    with a manager or supervisor until Darryl

2    Bentz; is that right?

3  A.    That's right.

4  Q.    Did you have similar problems with Tom Soles?

5  A.    No, ma'am.

6          MS. MAGUSCHAK:   Can I just take a short

7    break?

8          (Recess taken.)

9  BY MS. MAGUSCHAK:

10 Q.    Again, in your complaint you indicated that

11    your termination exacerbated existing medical

12    conditions.   Tell me about that.   What do you

13    mean by that?

14 A.    Ever since I got sugar diabetes I had lost

15    quite a bit of work off and on.   A week here

16    and a week there, whatever.   You know, I was

17    one of the highest paid supervisors.   You know,

18    she --   I was off before, and it was all due to

19    sugar and stuff.

20          She made me come back to work.   Carol

21    Haskell told me I had to come back to work.   If

22    I didn't come back to work, I was going to be

23    terminated.

24 Q.    When did she tell you that?

25 A.    That was in '98 sometime.   I don't know what

69

Exam./Maguschak - Weaber

1    date it was or whatever.

2         I went back to work on a Thursday night.

3    The superintendent --  Let me think about this

4    a little bit.  Darryl Bentz was superintendent

5    back in '98.  It had to be in '98 because when

6    Darryl Bentz was taken off the floor as a

7    superintendent Tom Kettering took his place.

8         When I came back that Thursday night, Tom

9    Kettering came to my office approximately about

10   5:30.  He was talking to me.  And he said,

11   Linda, he said, I don't want to sound cruel or

12   anything, he said, but you look awful.  He

13   said, You do not belong here.  He said, I want

14   you to go home now.  As a matter of fact, I

15   don't even want you to drive.  He said, You

16   need to go home.  He said, Call your husband.

17   Have your husband come.

18        Well, I still stayed until almost 7

19   o'clock that night.  I drove myself home.

20        But it was just --  You know, it was just

21   my nerves had gotten so bad through Darryl

22   Bentz and stuff I was just completely ran down.

23 Q.   Did you have any problems with Mr. Kettering?

24 A.   No, not at all.

25 Q.   You never felt like he treated you unfairly?

70

Exam./Maguschak - Weaber

1   A.   No, not at all.

2   Q.   What about Larry Weinsheimer, did you have any

3        problems with him?

4   A.   Just when he told me I was a liar about Roy

5        Keeton.

6   Q.   That was in the meeting with Darryl Bentz?

7   A.   Right.  Then he called me back in after he had

8        the meeting with Richard Chase and told me that

9        I shouldn't have talked to Richard Chase about

10       anything.

11            I told him I was sorry.  Richard Chase

12       came to me and started talking to me on the

13       floor.  I told him I was sorry about that.

14       That's the only thing that Larry Weinsheimer

15       and I ever talked about.

16  Q.   As a result of your termination from Hershey,

17       did you have any emotional or stress problems

18       as a result of the termination?

19  A.   I'm still depressed about it.

20  Q.   Have you had any physical problems as a result?

21       Sleeplessness or anything like that?

22  A.   Yes.  I don't sleep very good.

23  Q.   Even to this day?

24  A.   To this day, no.  Hershey was my life.

25  Q.   Have you seen a physician or psychiatrist as a

71

Exam./Maguschak - Weaber

1        result of these kind of problems?

2    A.    No.    No.

3    Q.    Have you taken any medication or anything as a

4        result of those problems?

5    A.    Yes, I do.

6    Q.    What kind of medication?

7    A.    Did I give you a copy of that, Andy, with those

8        papers that I gave you today?  I thought I had

9        a copy of my medications.

10            I take a depression pill, and I take five

11        Xanax in a day.

12    Q.    Five Xanax?

13    A.    Uh-huh.

14    Q.    Do you know what the depression pill is?

15    A.    Celetex (phonetic) or something like that.  I

16        made a copy of it today.

17            MR. OSTROWSKI:  I gave you guys copies of

18        whatever she gave me.

19            MR. JACKSON:  We got tax returns, or

20        copies of tax summaries.

21    A.    I had copied it off the --  Maybe it's not.  I

22        did make a copy of it.  I'm supposed to take

23        Prilosec for hiatal hernia.  I haven't had the

24        money for that.

25    BY MS. MAGUSCHAK:

72

Exam./Maguschak - Weaber

1   Q.   Who prescribed the depression medicine?

2   A.   Dr. Barton.

3   Q.   Is that your family physician?

4   A.   Yes, it is, Dr. Robert Barton.

5   Q.   Have you taken the Xanax -- When did you start

6       taking the Xanax?

7   A.   Before this happened to me.

8   Q.   Before?

9   A.   Yeah, before. When Darryl Bentz -- I mean I

10      was just a bundle of nerves.

11   Q.   Did you take that continuously since when you

12      started taking it with Darryl Bentz?

13   A.   Uh-huh.

14   Q.   Even during the time Tom Soles was your

15      manager?

16   A.   I didn't take it as much. I didn't take five

17      pills a day. I usually just took maybe one in

18      the morning and two to sleep at night. If I

19      didn't take the two to sleep at nighttime, I

20      don't sleep.

21   Q.   And have you taken the five pills a day since

22      your termination?

23   A.   Yes.

24   Q.   And when did you first start to take the

25      depression medicine?

73

Exam./Maguschak - Weaber

1   A.   I took that, I guess, right when --  When

2        Darryl Bentz was my manager, I was on that.

3        Through losing my job, my daughter Judy --  It

4        affected our family.  She was told not to have

5        anything to do with me or talk with me or

6        anything.  And she has two children, which

7        really affected our family because she didn't

8        want to lose her job too, which now she's

9        losing it anyhow.

10  Q.   Who told her not to have anything to do with

11       you or not to talk to you?

12  A.   Well, they have production meetings every week,

13       and they announced it at staff.  Plus she was

14       called in when she took me out.  She was called

15       in and told her to stop asking so many

16       questions, to leave it alone and not to call me

17       and talk to me.

18  Q.   Who called her in?  Do you know?

19  A.   Tom Kettering had to call her in through Larry

20       Weinsheimer's --  He told Tom Kettering because

21       she works up in shift also in wrapping.  Tom

22       Kettering was the superintendent, and he had to

23       call her in and tell her to stop asking

24       questions.

25  Q.   What kinds of questions was she asking, or was

74

Exam./Maguschak - Weaber

1      she asking questions?

2 A.   She just wanted to know what was going on with

3      her mother.

4 Q.   Was this after the termination?

5 A.   When they took me out on suspension, yes.

6 Q.   During the suspension time period?

7 A.   Yes.  After the termination, they announced

8      that nobody was supposed to have contact with

9      me and talk with me or anything.

10 Q.   Was she told specifically not --

11 A.   Yes.

12 Q.   Was she specifically told not to have contact

13      with you?

14 A.   Yes, she was.

15 Q.   And how else did the termination affect your

16      family?

17 A.   Right now I'm up to lose everything I have.

18 Q.   What do you mean by that?

19 A.   Well, my properties, all mortgages on them.

20      It's just not enough money to pay everything

21      that we have mortgages on.  I've already went

22      into my retirement, which I paid penalties on.

23      My credit has went from up here down to here.

24      Everything is late, and it's affected our whole

25      family, my husband.  It affects your attitude,

75

Exam./Maguschak - Weaber

1    affects everything about you.  It's been rough.

2    I mean May the 7th I bought them -- got

3    them two properties, and May the 21st I didn't

4    have a job.

5  Q.    In your answers to interrogatories, you listed

6    people who have some knowledge related to this

7    lawsuit.  Let me just ask you some questions

8    about some of these people.

9    I think you told us quite a bit about

10    Darryl Bentz and Tom Soles.  Is there anything

11    else about Larry Weinsheimer, other than what

12    you've already told us, that he would know

13    about issues involving your lawsuit?

14  A.    No.  The only thing, I think that because Larry

15    didn't take Darryl serious, I don't know if

16    Larry got in trouble over that or not.  I don't

17    know.

18  Q.    Richard Chase, as I understand, he was the one

19    who told you that Roy Keeton was going to hurt

20    you.

21  A.    Yes.

22  Q.    That was during the time that Darryl Bentz was

23    your manager; is that right?

24  A.    Yes.

25  Q.    Does Richard Chase still work at Hershey?

76

Exam./Maguschak - Weaber

1   A.   Yes, he does.

2   Q.   Other than that, which we've already discussed,

3        did he have any other information that you

4        think is important to your lawsuit, to your

5        claims?

6   A.   Not that I know of.

7   Q.   You have referred to Ken Smith and Greg Marks.

8        It says they are aware of Bentz's plan to try

9        to get you fired.

10   A.   Yes.

11   Q.   What do you mean by that?

12   A.   He told them straight out he was going to have

13        me fired.

14   Q.   Do you know whether Ken Smith and Greg Marks

15        still work at Hershey?

16   A.   Yes, they do.

17   Q.   You said Tom Kettering knows facts and

18        circumstances regarding your health and events

19        leading to your termination.  Let me ask you.

20        First, what facts and circumstances regarding

21        your health was Tom Kettering aware of?

22   A.   Just what I had just told you about him coming

23        in and telling me to go home.  He said I did

24        not belong there, you know.

25   Q.   When, approximately, was that, did that occur?

77

Exam./Maguschak - Weaber

1  A.  I can't really give you a date on it.

2  Q.  Who was your supervisor at the time?

3  A.  My manager was Tom Soles.

4  Q.  So it was when Tom Soles --

5  A.  Yes.

6  Q.  Other than that, are you aware of what other

7      facts and circumstances Mr. Kettering was aware

8      of regarding your health?

9  A.  No.

10  Q.  You indicated that Tom Kettering was also aware

11      of events leading to your termination.  What do

12      you mean by that?

13  A.  Just that, you know, he knew I was sick, but he

14      was --  You know, he talked with Judy

15      afterwards, and maybe I worded that wrong or

16      whatever.  I mean Tom Kettering never said

17      anything wrong to me.

18  Q.  Then you indicate Carolyn Haskell, and you say

19      you had conversations regarding your health and

20      request for FMLA in 1999.  Is there anything

21      else in addition to what you've already told us

22      about your conversations with Carolyn Haskell?

23  A.  No.

24  Q.  Who is Pat Kilgore?

25  A.  Pat Kilgore is a plant manager.

78

Exam./Maguschak - Weaber

1  Q.  What information does Pat Kilgore have that you

2      think is related to your lawsuit?

3  A.  When I was terminated, I was terminated by

4      Cindy Lighty, the security manager, which was

5      Vrabel --

6  Q.  I'm sorry.  Who?

7  A.  Vrabel his last name was.

8          MR. JACKSON:  Joe?

9  A.  I think.

10         MR. JACKSON:  With a V?

11 A.  I think it is a V, but I can get you the

12     correct spelling of that.  And a guy from

13     benefits, which his last name was Sweinhart.

14 BY MS. MAGUSCHAK:

15 Q.  Gordon Sweinhart?

16 A.  Gordon Sweinhart.  Larry Weinsheimer was not in

17     there.  Tom Soles was not in there, and neither

18     was Pat Kilgore.  No one else was in there to

19     terminate me.

20 Q.  So it was Cindy Lighty, Gordon Sweinhart, and

21     Joe Vrabel?

22 A.  Yes.

23 Q.  You have Gordon Sweinhart and Ray Warble.

24 A.  It's Joe Vrabel.

25 Q.  That's what you meant?

Exam./Maguschak - Weaber

1  A.    Yes.

2  Q.    Other than being present when you were

3        terminated, are you aware of any other

4        information that Gordon Sweinhart or Joe Vrabel

5        have regarding your lawsuit or your

6        termination?

7  A.    No.   The only thing, Sweinhart called me, gave

8        me a paper.   They wanted me to sign a paper for

9        the severance pay for five thousand some

10        dollars.   I don't know the exact amount

11        anymore.   And I didn't sign it.

12            He called me up and told me my 21 days

13        were up, that I need to sign that so they can

14        send me my severance pay.   I told him I am not

15        signing it; he'll hear from my lawyer.

16  Q.    And that was Gordon Sweinhart?

17  A.    Yes.

18            (Confidential Separation Agreement, five

19        pages, was produced and marked Weaber Exhibit

20        2.)

21  BY MS. MAGUSCHAK:

22  Q.    I'm going to show you a document that's titled

23        Confidential Separation Agreement, and we've

24        marked that as Exhibit 2.   I understand that

25        this is a document that we received from your

Exam./Maguschak - Weaber

1      attorney.

2            MR. OSTROWSKI:  I have the original with

3      the signatures on it.

4  BY MS. MAGUSCHAK:

5  Q.   At Page 5 of that document, is that your

6       signature?

7  A.   Yes, it is.

8  Q.   To your knowledge, is that Cindy Lighty's

9       signature on that page as well?  Do you know?

10  A.  Yes, it is, to my knowledge.

11  Q.  You did sign this document?

12  A.  Yes.  She told me I had to sign it, this one

13      here.

14  Q.  Who told you you had to sign it?

15  A.  Cindy Lighty.

16  Q.  So when you were talking about something else

17      that Mr. Sweinhart wanted you to sign, there

18      was some other document other than this one

19      that he wanted you to sign?

20  A.  They wanted me to sign that I would agree to

21      take five thousand some dollars severance pay

22      for my separation from Hershey Foods.

23  Q.  Do you have a copy of that document?

24            MR. OSTROWSKI:  What was it?

25  A.  It's for the severance pay.

Exam./Maguschak - Weaber

1       MR. OSTROWSKI:  That's the only thing you

2  gave me.

3       (Document entitled Severance Benefits, one

4  page, was produced and marked Weaber Exhibit

5  3.)

6       MR. JACKSON:  Can we take a two-minute

7  break?

8       (Recess taken.)

9  BY MS. MAGUSCHAK:

10  Q.   I put in front of you a document that we've

11       marked as Exhibit 3.  It's entitled Severance

12       Benefits.  I believe this was a document that

13       we received from your attorney.  Did you

14       receive this document upon your termination?

15  A.   Yes.  This one here, the document that you just

16       handed me, this is the document they gave me.

17            This is a document they gave me --

18  Q.   Now you're referring to Exhibit 2.

19  A.   Okay.  This here document they gave me when

20       they terminated me.  The document that you

21       handed me before, this document --

22  Q.   And that's Exhibit 2?

23  A.   Yes.

24  Q.   I just want to make it clear for the record.

25  A.   I was going to send it in.  That's why it's

82

Exam./Maguschak - Weaber

1    marked May the 25th, '99.  I didn't send it in.

2    I called the lawyer.  That's why I had handed

3    it to him.  This is what they wanted me to sign

4    and have it in within 21 days.  That's why

5    Gordon Sweinhart called me and told me my 21

6    days is up, that I got to sign this paper and

7    send it in to him so he can mail me my check.

8    And I didn't do it.

9  Q.  So you signed it, but you never sent it back to

10      Hershey?

11 A.  That's right.  Yes.

12 Q.  And you did receive Exhibit 3 as well; is that

13      right?  You received Exhibit 3?

14 A.  Yes, I did.  Yes.

15 Q.  Who do you believe made the decision to

16      terminate your employment with Hershey?

17 A.  I really can't say.  I don't know, but it went

18      from Cindy Lighty's office to whoever.

19 Q.  Do you have a belief as to who was involved in

20      making that decision?

21 A.  I'm sure medical was involved in it.

22 Q.  Medical --

23 A.  Carolyn Haskell.

24 Q.  Anyone else?

25 A.  Well, it had to go through Pat Kilgore.

83

Exam./Maguschak - Weaber

1   Q.   Anyone else that you believe was involved in

2        the decision?

3   A.   I'm sure it had to go through Larry

4        Weinsheimer.

5   Q.   Anyone else that you believe was involved in

6        the decision?

7   A.   I wouldn't know.  I'm not --  You know, I'm not

8        sure what their procedures are, you know.  But

9        they're the main people.

10   Q.   They're the main people?

11   A.   Yeah.

12   Q.   Why do you believe you were terminated?

13   A.   Because of my health, because I lost time that

14        I had lost.  Like I said, once I got sugar

15        diabetes, I had lost quite a bit of work.  It

16        was a real hard time for me, trying to get it

17        under control.  When you're put under stress

18        like that, anybody that has sugar diabetes that

19        makes it all the worse on you.

20   Q.   When you say stress like that, what do you

21        mean?

22   A.   Stress like I went through with Darryl Bentz.

23   Q.   Again, in your answer to Interrogatory 3, you

24        refer to Dr. Giaconne, G-I-A-C-O-N-N-E.  He

25        provided cardiac services in 1999.

84

Exam./Maguschak - Weaber

1   A.   Dr. Di Giacomo.

2   Q.   Do you know how to spell that?

3   A.   Not really.

4   Q.   Where is he located?

5   A.   He's out of the Good Samaritan Hospital.  I did

6        not pass my stress test.  That was after the

7        episode in February of 1999.

8   Q.   You did not pass the stress test?

9   A.   No, I did not.

10  Q.   How often did you see Dr. --

11  A.   Di Giacomo.

12  Q.   Thank you.

13  A.   Approximately --  I think it was three times

14       and twice, I guess it was, at his office.  Then

15       he did the stress test.  Then I was gave to his

16       assistant, Dr. Glick, and they did a heart

17       catheterization on me.  They thought I had a

18       blockage in the heart, but they didn't find

19       anything.

20  Q.   Was this all in early 1999?

21  A.   Yes, it was.

22  Q.   Have you seen Dr. Di Giacomo since then?

23  A.   No, I haven't.

24  Q.   Who is Dr. Deysher?

25  A.   Dr. Deysher is a specialist for your throat and

85

Exam./Maguschak - Weaber

1    your digestion system and stuff.

2  Q.    Where is he located?

3  A.    He's located in Lebanon.

4  Q.    How often did you see Dr. Deysher?  Strike

5    that.

6          For what condition did you see

7    Dr. Deysher?

8  A.    Well, because of all the pressure on my chest

9    and everything.  I've seen him several times.

10    I couldn't give you the number.  I don't have

11    it.

12  Q.    Do you know when the first time you saw him

13    was?

14  A.    Not offhand, no.

15  Q.    Dr. Dhaduk?

16  A.    Dhaduk.

17  Q.    Where is he located?

18  A.    He's located in Lebanon.  He is --  I don't

19    know what his professional name is, but he's

20    the one that said that I had a slight stroke on

21    my right side.

22  Q.    When was that?

23  A.    That was in between this period.  A matter of

24    fact, I had just went to him about two weeks

25    before I had got terminated, and I had an

86

Exam./Maguschak - Weaber

1    appointment after I was terminated for follow

2    up, and I told him.

3        He said, Well, how can they terminate you?

4    He said, You had another slight stroke.

5        I said, Well, I was terminated.

6  Q.  When did you first see Dr. Dhaduk?  Was it in

7      1999, or had you seen him previous?

8  A.  No.  I had seen Dr. Dhaduk before that.  He has

9      said so far that I have had three slight

10     strokes on my right side.

11         The reason I went to Dr. Dhaduk was when I

12     had to go over and exercise for Carolyn Haskell

13     we were doing Tai-Bo.  I realized I didn't have

14     the strength on my left side.  I didn't even

15     realize that I had another slight stroke until

16     I tried to balance myself and I couldn't do it

17     on this side.

18 Q.  Did you tell anyone at Hershey that you had had

19     slight strokes?

20 A.  Yes.  Carolyn Haskell.

21 Q.  When did you first tell her?

22 A.  When Dr. Dhaduk told me.

23 Q.  Would this have been in 1999?

24 A.  Yes, and before that when he had predicted

25     before that I had them.  But I didn't even

87

Exam./Maguschak - Weaber

1      realize it happened to me again until I went

2      over there and exercised.

3  Q.  Did you tell anyone else at Hershey other than

4      Carolyn Haskell?

5  A.  I really don't remember.

6  Q.  Dr. Barton is your family physician?

7  A.  Yes, he is.

8  Q.  How long has he been your family physician?

9  A.  He's been my family --  Oh, gee.  About 30

10     years.

11 Q.  And is he still your family physician?

12 A.  Yes, he is.

13 Q.  Where is he located?

14 A.  He's located in Lebanon.

15         MS. MAGUSCHAK:  Let me just talk to Brian.

16     I think now might be a good time to break for

17     lunch.

18         (Recess taken.)

19         MS. MAGUSCHAK:  Do you want to take a

20     break for lunch now?

21         MR. OSTROWSKI:  Sure.

22         (Luncheon recess taken at 12:25 p.m.)

23         (The deposition reconvened at 1:26 p.m.)

24 BY MS. MAGUSCHAK:

25 Q.  You want to clear something up.  Go ahead.

88

Exam./Maguschak - Weaber

1  A.   Yes.  I said about Mary Kay for -- I just

2       signed up for it.  I'm having my first party

3       this week.  I signed up for that a couple weeks

4       ago, but I just got my kit, and I was thinking

5       this was my first party.  I wanted to clear

6       that up.  I signed up a couple weeks ago.

7            MR. OSTROWSKI:  I told her you already had

8       a FBI investigation underway.

9            THE WITNESS:  I thought, oh, my God, I

10      didn't tell them that.  That's not right.

11           MR. JACKSON:  When do you get your pink

12      car?

13           THE WITNESS:  I'll tell you what.

14           MR. JACKSON:  Off the record.

15           (Discussion off the record.)

16  BY MS. MAGUSCHAK:

17  Q.   Was there anything else you wanted to clear up?

18  A.   No.  I just wanted to clear that up.  I didn't

19      say that right.

20  Q.   Okay.  If anything else comes to mind, just let

21      us know.  That's fine.

22  A.   No.  That's the only thing.  That wasn't right.

23  Q.   Now, in reviewing the complaint that was filed

24      on your behalf, one of the claims that I

25      understand you're making was that you were

89

Exam./Maguschak - Weaber

1    terminated in order to deprive you of the full

2    benefits of your benefit and compensation

3    plans.  Is that right?

4  A.  Will you explain that a little bit to me,

5    please?

6  Q.  Sure.  In Count 1 of your complaint, it's

7    referred to as an ERISA account.  If you just

8    want to read that page, essentially.

9       (Pause.)

10 A.  Yes.

11 Q.  So that Count 1, on what facts do you base that

12    claim?  What facts are you aware of that you

13    believe support the ERISA claim?

14 A.  Well, everything that I went over with you.

15    You know, my health.  You know, my health

16    really tore me down.

17       I really feel that I'm --  I was one of

18    the highest paid supervisors, a 208.  With

19    Carolyn Haskell telling me this stuff and

20    making me go through this stuff, I mean it was

21    very stressful.  I didn't feel I really

22    deserved all that.  I mean no one can control

23    how their health might turn out, you know.  I

24    just really felt I was treated unfairly by her

25    at the beginning.

Exam./Maguschak - Weaber

1   Q.   At the beginning?

2   A.   When she started saying it's all in my head and

3        I'm fat and I got to do this and I got to go to

4        counseling and stuff, go to the gym and setting

5        up a program for me and stuff to keep my job.

6        I mean that's just threatening your job.

7             Besides that, one other time I called in

8        and I wanted a day off, and my brother was at

9        my house.  My brother -- I don't know if he was

10       drunk, to be truthful with you.  I don't know

11       if he was drugged or whatever, but he was

12       carrying on so bad I couldn't leave him at my

13       house.

14            So I called in and called Larry's office.

15       I called Darryl Bentz's office, couldn't get

16       nobody.

17            I called medical.  Carol Haskell called me

18       back.  So she told me I couldn't have no more

19       days off.  I couldn't leave my brother in my

20       house like that, and he was carrying on so bad.

21       She tried to talk to him on the telephone.

22       Here she went and called the police, and the

23       police came to my house to take him away.

24   Q.   How do you know that she called the police?

25   A.   She told me she did.

91

Exam./Maguschak - Weaber

1   Q.   When did that occur?

2   A.   I can't give you an exact date.  This was

3        before this happened to me in February.  I

4        would say that was in '98 sometime.

5   Q.   Was it while Tom Soles was your manager?

6   A.   No.  Darryl Bentz was.

7   Q.   I'm just trying to timewise figure it out.

8   A.   I mean I just don't have the exact dates of it.

9   Q.   That's fine.

10  A.   I mean that just made him all the worse by cops

11       surrounding my house in the middle of the day,

12       you know.  And they didn't take him away anyhow

13       because they were scared of him.

14  Q.   In the complaint, Paragraph 10, do you see

15       that?  You refer to a plan.

16  A.   Number 10?

17  Q.   Yes.

18  A.   Well, they terminated me May the 21st.  I mean

19       they stopped my prescription plan that day at

20       2:30.  That was it.  They dropped everything on

21       me.

22            I have a doctor bill right now at home

23       that Hershey didn't even pay.  I didn't even

24       know about that until a couple weeks ago.  I

25       think it was March something, something in

Exam./Maguschak - Weaber

1    March.   They didn't even pay it.

2  Q.  You say in Paragraph 10 in May 1999 Defendant

3    announced substantial earnings losses and a

4    plan to reduce the administrative costs

5    associated with its compensation and benefits

6    plans.

7        When you say that Hershey announced a plan

8    to reduce the administrative costs, was there

9    anything in writing?  Are you aware of a

10    writing in that regard?

11  A.  No.  Just that they told me everything was

12    dropped on me, all my benefits.

13  Q.  Were you ever told by anyone that you were

14    being terminated because you used too many

15    benefits or in order to avoid additional

16    benefits costs?

17  A.  I wasn't told to this day, ma'am, why I was

18    terminated.

19  Q.  So let me just make sure that we're clear on

20    the record.  Did anyone tell you that you were

21    being terminated or being fired in order to cut

22    down on the benefits?

23  A.  No.

24  Q.  Did anybody tell you you were being terminated

25    in order to avoid your -- or to reduce costs by

93

Exam./Maguschak - Weaber

1        saving on your salary?

2   A.   No.

3   Q.   Did you ever hear any comments by any

4        managerial people for Hershey that they needed

5        to get rid of highly salaried persons?

6   A.   You hear scuttlebutt all the time when you work

7        in a factory.  No, not directly from any kind

8        of higher-up.  After I was terminated, they did

9        send a letter out about reducing --  I don't

10       even know what it read anymore.  Wolfe sent it

11       out, I think.

12            (May 26, 1999 letter to Dear Fellow

13       Employee from K. Wolfe, two pages, was produced

14       and marked Weaber Exhibit 4.)

15  BY MS. MAGUSCHAK:

16  Q.   I'll show you a document that's been marked

17       Weaber Exhibit 4.  It's a two-page letter dated

18       May 26, 1999.  Is this the document you were

19       referring to?

20  A.   Yes, it is.

21  Q.   And how did you obtain this document?

22  A.   It came to me through the mail.

23  Q.   So it came directly to you?

24  A.   Yes.  It came through the mail to me.  It had

25       no mailing return address on it.  It just came

94

Exam./Maguschak - Weaber

1       to me through the mail.  So I'm just --  No one

2       ever said anything to me, who sent it to me or

3       whatever.  But it was handwritten to me.

4  Q.   The envelope was handwritten?

5  A.   The envelope was handwritten, and that's how I

6       got it.

7  Q.   I think the fifth paragraph of this letter

8       indicates that --  Well, it says, "We are doing

9       everything possible to restore our sales to

10      plan levels and reduce operating costs."  Are

11      you alleging as part of this lawsuit that your

12      termination was a result of a desire to reduce

13      operating costs?

14  A.   No.  I think because I was such a high paid

15      supervisor and with my illness and the loss of

16      time.  I think that's more the reason why I was

17      terminated.  I mean I lost time being sick.

18  Q.   Do you know in comparison to other employees at

19      19 East, at the 19 East plant, how your lost

20      time compared to others?

21  A.   The lost time that I lost, I had doctors'

22      referral notes every time I lost time.  I

23      didn't just take off because I needed a day off

24      to take my kids shopping or something like

25      that.  I always had an excuse.  I was sick, and

95

Exam./Maguschak - Weaber

1       I always had proof of that.

2   Q.  My question is, though:  How does the amount of

3       absences or lost time that you had compare to

4       other employees at the 19 East plant?  Do you

5       know?

6   A.  Other supervisors?  I do not know.  We had no

7       knowledge of any absenteeism, something like

8       that.  Just when we'd have our meetings across

9       the street with our plant manager and he would

10      go over the goals and where we're at and stuff.

11      That's the only thing I ever knew about

12      absenteeism of salaried.

13  Q.  Do you know what your administrative cost

14      center was?

15  A.  No, I don't.

16  Q.  You contend you were a highly compensated

17      employee?

18  A.  Yes.

19  Q.  And your supervisor at the time of your --

20      Your direct supervisor was Tom Soles; is that

21      right?

22  A.  Yes, it is.

23  Q.  Do you know whether he was compensated at a

24      higher rate than you?

25  A.  Oh, I have no idea.  I'm sure he was.  He was a

96

Exam./Maguschak - Weaber

1        manager.

2    Q.   Who was his supervisor?

3    A.   Larry Weinsheimer.

4    Q.   Do you know whether Weinsheimer was compensated

5        at a higher rate than you?

6    A.   I wouldn't know that kind of stuff.  I have no

7        idea.

8    Q.   Other than this letter that we marked as

9        Exhibit 4, do you have any other documentation

10       or information about how Hershey intended to

11       reduce operating costs?

12   A.   No more than hearsay, no.

13   Q.   What kind of hearsay did you have about how

14       they intended to reduce operating costs?

15   A.   You know, I have friends and I have other

16       family members that work there besides my

17       daughter.  I mean, you know, people talk.  You

18       just hear it in conversation.

19   Q.   Well, what kind of things were you hearing?

20   A.   Well, just like how they're downsizing now and

21       stuff like that.  That's all.

22   Q.   Well, looking at this May 1999 time frame, did

23       you hear any talk about how Hershey was going

24       to reduce operating costs?

25   A.   No, not till I read this letter.  That was the

97

Exam./Maguschak - Weaber

1    first I heard of it.

2  Q.  What about after you read this letter?  Did you

3      hear any more information or comments by

4      anybody about how they were going to do that?

5  A.  You heard a lot of people commenting about it.

6      You know, what's going to happen?  And stuff

7      like that.

8  Q.  Did you hear any comments about what was going

9      to happen?

10  A.  No.  No.

11  Q.  Do you know any other highly compensated

12      supervisors who were terminated around the same

13      time as you were?

14  A.  There was supervisors terminated after me.

15  Q.  Can you tell me who?

16  A.  Doug Landis.

17  Q.  Pardon me?

18  A.  Doug Landis.  Sid Dickinson, George Brown.

19      That's all I can remember off my head.  Oh,

20      Wade Hartman was another one.

21          MR. OSTROWSKI:  What was that name?

22          THE WITNESS:  Wade Hartman.

23  BY MS. MAGUSCHAK:

24  Q.  What was Mr. Landis the supervisor of?

25  A.  Training department of --  The training

98

Exam./Maguschak - Weaber

1    department.  Like they had coordinators for

2    different areas in the training department.

3  Q.  When was he terminated?

4  A.  It was after I was.  I have no idea.

5  Q.  Do you know how long after?

6  A.  Maybe about two, three month, if that long.  I

7    don't remember.

8  Q.  Was he replaced?

9  A.  I could not tell you.  I don't know.

10  Q.  What about Sid Dickinson, what was he the

11    manager of?

12  A.  Second shift sanitation.

13  Q.  Was he replaced?

14  A.  I couldn't tell you.  I don't know.  I'm not

15    there.  I just don't know.

16  Q.  Do you know when he was terminated?

17  A.  He was terminated in 2000 sometime.

18  Q.  Do you know what -- Do you know why he was

19    terminated?

20  A.  No, I do not.

21  Q.  Do you know what reason he was given?

22  A.  No, I do not.

23  Q.  What about Mr. Landis, do you know why he was

24    terminated?

25  A.  Just rumors you heard.  I don't know if that's

99

Exam./Maguschak - Weaber

1        true rumors or not.  I do not know.

2   Q.   George Brown, what was he the supervisor of?

3   A.   Well, when I was there, he was in wrapping room

4        yet, second shift wrapping.

5   Q.   When was he terminated?

6   A.   It was in 2000 sometime.

7   Q.   Do you know whether he was replaced?

8   A.   I have no idea.

9   Q.   Do you know why he was terminated?

10   A.   No, I don't.

11   Q.   And Wade Hartman, what was he the supervisor

12        of?

13   A.   He was in sanitation third shift.  He was

14        terminated in 2000, but I don't know why.

15   Q.   Do you know whether he was replaced?

16   A.   I have no idea.

17   Q.   Do you know whether you were replaced?

18   A.   Yeah.  I know they took --  Karen Keeton took

19        my job.

20   Q.   Do you know what her salary was?

21   A.   I have no idea.  Nobody knew anybody's salary

22        there.

23   Q.   Prior to your termination, was there any

24        information given to employees similar to the

25        information that's contained in this May 26,

Exam./Maguschak - Weaber

1        1999 letter?

2    A.   Not that I know of.

3    Q.   You also claim that you were terminated because

4         of your age; is that right?

5    A.   I think age has a lot to do with it, yeah.

6    Q.   On what facts do you base that claim?

7    A.   Well, all of the older supervisors, we were

8         called in.  Connie Buck, myself, Carl Wilson,

9         we were called in.  I think it was in 1998.

10        Don't quote me on the time.

11             But somewhere around there we were called

12        in and asked us when we planned to retire.  I

13        mean we didn't give them --  I didn't anyhow

14        because you never know what's going to happen.

15        My dream was to retire when I was 55.

16   Q.   You said that the people who were called in --

17        Was this all at one time?

18   A.   No.  Individual by our managers.

19   Q.   So you were called in by whom?

20   A.   It was Darryl Bentz at that time.

21   Q.   What specifically were you asked?  Was anybody

22        else present in the room?

23   A.   No.

24   Q.   What do you recall?

25   A.   Just at what age are we planning on retiring

Exam./Maguschak - Weaber

1       at?

2   Q.  And you did not give a response?

3   A.  I couldn't give him a response, you know.  I

4       didn't have --  I know what I wanted to retire

5       at, but I mean you don't know what's ahead of

6       you.

7   Q.  Who else did you say was called in?

8   A.  Carl Wilson was called in, and so was Connie

9       Buck.

10  Q.  Who was Carl Wilson called in by?

11  A.  Darryl Bentz.

12  Q.  How do you know he was called in?

13  A.  Carl Wilson asked me if I was called in.

14  Q.  What did Carl tell you about his conversation

15      with Mr. Bentz?

16  A.  Just the same thing.  He said he couldn't give

17      him an answer.  We don't know what's ahead of

18      us in time.  I mean we weren't near the age of

19      55 yet at that time.  And, really, the age

20      limit was 57 to go out.  Was it 59?  I don't

21      rightly remember.

22  Q.  Connie Buck; is that right?

23  A.  Yes.

24  Q.  Is that a male or female?

25  A.  Female.

102

Exam./Maguschak - Weaber

1   Q.   Who was she called in by?

2   A.   Darryl Bentz.

3   Q.   How do you know she was called in?

4   A.   We talked about it.

5   Q.   You and she?

6   A.   Uh-huh.

7   Q.   And what did she tell you about her

8        conversation with Mr. Bentz?

9   A.   Same thing.  You can't answer something like

10       that.

11  Q.   This occurred while Mr. Bentz was your

12       supervisor, your direct supervisor?

13  A.   I'm sure it was Mr. Bentz, yes.  I don't think

14       it was Alexia.  I'm pretty sure it was Darryl

15       Bentz that called us in and asked us that.

16  Q.   Did you discuss that with any other managerial

17       employee at Hershey?

18  A.   No.  We were the oldest ones there left.  The

19       other supervisors under us was a younger

20       generation.

21  Q.   Did you ask Mr. Weinsheimer about it?

22  A.   No.

23  Q.   Did you refer to that in your conversation with

24       Cindy Lighty?

25  A.   No.  Didn't give it no more thought.

103

Exam./Maguschak - Weaber

1  Q.  Are Carl Wilson and Connie Buck still employed

2      at Hershey?

3  A.  Connie Buck is retired, and Carl Wilson is

4      still there.  I think Connie Buck is going out

5      March 1st.  That's when I think she's going

6      out.  But she's taking that retirement, that

7      early retirement.

8  Q.  She's taking an early retirement?

9  A.  Yeah.  She might have already gone.  I don't

10     know.  I haven't seen Connie since I left there

11     or talked to her.  She might already be gone,

12     but I know she was taking that early

13     retirement.

14  Q.  As far as you know, Wilson is still there?

15  A.  Carl Wilson is still there, yeah, as far as I

16     know, because they said he wasn't taking the

17     early retirement.

18  Q.  When Mr. Bentz called you in and asked you

19     this, were you offended by his question?

20  A.  No, not really.  I just figured it's something

21     he was told to do.  It was just no more than

22     any other time calling and ask questions about

23     anything.  No.

24  Q.  Did he tell you who told him to do it?

25  A.  No.

Exam./Maguschak - Weaber

1   Q.   Other than this conversation or question from

2        Mr. Bentz, are you aware of any comments by

3        anyone at Hershey that we have to get rid of

4        old people or we have to get rid of people over

5        such and such an age?

6   A.   No.

7   Q.   Are you aware of any documents, whether you

8        have them or that you've even seen, that talk

9        about trying to get rid of older people or

10       getting rid of people over 40 or anything like

11       that?

12  A.   No.  They offered that --  At the time they

13       were offering that --  They had offered before

14       if you were 55 by the end of December 31st or

15       whatever you could go out on retirement or

16       something, and they just --  We just thought

17       maybe they're going to come up with another

18       offer like that.  I mean it was just like

19       general conversation.

20  Q.   Do you believe there were other employees other

21       than yourself who were terminated or

22       disciplined because of their age?

23  A.   No, not that I know of.  I mean I don't know

24       their ages.  I have no idea why the other ones

25       were terminated, but they were younger than I

105

Exam./Maguschak - Weaber

1    was.

2  Q.  When you say --

3  A.  Like Doug Landis and George Brown and Sid and

4      them, they were all younger than I am.

5  Q.  In Paragraph 20 of your complaint, you say the

6      unlawful actions by Defendant against

7      Plaintiff, to which similarly situated younger

8      employees were not subjected, were taken

9      because of her age, meaning your age.

10         You refer to similarly situated younger

11     employees.  Who do you mean when you say that?

12 A.  Well, there were some other supervisors that

13     were taken off of supervision to --  I don't

14     know the reason for.  I guess lack of their

15     jobs or whatever.  But they didn't lose their

16     job.  They were offered a job back into the

17     plant.

18 Q.  Who are you talking about?

19 A.  Well, Sandy Weatherby, Jackie Presley, Stan

20     Bechtel.

21 Q.  Stan --  I'm sorry.

22 A.  Bechtel.  Then there was another one too.  I

23     don't know what his name was.  He was from the

24     lower end.  I kind of think his first name was

25     Larry, but I'm not sure what his last name was.

106

Exam./Maguschak - Weaber

1   Q.   Anyone else?

2   A.   Not that I can recall at the time.  At this

3        time I can't think of anybody else.

4   Q.   What you're saying is that they were

5        disciplined but they weren't fired.  They were

6        given the alternative to go back to being an

7        hourly employee, essentially?

8   A.   Yes, ma'am.

9   Q.   The first person you mentioned was Sandy

10       Weatherby?

11   A.   Yes.

12   Q.   What was she supervisor of?  Do you know?

13   A.   I think at that time she was supervisor of --

14       in confectionery down in Rolo department.  I

15       think so.  I'm not sure.

16   Q.   Then she returned to being an hourly employee

17       at some point?

18   A.   Yes.

19   Q.   When did that occur?

20   A.   I don't know what year it was.

21   Q.   Well, it was while you were employed?

22   A.   Yes, yes.

23   Q.   Do you know why she was demoted?

24   A.   I have no idea.

25   Q.   Jackie Presley, is that male or female?

107

Exam./Maguschak - Weaber

1  A.  That's a woman.

2  Q.  What was she supervisor of?

3  A.  I'm not positive, but I kind of think she was

4      in wrapping room.

5  Q.  At some point in time after that, she returned

6      to be an hourly employee?

7  A.  Yes.

8  Q.  Do you know why she was demoted?

9  A.  I have no idea.  All we were told was because

10     of lack of performance.  That's all.  That's

11     all you ever heard, you know.  They didn't go

12     into specifics or anything.  Nobody went into

13     specifics.

14 Q.  Do you know how old Jackie was at the time?

15 A.  No, I couldn't tell you her age.  I don't know.

16 Q.  What about Sandy, do you know how old she was?

17 A.  I couldn't tell you that either.

18 Q.  Stan Bechtel, what was he supervisor of?

19 A.  He was supervisor of maintenance, third shift.

20 Q.  At some point in time, he was demoted from --

21 A.  Demoted from supervision back to a maintenance

22     person, but he had to go down to the lower end.

23     He was up in Area One, and he had to go down to

24     the lower area.

25 Q.  Do you know why he was demoted?

108

Exam./Maguschak - Weaber

1  A.   No.  Just job performance.  That's all we ever

2       heard.

3  Q.   Do you know when that occurred?

4  A.   A couple of years before me.

5  Q.   Do you know how old Stan was?

6  A.   No, I don't.

7  Q.   This other person who may be Larry, what was he

8       supervisor of?

9  A.   I really don't know.  He was down at the lower

10      end.  I don't know.  I have no idea what he did

11      or whatever, but that was quite a few years

12      ago.

13 Q.   In Count 3 of your complaint -- and you can

14      look at it if you'd like to -- you claim you

15      were terminated in order to interfere with your

16      FMLA rights or in retaliation for attempting to

17      exercise those rights.  Is that correct?

18 A.   Well, she gave me a hard time getting them.

19      Yes, that's how I felt about it.  If I didn't

20      do what she said to go for counseling and

21      saying that I was fat when I wasn't fat -- I

22      don't think I'm fat to this day -- and telling

23      me she wasn't going to give me these FMLA

24      unless I did what she said and I'm going to

25      lose my job, yeah.  Yes.

109

Exam./Maguschak - Weaber

1  Q.   Were you ever denied FMLA leave?

2  A.   I was up till I did what she wanted me to do.

3  Q.   But you eventually got it?

4  A.   Yeah.  May the 8th I think it was.

5  Q.   And you got the time off?

6  A.   She gave that to me, yeah, right before I got

7       terminated.  Yes.

8  Q.   You had FMLA leave on a variety of occasions;

9       is that true?

10  A.   Yes.

11  Q.   Each time you returned you were reinstated to

12       your prior position; correct?

13  A.   Yes, I was.

14  Q.   During the times that you were on FMLA leave,

15       did they maintain for you your health benefits?

16  A.   Yes, they did.

17  Q.   In fact, during your FMLA leaves, you got some

18       wage replacement benefits; is that correct?

19  A.   Yes, I did.

20  Q.   Prior to 1999 you --  You had FMLA leave prior

21       to 1999; is that right?

22  A.   Yes.  FMLA, they had only started that a couple

23       years.  They didn't have that for too many

24       years before I left there.

25  Q.   Are you contending that you believe you were

110

Exam./Maguschak - Weaber

1    terminated for taking FMLA leave?

2  A.  No, I don't think I was terminated for that.  I

3    think I was terminated because of all the

4    absence I had and being a higher paid

5    supervisor.

6  Q.  In Count 4 you claim that you were terminated

7    because of a disability or because Hershey

8    regarded you as a disabled; is that right?

9  A.  Well, she tried to tell me that there was

10    nothing wrong with me because of my diabetes.

11    I feel that, you know, because of my illness

12    and because of the diabetes I lost time through

13    it through the stress and stuff that Darryl

14    Bentz put me through.

15       I just --  I feel that they just --  It's

16    like any other company.  You're there to make

17    money.  I did have a job, and you need to --  I

18    felt, you know, they got rid of me to replace

19    me with somebody that can be there all the

20    time, you know.

21       But I didn't take off unless I was really

22    sick, and I've always had a doctor's excuse.  I

23    mean it wasn't like I just took off for the

24    heck of it like some of them do.

25  Q.  You claim that your disability was diabetes?

111

Exam./Maguschak - Weaber

1   A.   Yes.

2   Q.   I think in your complaint it says diabetes and

3       related conditions.  What related conditions do

4       you mean?

5   A.   Well, they had me off because of --  One time

6       they had me off because of the first slight

7       stroke I had.  I had absolutely no strength in

8       this side at all in my legs and stuff.  But

9       that's what it was about.

10   Q.   When was your diabetes diagnosed?

11   A.   I think it was about '94 or '95, somewhere

12       around there.  I'm not really positive on the

13       year, but somewhere around there.

14   Q.   Mid 1990s?

15   A.   Yeah.  Yeah.

16   Q.   Who diagnosed it?

17   A.   Dr. Barton.

18   Q.   In 1999 how did your diabetes and related

19       conditions affect you?

20   A.   Diabetes can affect you in a lot of different

21       ways.  When I had this on my chest, I was sure

22       it wasn't my heart.  I told them that before

23       they took me to the medical center.

24           Well, my sugar was up to 400 and some.  I

25       do follow a diet.  But right at that time we

112

Exam./Maguschak - Weber

1    were changing machinery over.  It was a lot of

2    stress and everything going on, and I wasn't

3    even --  I wasn't over Darryl Bentz to begin

4    with, even that Tom Soles was there.  You just

5    don't get over something like that overnight.

6    No matter what, I still had to see him in the

7    halls and stuff like that.

8         You feel good one time, and the next time

9    you don't.  I mean you get weak.  You get very

10   weak at times.  Some people sleep a lot with

11   it, which that never --  I just get real weak

12   and sick.  Like terrible, terrible headaches

13   anytime you're put under a lot of pressure or

14   tension or whatever that was going on.

15   Diabetes can react in so many different ways.

16 Q.  Did your diabetes and related conditions affect

17      you in your ability to work?

18 A.  Just the times that I was really sick with it,

19      when it went up real high.  I just wasn't able.

20      I couldn't --  I had no strength to go.

21 Q.  To go to work, you mean?

22 A.  Right.  It's just so hard to explain to you

23      unless you ever dealt with it yourself.  Like

24      when your sugar is real high, you get pains, so

25      many pains in your legs and your feet.  I mean

Exam./Maguschak - Weaber

1    it's -- You just don't function right, in

2    plain words.

3  Q.  Did your diabetes affect you in your ability to

4    care for yourself?

5  A.  No.  I've always cared for myself.

6  Q.  Did your diabetes affect you in your ability to

7    walk?

8  A.  Sometimes you get staggery if your sugar was

9    high, yes.

10 Q.  Did you ever have to use a wheelchair or a

11   walker or a cane or anything like that?

12 A.  No.

13 Q.  Did your diabetes affect you in your ability to

14   see?

15 A.  Sometimes.  I mean sometimes --  It wouldn't

16   stay, you know.  Just sometimes your eyes get

17   blurry.

18 Q.  I see you have glasses.  Do you wear glasses?

19 A.  Yes, I do.

20 Q.  Did you wear glasses before your diabetes was

21   diagnosed?

22 A.  Yes, I did.  I wore glasses just for

23   nearsightedness before.  Since I have diabetes,

24   my eyes have got worse than what they were.

25 Q.  With your glasses, is your vision okay?

Exam./Maguschak - Weaber

1   A.   Yes.

2   Q.   Did your diabetes or does your diabetes affect

3        you in your hobbies, such as fishing?

4   A.   Sometimes.  If you don't --  When your sugar is

5        up, I surely don't go out here on that river,

6        you know.  No.

7   Q.   Did your diabetes affect you in your sewing or

8        crafts?

9   A.   Yeah, at times.

10  Q.   In what way?

11  A.   Well, like I just said to you, if you really

12       get stressed out, it seems like everything

13       starts running together for you or whatever.

14       You just --  If your sugar goes up at all, your

15       eyesight can get blurry or whatever.  So I just

16       don't do them.  If I mind it, I just put it

17       away.

18  Q.   Did your diabetes affect your ability to

19       exercise?  You told me you exercise to a

20       videotape or something like that.

21  A.   Yeah.  I exercise ever since Carol Haskell had

22       got on me.  If I don't feel up to it, I just

23       don't do it, if you feel tired or weak or

24       whatever.

25  Q.   Do you think the exercises helped your

Exam./Maguschak - Weaber

1    condition?

2  A.    Yes.  Exercise does help sugar diabetes.  They

3        want you to exercise, but I mean you can't

4        exercise all the time either.

5  Q.    How frequently would you say your sugar is

6        elevated so that you can't sew or do your

7        crafts?

8  A.    When are you talking about?  Now, or are you

9        talking about then when I worked at Hershey?

10 Q.    In 1999.

11 A.    In 1999 I didn't do no crafts and sewing and

12       stuff.

13 Q.    Why not, or did you just take it up?

14 A.    What?

15 Q.    Why not?

16 A.    I couldn't do it.  I was sick in 1999.

17 Q.    Throughout 1999?

18 A.    No.  That started with that on my chest in

19       February.  I didn't go back into it.  I did

20       start the exercising like Carol Haskell wanted

21       and stuff like that.  But I wasn't sewing and

22       fishing and hunting or anything like that, no.

23 Q.    Are you aware of any other Hershey employees

24       who you believe were terminated because of

25       health issues?

Exam./Maguschak - Weaber

1  A.  I have no idea why they were terminated.  I

2      have no --  No.

3  Q.  How do you believe you were discriminated

4      against with respect to your diabetes

5      disability?

6  A.  I don't feel I should have had to go through

7      what Carolyn Haskell put me through.  I don't

8      think I needed any counseling, to go down there

9      and tell them that she's making me come here

10     because it's either me come here or lose my job

11     because that's what she wants.  She disrespect

12     --

13 Q.  I'm sorry.  Go down there and tell them.  Who

14     do you mean?

15 A.  Tell Dr. Hower I'm only here because I have to

16     be here because Carol Haskell told me that I'm

17     fat and that it's all in my head about my

18     diabetes.

19          I was bitter.  I mean I loved Hershey.  I

20     gave everything I had all them years for

21     Hershey.  I put Hershey before my family many,

22     many times.

23 Q.  Had you ever seen Dr. Hower before 1999?

24 A.  Yeah.  I took my daughter there.

25 Q.  Had you personally ever seen him?

117

Exam./Maguschak - Weaber

1  A.  Over my daughter, yeah.  I took my daughter

2      there, and we talked with her, and we talked

3      privately.  She had a baby at 16 years old.

4  Q.  When was that, approximately?  I mean when you

5      saw Dr. Hower.

6  A.  Terry had Gared in '91.  I don't know.  It

7      might have been '93, '94.  I don't know what

8      year it was that she was having some real bad

9      problems.  We had a program at Hershey that you

10     could take your children for counseling or

11     whatever, and I took Terry, yes.

12 Q.  Did you see Dr. Hower in 1997 at all?

13 A.  I really don't know if I did or not.  It could

14     have been.  I don't know.  I took Terry to two

15     different doctors.  There was a doctor in

16     Harrisburg too, but I don't remember what his

17     name was.

18 Q.  Do you know if Cindy Lighty knew anything about

19     your diabetic condition?

20 A.  I can't say yes.  I can't say no.  I would

21     think she would have communicated with the

22     medical department there, with Carol Haskell.

23     I would think she would anyhow.  If she was

24     doing her job, I would think so.  I can't say

25     that.  I don't know.

118

Exam./Maguschak - Weaber

1  Q.   In any of your conversations with her, did she

2       say anything about your diabetic condition?

3  A.   No, she did not.  Not that I remember, no.  I

4       did tell her about being under doctor's care.

5       I did tell her about that.

6  Q.   What did you tell her?

7  A.   That was when she called --  We went down

8       there.  You know, what Dr. Dhaduk said and that

9       it was my sugar.  That's all I told her.

10  Q.   I'm sorry.  When you went down there?

11  A.   When she had called me down there when they put

12      me out on suspension, you know.  But that was

13      about it.  It was just a short conversation.

14  Q.   When you were suspended, during that

15      conversation with Cindy Lighty, you told her

16      about seeing Dr. Dhaduk; is that right?

17  A.   Yes.

18  Q.   Tell me what you remember about what you told

19      Cindy at that time.

20  A.   All I know is that when she called me in there

21      she said, You know what we're in here for,

22      Linda?  We're in here for honesty.

23          And I said yes.

24          At that time it was over a meeting that my

25      people had, and I told her everything that

Exam./Maguschak - Weaber

1   happened at that meeting and the truth about

2   it.

3       I told her.  I said --  She couldn't

4   believe that when I went back to the floor, my

5   department and stuff, that I didn't pay no

6   attention to the clocks.  Well, no, I didn't

7   because I work second shift and it was into

8   third shift.  I didn't even look at no clocks.

9       I told her.  I said, Well, you know, I've

10  been under so much stress, and I said going to

11  the doctors.  And I told her what Dr. Dhaduk

12  and them said.  And that was about it that I

13  can remember of it.

14  Q.  What did you tell her that Dr. Dhaduk said?

15  A.  That I had another slight stroke.  I told her

16  that.  I don't even remember what her remarks

17  was.

18  Q.  That was my next question.  Did she say

19  anything about that?

20  A.  I don't even remember what her remarks was.

21  Q.  Was anybody else in the office at that time, or

22  was anybody else in that meeting?

23  A.  Tom Soles was with me that time.

24  Q.  Did he say anything about --

25  A.  Tom Soles didn't say a word.  Tom Soles did say

Exam./Maguschak - Weaber

1    weeks before that when I wasn't feeling good,

2    he said, Now, Linda, if you can't do your job,

3    maybe I can find you something else to do if

4    you want to do it.

5        I said, No.  I'll do my job.

6        Tom Soles did offer me that.

7  Q.  When did he say that?

8  A.  That was when I came back right after I was so

9    sick.

10 Q.  In March of '99?

11 A.  Yeah, somewhere in there.  I can't give you the

12    date or whatever.

13 Q.  But in that time frame?

14 A.  Somewhere in that time frame Tom did say that

15    to me.

16 Q.  Were you offended when he said that?

17 A.  No.  I thought it was very nice of him.  Tom

18    Soles would call to the house and ask me how I

19    was.  I mean he was a very concerned person.

20    No, I wasn't offended at all.  I thought it was

21    very nice of him to even offer that, but I felt

22    that I could do my job.

23 Q.  In Paragraph 31 you also say that you were

24    regarded by Defendant as being disabled.  Who

25    do you believe regarded you as disabled?

Exam./Maguschak - Weaber

1  A.   Carolyn Haskell.

2  Q.   Why do you say that?  What makes you believe

3       that?

4  A.   Well, how she treated me.  I mean I was there

5       doing my job, and she still acted like I had to

6       do what she wanted me to do just to keep a job.

7       It was very defensive when she told me that it

8       was in my head and that I was fat and I had to

9       go to a counseling psychiatrist to talk to him.

10 Q.   Is it fair to say that Carolyn Haskell thought

11      that you were medically able to do your job?

12 A.   She thought so, yeah.  To me she was hassling

13      me.

14 Q.   Other than Carolyn Haskell, was there anyone

15      else who you believed regarded you as disabled?

16 A.   Carolyn Haskell had an assistant there, and I

17      can't remember her name.  I had talked to her

18      one time.

19 Q.   Kathy Mull?

20 A.   Was it Kathy Mull?  She's a younger girl.

21           MR. JACKSON:  I don't know.  Everybody is

22      young.

23 A.   I kind of think she took Carolyn Haskell's

24      place now.

25           MS. MAGUSCHAK:  I don't know.

Exam./Maguschak - Weaber

1  A.    I don't know.  She told me too.  She said about

2        me being fat.  But I just don't remember what

3        her name was, but I kind of think she took over

4        for Carolyn Haskell when Carolyn Haskell left

5        there.  Well, I know she did, whatever her name

6        was.

7  Q.    Other than Carolyn and her assistant, anybody

8        else that you believe regarded you as disabled?

9  A.    No.

10 Q.    And am I correct that the reason you believed

11       that is the comments that Carolyn made to you

12       in 1999 --

13 A.    Yes.

14 Q.    -- that we already talked about?

15 A.    Yes.

16            (June 24, 1999 PA Human Relations

17       Commission Complaint, three pages, was produced

18       and marked Weaber Exhibit 5.)

19 BY MS. MAGUSCHAK:

20 Q.    I'm going to show you a document that we've

21       marked as Weaber Exhibit 5.  Now I show you a

22       document that we've marked Weaber Exhibit 5.

23       Is this the original claim you filed with the

24       Pennsylvania Human Relations Commission?

25 A.    I don't know.  This is what I typed up on my

123

Exam./Maguschak - Weaber

1    computer trying to keep my thoughts together.

2    Q.   And the date on it is June 24, 1999; is that

3         right?

4    A.   That's right, yes.

5    Q.   You typed this yourself on your home computer?

6    A.   Yes.

7    Q.   Is this your signature on the last page?

8    A.   Yes, it is.

9    Q.   Did you send this to the Pennsylvania Human

10        Relations Commission?

11   A.   I think I did.  I'm not sure.  Yes, I guess I

12        did.  Yes.

13             (2/15/2000 PA Human Relations Commission

14        Amended Complaint, three pages, was produced

15        and marked Weaber Exhibit 6.)

16   BY MS. MAGUSCHAK:

17   Q.   Now I've put in front of you a document that

18        we've marked as Weaber Deposition Exhibit 6.

19        Is that the amended complaint that you filed

20        with the Pennsylvania Human Relations

21        Commission?

22   A.   Yes.

23   Q.   Is that your signature on the third page?

24   A.   Yes, it is.

25   Q.   Is that dated 2/15/2000?

124

Exam./Maguschak - Weaber

1   A.    Yes, it is.

2            (2/13/01 EEOC Notice of Right to Sue, one

3         page, was produced and marked Weaber Exhibit

4         7.)

5   BY MS. MAGUSCHAK:

6   Q.    Ms. Weaber, I put in front of you what we've

7         marked as Weaber Exhibit 7.  Is that the Notice

8         of Right to Sue that you received from the

9         EEOC?

10  A.    Yes, it is.

11  Q.    Going back to Exhibit 6, I note that in the

12        first paragraph on the top of the second page

13        it says, "On or about May 13, 1999, Cynthia

14        Lighty, corporate attorney, suspended me

15        because of my age, 51 and or gender, female and

16        or non-job related disability, diabetes and or

17        perceived disability, mental."

18            There does not appear to be in the federal

19        court complaint a sex discrimination claim.  Am

20        I correct that you're not pursuing a sex

21        discrimination claim?

22  A.    No, I'm not.

23  Q.    Pardon.

24  A.    No, I'm not.

25  Q.    I asked it poorly.  Are you pursuing a sex

Exam./Maguschak - Weaber

1    discrimination claim in the federal court case?

2  A.    No, I'm not.

3  Q.    When you were terminated, what position did you

4        have at that time?

5  A.    I was a supervisor of Kiss and chip molding,

6        Kiss wrapping and chip molding.

7  Q.    How long had you had that position?

8  A.    I would say approximately three, four years.  I

9        had molding before that.  I was in third shift

10       molding.

11              Third shift Kiss was out of hand as far as

12       supervision and the employees.  Vince Castelli

13       was my manager at that time.  He called me in

14       and asked me if I would go over to Kisses third

15       shift to get it straightened up.  I agreed to

16       leave third shift molding to go over to Kisses

17       to get it straightened up.

18              The third shift job was handed out, and

19       Dave Fortna was supposed to get third shift

20       Kisses.  But the lower end, his area, hadn't

21       shut down yet, and they were waiting for him to

22       come up.

23              So then when it was time for him to come

24       up to third shift Kisses, Vince Castelli asked

25       me to stay there and let Dave go to molding

Exam./Maguschak - Weaber

1    because Dave was from condensing and he only

2    had maybe about 15 people, where Kiss

3    department sometimes ran from 67 people to 107

4    people, maybe more.  So they thought it would

5    be easier for him to learn molding at our end

6    than Kisses right away because of all the codes

7    and production going out and all that.

8        So I agreed to that.  I had got a pretty

9    nice raise for staying in Kisses for him.

10   Q.   Who was your first supervisor in that position?

11   A.   In Kisses?

12   Q.   Yes.

13   A.   Vince Castelli.  I went to Kisses when I first

14        became supervisor, too, in '84.

15   Q.   In '84 was your first supervisory position?

16   A.   Yes.  And my assignment was Kisses on third

17        shift.  We had so many managers.  The managers

18        that we had was there a couple weeks and gone

19        in the next couple of weeks.  I don't remember

20        who the manager was at the beginning.  I know

21        who it was.  It was Al Heatwole.

22   Q.   Who?

23   A.   Al Heatwole.

24   Q.   He was --

25   A.   He was the manager.  He was our manager, Al

127

Exam./Maguschak - Weaber

1    Heatwole.  That's who it was.  He had molding

2    and Kisses.

3  Q.  And after Al left, who was your next manager?

4  A.  Oh, my.  It was so many of them.  Phil Ceresini

5    was there.  Linda Menischeschi was there.

6    Vince Castelli was there.  Larry Weinsheimer

7    was there.  Alexia was there.

8  Q.  Alexia was the manager immediately prior to

9    Darryl Bentz; is that right?

10 A.  Yes.  Darryl Bentz.

11 Q.  How long was Alexia your manager?

12 A.  I would say about a year and a half, somewhere

13    around there.  Approximately a year and a half

14    to two years, I think.

15 Q.  When did you change to second shift from third

16    shift?

17 A.  I would say maybe '97.  I'm not quite sure what

18    year it was.

19 Q.  When Alexia was your supervisor, what shift was

20    that?

21 A.  I was on second shift, Kisses.

22 Q.  In your most recent position, approximately how

23    many employees did you supervise?

24 A.  Like I said, sometimes when we were in slow

25    motion, it could go down to 67.  When we were

128

Exam./Maguschak - Weaber

1      in full motion, we had Kiss molding and Kiss

2      chip molding.  It would sometimes go up to 113.

3   Q.  Prior to May of 1999, had any manager at

4      Hershey Foods ever raised an issue or had a

5      conversation with you about honesty?

6   A.  Cindy Lighty and I did.

7   Q.  When was that?

8   A.  Cindy Lighty and I had that conversation about

9      Darryl Bentz.

10  Q.  Was that the conversation that you referred to

11     earlier after Tom Soles replaced Darryl Bentz?

12  A.  Yes.

13  Q.  Prior to May 1999, had any manager at Hershey

14     ever raised an issue or had a conversation with

15     you about your honesty?

16  A.  Darryl Bentz.

17  Q.  When was that?

18  A.  I can't give you the date.  I don't know what

19     the date was.

20  Q.  Approximately.

21  A.  That was over what we talked about earlier,

22     about Karen Keeton's husband and stuff.  I

23     would say in '98, '97, '98.

24  Q.  Anyone else other than Darryl Bentz talk to you

25     about your honesty?

129

Exam./Maguschak - Weaber

1  A.   No.  But I did go back and say something to

2       Connie Buck about what he talked to me about.

3  Q.   What Darryl Bentz talked to you about?

4  A.   Yeah.  I said to Connie, I said, Now you worked

5       with me all these years.  I said, Have I ever

6       been dishonest?  Do you know of me ever saying

7       something that wasn't true or dishonest?

8         She said, No, Linda.  She said, Why would

9       he say that?

10      I said, I have no idea.

11      May I be excused for a few minutes?

12      MS. MAGUSCHAK:  Sure.

13      (Recess taken.)

14      (Document entitled Performance Management,

15     January 1998 to December 1998, 11 pages, was

16     produced and marked Weaber Exhibit 8.)

17  BY MS. MAGUSCHAK:

18  Q.   I'm going to show you a document that we've

19      marked as Weaber Exhibit 8, which is a

20      Performance Management document for you with a

21      review period of January 1998 through December

22      1998.  Have you seen this document before?

23  A.   Yes, I have.

24  Q.   If you could, turn to Page 11 of that document.

25  A.   Yes.

130

Exam./Maguschak - Weaber

1    Q.    Under Performance Summary, do you see that?

2    A.    Uh-huh.

3    Q.    The third sentence says, "There is a negative

4          perception among many of her peers that she

5          needs to remedy."  Do you know what he was

6          referring --  I'm assuming Tom Soles wrote

7          this.  Is that correct?

8    A.    That's right.

9    Q.    Do you know what he was referring to there?

10   A.    Yes.  He was referring to Darryl Bentz.

11   Q.    He's referring to "many of her peers."  Do you

12         know what that means?

13   A.    Not unless he meant Larry too.  I have no idea.

14         He didn't explain it to me.  He just said it

15         was because of Darryl's performance before

16         this, that when he put me on probation.

17              As you can see, everything else I done was

18         excellent.  I never had no trouble with any

19         manager until Darryl.

20   Q.    Under Plans for Training and Development, the

21         second sentence of that says, "Linda must

22         continue all efforts on the development plan

23         above and must restore trust and confidence of

24         others."  Do you know what that refers to,

25         "must restore trust and confidence of others"?

Exam./Maguschak - Weaber

1  A.    No, I don't.  The only thing I know --  The

2       only thing I --  What I can tell you about this

3       here is Karen Keeton --  She was the third

4       shift supervisor of Kisses, and I was the

5       second shift supervisor.

6           No matter what second shift did --  We had

7       a little book there, a little black book.

8       Anything that happened on our shift we'd write

9       it down on there.

10         Karen had a habit of going to Sam Selvey,

11      which was her superintendent for third shift.

12      No matter what she might have found wrong, she

13      would go to him, and then he would take it to

14      Tom Soles.

15         To make a long story short, it had got so

16      bad my working foreman, Greg Marks, would

17      actually --  When she came in for her shift --

18      We always overlapped, came in early to see what

19      was going on.  You had to, or you wouldn't have

20      been able to come in at 2:30.  Like I was

21      always there about ten of two.  My shift

22      started at three o'clock.

23         But she would --  He would actually get up

24      and walk out because he would not communicate

25      with her at all.

132

Exam./Maguschak - Weaber

1  Q.  Who would?

2  A.  Greg Marks, because of her little remarks that

3      she would write in this book about always our

4      shift.  She would go to Sam about this and Sam

5      about that.

6          Well, it had come down to the point that

7      Tom Soles called Karen in and told Karen about

8      going to Sam about everything.  I mean it

9      wasn't really --  It was just nitpicking of

10     stuff, and it was just because she didn't like

11     me, in plain words.

12         I mean I tried to do everything I could do

13     to work with her, but I wasn't going to make my

14     relief supervisor stay in there if he didn't

15     want to stay in there.  I would communicate

16     with her what was going on, what we were

17     supposed to do or whatever.

18         That's the only thing I would say it was

19     about.

20  Q.  As far as you know, that's what it refers to?

21  A.  That's what I was told.  That's the only thing

22     I can tell you about it.  I don't know of

23     anything else.

24         Like I had told you before, I had tried to

25     communicate with everybody I could and stuff.

133

Exam./Maguschak - Weaber

1              Right there he's saying that we did excellent

2              communication and stuff.  I mean I don't know

3              what else.

4    Q.    Is that your signature on the bottom of that

5              page?

6    A.    Yes, it is.

7                   (Document entitled Performance Management,

8              January 1997 to December 1997, 10 pages, was

9              produced and marked Weaber Exhibit 9.)

10   BY MS. MAGUSCHAK:

11   Q.    I'm going to show you a document that we've

12            marked as Weaber Deposition Exhibit 9, which is

13            a performance management document for you.  It

14            says the date of the review period is January

15            of 1997 to December of 1997.

16   A.    Yes.

17   Q.    Turning to Page 10 of that document --  Are you

18            with me?

19   A.    Yes, I am.

20   Q.    Is that your signature at the bottom of the

21            page?

22   A.    Yes, it is.

23   Q.    The performance rating on that document says

24            "not fully achieved."  Is that right?

25   A.    That's what it says.

134
Exam./Maguschak - Weaber

1   Q.   This performance appraisal, to the best of your

2        knowledge, was done by Darryl Bentz; is that

3        right?

4   A.   Yes, it was.

5   Q.   In the second sentence under Performance

6        Summary of that document, it says, "Through

7        various sources it has been verified that Linda

8        periodically has utilized profanity and

9        intimidation tactics to get hourly personnel to

10       do their jobs and/or has fabricated untruths in

11       an attempt to establish her point of view."

12       Did I read that correctly?

13  A.   You read that correctly.  We had a policy there

14       with Pat Kilgore.  You're not even allowed to

15       swear.  I've never did that.

16            My choice was sign this --  You had to

17       sign this paper no matter what he wrote on

18       here, and I signed it.  It was no sense in

19       arguing with him because I was fighting a

20       losing battle with him.  If you read it all,

21       you can just tell right there he was totally

22       against me or whatever.

23            But everything in front of this thing,

24       everything in front of here, our achievements

25       for the year and stuff, all us supervisors in

135

Exam./Maguschak - Weaber

1        the area had the same ones.  Like on Page 9

2        everything --  We all had the same thing.

3   Q.   I'm sorry.  I'm not understanding what you

4        mean.

5   A.   Well, we were all judged by the same

6        performance, everything, you know.

7   Q.   The same objectives, is that what you mean?

8   A.   Yeah, we all had the same objectives.

9        Everything was the same.

10  Q.   And what do you mean when you say that?

11  A.   Well, what I'm saying, if everything --  Like

12       starting from Page 2, 3, them two were

13       achieved.  Four was achieved.

14            The beginning of the year we all put our

15       objectives together, and we all worked as a

16       team to make sure they followed out for the

17       year.  Everything was achieved.  I mean he

18       wrote what he wanted to write about me, and you

19       have no other choice except to sign them.

20            If you see here, they overwrote themselves

21       down here.  I had to sign it on 2/9, and they

22       changed theirs back to 1/29 and 2/30.

23  Q.   I'm sorry.  Your point in making that comment

24       was --

25  A.   Well, first they had 1/29 and 1/30, Larry did.

Exam./Maguschak - Weaber

1         They signed it before I signed it.

2  Q.  Darryl Bentz became your supervisor in 1996; is

3      that right?

4  A.  I think it was '96, yes.

5  Q.  Did you believe that you were discriminated

6      against at Hershey before that time?

7  A.  No.

8  Q.  Are you aware of any facts that show that

9      Darryl Bentz had any involvement in the

10     decision to suspend or terminate you?

11  A.  No.

12  Q.  Are you aware of any facts that show that

13     Carolyn Haskell had any involvement in the

14     decision to suspend or terminate you?

15  A.  No.

16  Q.  Do you think it's fair to say that Darryl Bentz

17     didn't like you?

18  A.  Yes, I do.

19  Q.  And he didn't get along with you?

20  A.  He didn't like me, no.

21  Q.  Is it correct that --  I think you testified

22     before that he was a friend of your ex-husband.

23  A.  Yes.

24  Q.  Would you agree that the way in which Darryl

25     Bentz mistreated you had nothing to do with

137

Exam./Maguschak - Weaber

1        your diabetes?  Is that right?

2    A.   That's right.

3    Q.   Would you agree that Darryl Bentz's

4        mistreatment of you had nothing to do with your

5        age?

6    A.   I don't think so, no.

7    Q.   Would you agree that Darryl Bentz's

8        mistreatment of you had nothing to do with the

9        level of your salary?

10   A.   I don't think so.

11   Q.   Would you agree that Darryl Bentz's

12       mistreatment of you had nothing to do with your

13       use of benefits?

14   A.   I don't think it was that either, no.

15   Q.   Just to clarify for the record, when you say

16       you don't think so, are you agreeing with my

17       statement that I just made?  I don't think I

18       was asking the question too clearly.  I just

19       want to make sure we're on the same wavelength.

20   A.   I don't think it has nothing to do with that,

21       no.

22   Q.   Do you believe that Darryl Bentz's mistreatment

23       of you had anything to do with your taking time

24       off work?

25   A.   No.  I just think that that's a way that he

Exam./Maguschak - Weaber

1    could pick on me.  May I add a statement to

2    this?

3  Q.  Sure.

4  A.  I think after a couple --  I don't know how

5    long it was.  I can't give you an exact time.

6    Darryl Bentz closed the door one day when we

7    were in, and he said --  He put his arms around

8    my shoulder, and he said, Let's try to start

9    over from a fresh start.

10  Q.  I'm sorry.  Did you say when that was?

11  A.  It was a couple months after he was manager.

12    I said, That's fine, Darryl.

13    I felt very uncomfortable.  I'll be

14    truthful with you.  But I just took it that he

15    meant it from his heart.  I mean the man has a

16    Bible on his shelf there all the time there,

17    you know.  But it didn't work out that way.

18  Q.  Things didn't change?

19  A.  Nothing changed.  I thought he was sincere, but

20    he wasn't.

21  Q.  What is the Kiss-Chip Operation Support Team?

22  A.  That was a team of rework and waste,

23    corrugated, safety, sanitation.  Did I say

24    rework?

25  Q.  Yes.

Exam./Maguschak - Weaber

1  A.  Waste.  Everything combined into a department.

2  Q.  How did you become involved in that?

3  A.  Alexia was there.  Each supervisor had --  She

4      assigned each supervisor certain parts of it to

5      take care of.  Each of the three supervisors in

6      molding had a section to do.  The three

7      supervisors in Kisses had a section to do.

8          Well, then when Alexia left, well, none of

9      the rest knew.  It all got thrown on me that I

10     had to do it all, every one of them.  They used

11     to be divided out to the groups.  Then Darryl

12     told me that I had to do it all.

13 Q.  What was it that you were doing?

14 A.  What we did, we went around.  We did

15     inspections, safety inspections.  If we seen

16     anything wrong, we had to write a sheet up.  We

17     went around with the plant -- John Harmony.  I

18     went around with him for inspections of the

19     department.

20         As a team, we cleaned up stuff that

21     shouldn't have been laying around.  We got rid

22     of all the cabinets people couldn't --  They

23     had personal cabinets there.  We got rid of all

24     the cabinets.  We did everything that had to do

25     --  If we had corrugation problems, we worked

Exam./Maguschak - Weaber

1    with the people on that.  We took care of

2    chairs for the break room.  We took care of the

3    waste problems, what we could do to prevent

4    less waste, have pans made for underneath the

5    baggers or wherever we needed pans, oil pans

6    where it might have been dripping from the

7    motors.

8        We worked with maintenance and the

9    carpenter shop and everything and had

10   everything fixed up like it belonged to make

11   the department in order like it should have

12   been.

13   Q.   Let's say in 1999 who else was --  You were on

14        that team in 1999; correct?

15   A.   Yes.

16   Q.   Were you the leader of the team?

17   A.   Yes, I was.

18   Q.   Who else was a part of it in 1999?

19   A.   Ken Smith, Tom Landis, Henry Graby.

20   Q.   Henry --  I'm sorry.

21   A.   Henry Graby.

22   Q.   Bob Haas, Raymond Wolfe, Dale Godwin, Mike

23        Tomei.  I think that was it in '99.

24   Q.   Were those people you just mentioned hourly

25        employees?

Exam./Maguschak - Weaber

1  A.   Yes, they are.

2  Q.   How often would the group meet?

3  A.   One month we would meet on first shift, and the

4       next month we would meet on third shift.

5  Q.   So once a month?

6  A.   Once a month.

7  Q.   Did the group meet on May 6 of 1999?

8  A.   Yes, they did.

9  Q.   Do you know if everyone was there, all the

10      people you just mentioned?

11 A.   No, they weren't.

12 Q.   Do you know who was there?

13 A.   Yes.  And I missed one name.  I just thought of

14      his name.  That was Greg Weikel.

15 Q.   Greg --

16 A.   Weikel.

17 Q.   Do you know how to say that?

18 A.   W-E-I-K-E-L.  People that was there was Dale

19      Godwin, Ken Smith, Tom Landis, Raymond Wolfe,

20      Bob Haas, and Mike Tomei, and he came in at 11

21      o'clock.

22 Q.   So Greg Weikel and Henry Graby weren't there?

23 A.   Right.

24 Q.   What shift did that meeting occur during?

25 A.   That night they came in at 7 o'clock until 3

Exam./Maguschak - Weaber

1       o'clock in the morning.

2  Q.   Seven p.m. to 3 a.m.?

3  A.   Uh-huh.  Yes, ma'am.

4  Q.   So the meeting began at 7 o'clock?

5  A.   Yes, ma'am.

6  Q.   Where was the meeting held?

7  A.   It was held --  I can't remember the room

8       number.  It was over in the office side.  I

9       could take you to the room, but I couldn't tell

10      you the number of it.  It was up on the third

11      floor.  I kind of think it's 3035, but I don't

12      remember.

13  Q.   Did you take any notes during the meeting?

14  A.   Yes.

15  Q.   Do you still have those notes?

16  A.   I don't have them, no.  Everything I had was

17      there in the office when I left.

18  Q.   What office?

19  A.   In my supervisor's office.

20  Q.   Let me ask you about that, and then we'll move

21      on.  Did you have files in your supervisor's

22      office?

23  A.   Did we have files?

24  Q.   Files, yes.

25  A.   Files of what?

Exam./Maguschak - Weaber

1  Q.   Did you keep files in your supervisor's office?

2  A.   Yes.

3  Q.   Did you have a separate file for the support

4       team?

5  A.   No.  Hank Graby had that.  We'd have a book.

6       He was the secretary.  He did all the minutes,

7       and he would --  Everything would go in one

8       book.

9            All the supervisors, all the maintenance,

10       whoever we contacted, and John Harmony, they

11       all got copies of the minutes every month.  Tom

12       Soles got a copy of the minutes every month.

13       So did Larry Weinsheimer.

14            If Henry Graby wasn't there, Dale Godwin

15       took the notes.  They were the secretaries.

16  Q.   Do you know whether Dale Godwin took notes on

17       May 6th?

18  A.   I'm sure he did, yes.

19  Q.   Do you know whether anyone else took notes,

20       other than you and Dale Godwin?

21  A.   I couldn't tell you.  I don't know.  I don't

22       remember.

23  Q.   What do you recall occurring at that meeting?

24  A.   Well, at that meeting we had a lot of work to

25       do.  We were working with safety with Ann

144

Exam./Maguschak - Weaber

1    Menischeschi, and we had to write a mission

2    statement, what we planned to accomplish.  She

3    had gave us some questions and stuff, and we

4    did that, and I had faxed it to her that night.

5  Q.   Was she at the meeting?

6  A.   No, no.  But she had been at meetings before

7    with us, but not that night, no.

8         We did our inspection.  We went through

9    the department, did our inspection.  We picked

10   up some stuff.  We did other odds and ends.  We

11   finished some other paperwork we had.  We had

12   taken no breaks till --  Oh, it was almost --

13   It was almost 10 o'clock.  They said the

14   cafeteria wasn't open.  So they decided to go

15   over across the street at the pizza place

16   there.

17        When we got over to the pizza place, they

18   were closing down.  They had the grills and

19   stuff shut down.  They said they would make us

20   a cold sandwich, though.  They made us a cold

21   sandwich.  We ate our sandwich, and we came

22   back.  I only ate half of my sandwich.

23        I reported in to security, as a matter of

24   fact, to my ex-husband, about something that

25   was going on in a car in the parking lot after

145

Exam./Maguschak - Weaber

1  work.  We went back up there.

2       In a little while, Mike Tomei came over

3  because he worked his full shift, which was

4  till 10:54.  Then he came over, and I had asked

5  him if he wanted the other half of that sub

6  because I didn't want it.

7       We did all our work, was on the computer

8  communicating with people what had to be done.

9  Q.  Let me just ask one question.  When you came

10      back from the pizza place, did you reconvene at

11      whatever the number of that room was, the same

12      place?

13  A.  Yes, we did, ma'am.  Yes.

14      We did some more work and made copies of

15      things.  Tom Landis, he said --  I don't know

16      --  He looked down at his side.  Now, he was on

17      the fire crew.  I don't know if he had his

18      pager on or if he had a watch in his pocket or

19      whatever, because it's kind of a wide table

20      like this, maybe not quite as wide as this.  I

21      was sitting on that side.  He was sitting here.

22  Q.  I'm sorry.  When you say he was sitting here,

23      he was sitting across the table from you?

24  A.  Yeah, he was sitting across the table from me.

25      He looked down.  He said, Oh, it's a

146

Exam./Maguschak - Weaber

1    quarter of.  It's time to get out of here,

2    because in Kisses they punch in at 54.  You

3    have to be punched in by 54.  Like they punched

4    in at 6:54.

5        There was no clock in the room.  There was

6    no clock in that room.  So I thought --  I told

7    them, Hey, thanks for a good meeting.  We

8    scheduled our meeting for the next month, the

9    date.  We went over the date, which I had

10   already had them scheduled for a year as far as

11   the rooms, but we went over the date.

12       And the first shift meeting --  As a

13   matter of fact, at the first shift meeting, the

14   next meeting, I was going to tell them there

15   wasn't going to be no more third shift meetings

16   because I thought we had it pretty well

17   covered.  We could go down to one meeting every

18   other month.

19       Ken Smith was sitting on the side I was,

20   the opposite side from Tom Landis.  He said,

21   Yeah, let's get out of here.

22       I thanked them for the meeting, and they

23   left.

24       I just went over to the department, and I

25   got over to the department.  At that time we

Exam./Maguschak - Weaber

1  had two computers.  We were just getting our

2  office set up.  We used to only have one

3  computer, and then they had the second computer

4  in.

5      Well, Karen was on the one, because she

6  had third shift Kisses at the time.  Marian

7  Dalbert and Greg Weikel, they were just putting

8  that --  SAP, the shipping, we were just

9  getting that in over there.  They were just

10 starting it up, and they were trying to work on

11 that.  I was watching them trying to figure

12 this out because they were having so much

13 problems with it.

14     I put my books and everything away and

15 asked Karen if she needed any help with

16 anything because Marian Dalbert was her relief

17 supervisor.  She said no; she's fine.

18     So I went over and put in a paper for a

19 half a day, wrote out a paper for a half a day

20 of vacation, and I left.  I went home.

21     How my home is set up --  I had sold my

22 big house, and we moved into a smaller home.

23 When you walk in the back door, here is our

24 family room and here is our bedroom.  So my

25 husband was in bed.  I didn't even turn no

Exam./Maguschak - Weaber

1    lights on.  I just went in and crawled in bed.

2    I was tired after all them hours.

3        They're trying to say that I left --  I

4    don't even know what time they did say.

5        When I was called over to the office --

6    Well, the following day we had vacation.  It

7    was the first Friday of May.  Monday and

8    Tuesday I had situation leadership class up on

9    the hill, up at corporate.

10       I had told Mike Tomei that he'd only be

11   getting four hours' pay, that he wouldn't get a

12   full pay, and he didn't care.  That's what he

13   said.  He said, Well, I don't care, because his

14   working foreman had called me and asked me if

15   he was coming in Thursday.  And I said, No, he

16   said not.

17       So we had situation leadership Monday and

18   Tuesday.  And his regular boss, Tom Zidik, was

19   there; but Tom didn't talk to me at all.

20       I went back into work on Wednesday, went

21   over to the third floor office where we always

22   met to see if anybody needed people or who had

23   people or whatever.  All the supervisors

24   gathered up in there at 2:30 to see if anybody

25   needed anybody.

149

Exam./Maguschak - Weaber

1    I told Tom --  And Jay Albright was his

2    relief supervisor at the time, which I think

3    he's salaried now.  I think so anyhow.

4  Q.  Tom who?

5  A.  Tom Zidik.  I said to Tom Zidik, Mike only

6    worked four hours on Wednesday night.

7    Tom Zidik said, Well, Tuesday was the end

8    of pay period.

9    I didn't even give that a thought.

10   Tuesday was the end of the pay period.

11   I said, Well, you'll have to take it off

12   the next pay.  Didn't think nothing of it.

13   Well, I go over to the department.  The

14   next thing I know Tom Soles calls me up and

15   calls me in the office and talks to me about

16   this meeting.  He said that we left --  I don't

17   remember what it was.  I think it's on this

18   paper.  I wrote it down, what he told me.

19  Q.  Exhibit 5 I believe is what you're looking for.

20  A.  Is that what I'm looking for?

21  Q.  I believe so.  Is that what you're looking for?

22  A.  Yes.  He told me we left at 1:20.

23   And I told him.  I said, Tom, I don't

24   know.

25   I told him what happened, what Tom Landis

150

Exam./Maguschak - Weaber

1   said and what Ken Smith said, which Ken Smith

2   was my relief supervisor.

3       I told him.  I said, There was no clock in

4   the room.  I told him that if they did that I

5   will write them up.  I will call them in, and I

6   will write them up, or you can take it even out

7   of my pay, I said to him.  That's just how I

8   said it to him.

9       He told me to go back to work.  I went

10  back to work.

11      The next day I come in.  I get called

12  right into the office, go down to Cindy

13  Lighty's office with Tom Soles.  All Tom Soles

14  said to me --

15  Q.  Let me just stop you.  The meeting that you had

16  with Tom Soles that you just testified about,

17  was it just you and Tom or was anybody else in

18  the room?

19  A.  No.  It was just Tom and I.

20  Q.  Go ahead.

21  A.  We went down.  He called me over, shut the

22  door.  I went to shut the door.

23      He said, You don't have to shut the door.

24  We've got to go down to Cindy Lighty's office.

25      I said, Okay.

Exam./Maguschak - Weaber

1       We're walking down the steps.  And he

2   said, This is heavy stuff.

3       I just looked at him.  I said, All right.

4   And I went down.

5       She asked me, and she said, Linda, do you

6   know what this meeting is about?

7       And I just looked at her.  And she said,

8   Do you know how we had a meeting before about

9   honesty?

10      I said, Yes.

11      So I told her the whole story I told Tom

12  Soles the day before.

13      And she said, Well, we're suspending you

14  until further investigation.

15      Tom Soles walked me back to my department,

16  told me I could get whatever I need to take

17  with me.  I had the keys and stuff in my

18  pocket.

19      Greg Marks was on the floor with me at

20  that time because Ken Smith was at fire school

21  for that week.  I had to page Greg Marks.  I

22  paged him to come to the office.  I give him

23  the keys.  I took my planner with me, and that

24  was it.  Tom Soles walked me out.

25      Ken Smith called my home and told me that

Exam./Maguschak - Weaber

1        --

2    Q.    When did Ken Smith call your home?

3    A.    It was in the evening.  I don't know exactly

4          what day.  Yes, I do know what day it was.  It

5          was --  Did he call home, or did he call in at

6          work?  I can't remember.  But he called and

7          told me that Tom Soles called him in and have

8          Greg change his timecard.

9              I said, Have Greg change your timecard?

10             He said, Yeah.  He said, I put myself down

11         for eight hours.

12   Q.    Ken Smith told you that?

13   A.    Yeah.  I said, You put yourself down for eight

14         hours?

15             He said, Yeah.  He said, I told Tom that I

16         was going back in on Friday but then I didn't

17         feel up to it so I didn't come in.  He said, So

18         he knows that I have eight hours down there and

19         I wasn't there.

20             He said, So have him change my timecard

21         and take four hours off next pay.

22             See, I was on the floor, and my working

23         foremen always checked because we had the new

24         system of the swipe cards for time cards.  But

25         when we had meetings like that, we did it

Exam./Maguschak - Weaber

1    ourselves on the computer.  So Ken always did

2    all the timecard things and would go over and

3    make sure everybody punched in and it was set

4    up like it was supposed to be set up.

5        I told Greg.  Greg didn't want to do it.

6    No.  Wait.  Just let me think about this a

7    minute.  I'm trying to get straight.

8        Tuesday we had a meeting.  Wednesday I

9    worked.  He must have called into work

10   Wednesday night because I answered the phone on

11   the fax phone.

12       Greg didn't want to do it, but Greg did

13   it.  I wasn't there Thursday.  I wasn't there

14   no more then because that's when they sent me

15   home, Thursday.

16  Q.  So have you figured out when Ken Smith called

17      you?

18  A.  I'm sure it was Wednesday night on the fax

19      phone in the office, because I wasn't at home.

20      It couldn't have been at home because I was on

21      second shift.  Monday and Tuesday I was in

22      class.  Wednesday I went in.  He let me work.

23      So it had to be Wednesday night he called in

24      there.

25  Q.  He called you Wednesday night at work?

154

Exam./Maguschak - Weaber

1  A.   He called me Wednesday night on the fax phone

2        at work.  I told Greg, and Greg hesitated doing

3        it, and then Greg went in and did it.

4            Thursday as soon as I got in I got called

5        right down to Cindy Lighty's office and they

6        told me I was suspended.

7  Q.   So Ken called you after your meeting with Tom

8        Soles but before your meeting with Tom Soles

9        and Cindy Lighty?

10  A.   Right.  No, no.  After my meeting with --

11       Yeah, you're right there.  After my meeting

12       with Tom Soles, I went back and spent the day

13       at work.  It was in between, right that night.

14       So it had to be that Wednesday.

15           Then Thursday is when I went down to Cindy

16       Lighty's office, and she suspended me.

17           Then when I got my phone call I had to go

18       back in.  I had to go in at 2:30 on the 21st,

19       2:30 in the afternoon.  All that was there was

20       Joe Vrabel and Gordon Sweinhart.  My manager

21       wasn't there.  Pat Kilgore wasn't there.  Larry

22       Weinsheimer wasn't there.  No one else.

23  Q.   Cindy Lighty was there too; right?

24  A.   Just Cindy Lighty, Gordon Sweinhart, and Joe

25       Vrabel from security.

Exam./Maguschak - Weaber

1   Q.   Before you go forward with that, I want to go

2         back to the meeting that you had with Tom

3         Soles, the first meeting that was just Tom

4         Soles without Cindy Lighty.  How long did that

5         meeting last?

6   A.   Just a couple minutes.

7   Q.   And it was just the two of you; is that right?

8   A.   Yes.

9   Q.   Where was that meeting held?

10  A.   In his office.

11  Q.   When you left that meeting, did Tom Soles tell

12        you that he was going to continue

13        investigating?

14  A.   Just that it would be under investigation.

15        Yes, he did.

16  Q.   Did he tell you not to discuss it with anyone?

17  A.   Yes, he did.

18  Q.   Then it was that night that Ken Smith called

19        you?

20  A.   Yes.  And I didn't tell Ken Smith that I had a

21        meeting with Tom Soles.  I didn't talk to Ken

22        Smith about nothing.  The only person I talked

23        to was my husband when I got suspended.

24  Q.   And you didn't tell Ken Smith that there was an

25        issue regarding when the meeting on May 6th

156

Exam./Maguschak - Weaber

1    broke up?

2  A.   No.  No.  All he told me, that Tom Soles called

3       him in from a fire school, like I said, and

4       talked to him and Tom Soles knows that he

5       wasn't there Friday.  He was worried because he

6       put in the eight hours that he should have got

7       paid, instead of four.  Ken Smith is still in

8       charge of Kisses as a working foreman.

9  Q.   He's an hourly employee; right?

10 A.   Right.  Nothing was done about it.

11      The other thing I can say is Mike Tomei

12      got paid for eight hours.  Nothing was done

13      about his other hours either.

14 Q.   When you say Ken Smith wanted to change his

15      time from eight to four hours, for what day was

16      that?

17 A.   That was for on May the 6th, that Wednesday

18      night that we had the meeting.  He put in that

19      he was going to be there for eight hours, and

20      he wasn't.  He wasn't there for eight hours.

21      I was really under the impression it was a

22      quarter to three, that he was there for four

23      hours.  But they're saying we weren't even

24      there till then.  But in my heart --  And I

25      would swear on my children's life I didn't even

Exam./Maguschak - Weaber

1    look at a clock.  But I did tell Tom I would

2    write them up.  He could take it out of my pay.

3        But if they had done that to me and made a

4    total ass out of me, in plain words, I was very

5    upset that they would even do that because I

6    was good to my team.  I would buy them meals

7    and everything else, and I'd never get

8    reimbursed for it either.

9  Q.  Then the day after your meeting with Tom Soles

10       was the day you had a meeting with Cindy Lighty

11       --

12  A.  Yes.

13  Q.  -- and Tom Soles?

14  A.  Not --  Yes, yes.

15  Q.  Is that right?

16  A.  Yes.

17  Q.  It was just the three of you in that meeting?

18  A.  Yes.

19  Q.  How long did that meeting take place?  How long

20       did that meeting last?

21  A.  Maybe ten minutes.  Ten, 15 minutes.  I don't

22       know.  Not long.

23  Q.  That was in Cindy Lighty's office?

24  A.  Yes.

25  Q.  She told you you were suspended?

158

Exam./Maguschak - Weaber

1   A.   Yes.

2   Q.   Did she tell you why?

3   A.   Honesty.  That was it.

4   Q.   Is that all she said?

5   A.   That was it.

6   Q.   She didn't give any explanation as to what she

7        meant by honesty?

8   A.   No.  To this day, I still don't know why I was

9        terminated.

10  Q.   If I'm correct, I think you said when you came

11       in she said something like, We had another

12       meeting about honesty before this.

13  A.   Right.

14  Q.   What was she referring to?

15  A.   She was referring to me when I was telling her

16       about Darryl Bentz.

17  Q.   So she wasn't talking about another meeting

18       about your honesty?

19  A.   No.  No.

20  Q.   Did Tom say anything during this meeting?

21  A.   No.

22  Q.   Did you ask her what she meant by honesty?

23  A.   She asked me questions about the meeting.  I

24       told her everything I told Tom.

25  Q.   Did you tell her about your conversation with

Exam./Maguschak - Weaber

1     Ken Smith the night before?

2 A.   I told her that Ken --  I don't know if I told

3     her that or not, to be truthful with you.  I

4     don't know.  No.  I told her about that when

5     she terminated me.  That's when I told her

6     that.

7 Q.   Tell me everything you can recall about the

8     meeting with Cindy Lighty and Tom Soles when

9     you were suspended.

10 A.   Just that when I walked in I sat down.  Her

11     desk was about where you're at.  I sat down

12     over here.  Tom Soles sat down where she's

13     sitting.

14         She said, Linda, do you know what this

15     meeting is about?  It's about like what we had

16     before, honesty.

17         I said, Okay.

18         And she asked me questions about the

19     meeting, what time we left and stuff.  I told

20     her everything.

21 Q.   Tell me --

22 A.   Okay.  I'll tell you again.

23 Q.   Tell me again.

24 A.   I told her we're sitting in the room.  All the

25     work we did, I told her about that.  I told her

Exam./Maguschak - Weaber

1        about the break we took, the work we did.  We

2        came back, that I faxed that stuff to Ann

3        Menischeschi.

4             I told her that either Tom looked down at

5        a watch or at his pager.  I don't know what,

6        but he looked down.

7             And he said, It's a quarter of.  It's time

8        to get out of here.

9             And Ken Smith said, Let's get out of here.

10       Let's go.

11            I thanked them for the meeting, and we

12       knew what date.  We went over the schedule

13       about the date of the next meeting, and they

14       left.  There was no --  I told her there was no

15       clock in the room.  I don't know no more than

16       that.

17  Q.   And did she ask you any other questions?

18  A.   Not that I recall of.  She might have asked me

19       if I had anything else to say.  I don't know if

20       she said that to me or not.

21  Q.   Did she tell you that the investigation was

22       continuing, or how did she leave the meeting?

23  A.   She said, You're suspended till you hear from

24       us, and Tom will walk you back and get what you

25       need.

161

Exam./Maguschak - Weaber

1          He escorted me out, and that was it.

2   Q.   Between that meeting with Cindy Lighty --

3   A.   And that I couldn't talk to nobody.  She did

4        tell me that I couldn't talk to anybody about

5        what was said here in the office.

6          When I went home that night, my husband

7        asked me why I came home.  I did tell my

8        husband.  I did not talk to my daughters.  I

9        did not talk to my mother, and my mother lives

10       catty-corner across from me.  I didn't talk to

11       them.  I said I'm just off on vacation.  I

12       didn't tell them nothing else.  That was it.  I

13       didn't make no phone calls.  I didn't talk to

14       anybody on the phone.

15  Q.   Is that true through May 21st, 1999?

16  A.   That's true.

17  Q.   You didn't talk to anybody?

18  A.   Yes.  My husband answered the telephone when

19       the kids called.  I did not talk to any of my

20       daughters.  All three of my daughters I did not

21       talk to.  I didn't want to answer no questions.

22  Q.   How was the meeting on May 21st set up?  Who

23       contacted you?

24  A.   She works in --  Sue --  I don't know what

25       Sue's last name is.  She worked in personnel.

162

Exam./Maguschak - Weaber

1    She left a message on the answering machine to

2    call up there.

3        I called, and they said for me to come in

4    at 2:30, Cindy Lighty would like to see me at

5    2:30.  So I got there, went in, sat in Cindy's

6    room.  I waited for a little bit for her.

7        She came in.  And she said, Boy, you're

8    right on time all the time, huh?

9        I said, Yep.

10       Then Joe Vrabel was there and Gordon

11   Sweinhart.

12   Q.  Was this in Cindy's office?

13   A.  Yes.  Joe Vrabel sat beside me, and Gordon

14   Sweinhart sat over on that side.

15   Q.  Did you know who those people were before you

16   --

17   A.  I didn't know Gordon Sweinhart.  I knew Joe

18   Vrabel because I had -- which I didn't tell you

19   before.  But I had went in to the security

20   office and reported Roy Keeton, what he did to

21   me out in the parking lot, slamming on his

22   brakes thinking I'd hit him in the ass one

23   night.  I did report that to Joe Vrabel too.

24   Q.  When was that?

25   A.  That was when all this threatening was going

Exam./Maguschak - Weaber

1    on.

2  Q.    When Darryl Bentz was your supervisor?

3  A.    Yes.  So I knew Joe Vrabel, but I didn't know

4        --  Cindy introduced him.  She said they did

5        their investigation, and she said that I have

6        not been honest, I wasn't honest.  And she

7        said, We're terminating you.

8            I said, What wasn't I honest about?

9            She said, Well, that's not the concern to

10       you.

11           I said, Well, you get your people down

12       here in front of me and tell me.

13           She said, No.  She said, That doesn't

14       concern you.

15           She wished me good luck, and she laughed.

16           Joe Vrabel asked me, he said, Linda, is

17       there anything I can do for you?

18           I said, No, there's nothing you can do for

19       me, Joe.

20           I don't know what they expected.  I just

21       smiled, and I walked out.  I walked out the

22       door and never looked back.  I didn't go back

23       in and get my stuff, my pictures of my

24       grandkids and stuff that was sitting on my

25       desk.  I let my daughters get them.  I didn't

164

Exam./Maguschak - Weaber

1     go back in there.

2  Q.  Do you recall anything else that happened

3     during that meeting?

4  A.  She didn't tell me why I was terminated.

5  Q.  Other than to say you weren't honest?

6  A.  I wasn't honest.  And I was honest.  I told her

7     everything I could tell her.  I don't know what

8     more I could have done.

9  Q.  Either in that meeting or the previous meeting

10    with Cindy, did anybody ask you whether you had

11    contacted anybody on the team after your

12    meeting with Tom Soles?

13  A.  Yes.  Cindy told me that I contacted somebody.

14       And I said, No, I didn't, Cindy.  I said,

15    You bring them down here.  I said, I'll tell

16    them to their face.

17       She said she won't do that.

18  Q.  Did she say who you had contacted?

19  A.  No.  No, she didn't.  I did tell her that Ken

20    Smith called in about the --  At that time I

21    told her that Ken Smith called in about that,

22    that four hours, having Greg change that.  I

23    did tell her that.

24  Q.  Did you ever call Ken Smith at his home?

25  A.  I never called Ken Smith at his home, not

165

Exam./Maguschak - Weaber

1        unless -- Before all this happened, I might

2        have, but not after she suspended me or

3        anything. The only time I talked to Ken Smith

4        was when he called in there.

5   Q.  Did you ever call Ken Smith at his home in May

6        of 1999?

7   A.  Not that I know of. Not that I remember of,

8        no.

9   Q.  Did you ever have any problems with Ken Smith?

10  A.  No. That's what's so shocking. No.

11  Q.  Did you ever have any question in your mind

12       about Ken Smith's honesty?

13  A.  No, I didn't.

14  Q.  After your meeting with Tom Soles on May 12th

15       where he told you he was investigating, did you

16       contact Ken Smith and ask him to say that the

17       team had stayed the whole time on May 6th?

18  A.  No, I did not. I know Ken Smith wanted a white

19       hat, but I didn't think that bad.

20  Q.  I'm sorry. What do you mean by that?

21  A.  He wanted to be a supervisor. He even asked

22       them about being a supervisor, but I didn't

23       think -- I didn't think he'd try to cut my

24       throat for no reason.

25  Q.  Is Ken Smith still there? Do you know?

166

Exam./Maguschak - Weaber

1   A.   Yes.  He's the working foreman of Kiss

2        department yet, even though he tried to cheat

3        the company, yes.  They didn't do nothing about

4        it.

5   Q.   When you say he tried to cheat the company,

6        what do you mean?

7   A.   Well, he put four hours in there that he wasn't

8        --  How many other times has he done it?  He

9        could have done it to me that I didn't even

10       know about it.

11  Q.   So as far as you know, he's in the same

12       position he was in when you were terminated?

13  A.   Yes, he is.  Yes, he is.

14  Q.   Do you know whether he's been promoted since

15       you left?

16  A.   No.  He's still working relief supervisor.  But

17       Greg Marks, as soon as Karen became second

18       shift, he went first shift.  He wouldn't work

19       with Karen Keeton.

20  Q.   Who wouldn't work with Karen Keeton?

21  A.   Greg Marks.  He went back to regular worker on

22       first shift.

23  Q.   Greg Marks did?

24  A.   Yes.  Ken Smith's wife was a supervisor there

25       too, and she was down at the old craft building

167

Exam./Maguschak - Weaber

1    down there on Broad Street in Palmyra, and

2    somehow she lost her job.  I don't know what

3    happened there either since I'm gone.

4  Q.  Have you ever filed a charge of discrimination

5    or any other kind of charge against any other

6    employer other than Hershey?

7  A.  No, and I didn't enjoy this either.

8  Q.  Have you talked to any past or current Hershey

9    Foods employees about your lawsuit?

10 A.  Since I'm out of there?

11 Q.  Yes.

12 A.  Yes.

13 Q.  Who did you talk to?

14 A.  Well, my family knows it.  My mother knows it.

15    My one cousin.

16 Q.  Am I correct that Cindy Lighty told you that

17    she had received a report that you had

18    contacted a member of the support team after

19    your meeting with Tom Soles?

20 A.  Yeah, she told me I did.  I told her I didn't,

21    and I didn't.  I didn't talk to nobody.  The

22    only one I talked to was my husband.

23 Q.  Do you have any knowledge or facts to dispute

24    Cindy Lighty's statement to you that she

25    received such a report from somebody on your

Exam./Maguschak - Weaber

```
 1        team?
 2   A.   I don't know if she did or not.  I can't say
 3        that.  I don't know.  It's her word against my
 4        word.  I don't know.
 5   Q.   I asked you since your termination whether you
 6        had spoken with any past or current Hershey
 7        Foods employees.
 8   A.   You didn't ask me for Hershey Foods employees.
 9   Q.   Didn't I?
10   A.   No.
11   Q.   I'm sorry.  Let me ask you that then.  Since
12        your termination, other than your daughters,
13        have you spoken to any past or current Hershey
14        Foods employees about your termination or about
15        your lawsuit?
16   A.   Dale Godwin seen me at Redner's grocery store.
17        He said about the raw deal I got, that I was
18        shafted, that he was called down to personnel
19        to talk about me but anything that he wanted to
20        say about me they didn't want to listen to.
21   Q.   Did he say when he was called down to
22        personnel?
23   A.   No.
24   Q.   Did he give you any more details about what --
25   A.   That was it.
```

Exam./Maguschak - Weaber

1   Q.  Did he say what they wanted, what kind of

2       questions they asked him about you?

3   A.  He said they wanted all negative things about

4       me.  He said he tried to tell them all the good

5       things, and he said they told him they don't

6       want to hear that kind of stuff.  I don't even

7       know who he was talking to.  I didn't ask him.

8   Q.  When did you have this conversation with Dale

9       Godwin?

10   A.  Oh, my God.

11   Q.  Approximately.

12   A.  Last year I guess it was sometime.  I just ran

13       into him in the grocery store.  That's the

14       first I seen him.

15   Q.  When was the last time you spoke to Ken Smith?

16   A.  The night he called me.

17   Q.  Other than Dale Godwin, when was the last time

18       you spoke to any other members of the support

19       team?

20   A.  Well, I talk to Raymond Wolfe all the time, but

21       nothing about Hershey Foods.  He has cancer,

22       and he'll call and stuff.  No.

23   Q.  Have you ever talked to Mr. Wolfe about --  Was

24       he at the meeting on May 6th?

25   A.  Yes, he was.

Exam./Maguschak - Weaber

1   Q.   Have you ever talked to him about the issue of

2        whether the meeting broke up early or anything

3        like that?

4   A.   He said it was 3 o'clock.  I did ask him that.

5   Q.   So he said it went the full time?

6   A.   Yep.  He said it was 3 o'clock.  He said --

7        Quarter of three, he said.

8             I asked him.  I said, Raymond, what time

9        was it?

10            He said, A quarter of three.

11            And he told me that he was called over to

12       the office.  He told me he was called over to

13       the office, and he told them --  He said, I

14       told them it was a quarter of three.

15            But the rest of the team --  Like Bob

16       Haas, he retired.

17  Q.   Have you spoken to him since your termination?

18  A.   No, I wouldn't.  Henry Graby, I guess he's

19       still there.  I haven't seen none of them.  The

20       only one I ever ran into was Dale Godwin, and

21       that was at Redner's grocery store.

22  Q.   The only person you talked to from the team is

23       Mr. Wolfe?

24  A.   Yep.

25  Q.   When was the last time you spoke with Darryl

171

Exam./Maguschak - Weaber

1          Bentz?

2    A.    Before I got terminated.  I ran into him when I

3          was going back to the tour room for a meeting,

4          and he said hello, and I said hello to him.

5    Q.    When was the last time you spoke with Larry

6          Weinsheimer?  Is it Larry?

7    A.    Larry Weinsheimer?  When we went to the human

8          relation meeting.  I seen him this past

9          Christmas, but he didn't speak to me, and I

10         didn't speak to him.  I seen him when we went

11         to cut the tree down at the tree farm.

12   Q.    So you saw him at the fact-finding before the

13         Human Relations Commission?  Is that when you

14         saw him?

15   A.    Yeah, at the meeting that we had there.

16   Q.    At the Human Relations Commission?

17   A.    Yeah.

18   Q.    Who else was there?

19   A.    Tom Soles and a young girl.  I don't know what

20         her name was.  She was supposed to be a lawyer

21         from corporate is all I know.  I don't know

22         what her name was.  Dark-haired girl.

23   Q.    Tall?

24   A.    Pretty tall, thin.

25   Q.    When was the last time you spoke with

172

Exam./Maguschak - Weaber

1       Mr. Kettering?

2   A.   Before I was terminated.  Let me think.  Or did

3        I see him in --  I seen him, I think, at the

4        grocery store.  I said hello, and that was in

5        passing.  I walked past.  He said, Hello,

6        Linda.  And I said hello to him.  That's been

7        quite a few months ago.

8   Q.   When was the last time you spoke to Greg Marks?

9   A.   Greg Marks?  The night I handed him my keys.  I

10       didn't even go to his daughter's viewing.  His

11       daughter walked on a ledge in Philadelphia

12       thinking she locked her keys out of her house,

13       and she had a roof that she took friends out

14       on.  The door got locked.  She thought she

15       could walk on the ledge to get to the window,

16       and she fell off, and she was killed.  I didn't

17       even go to the viewing, because I don't want to

18       talk to the people about Hershey.

19  Q.   When was the last time you spoke to Richard

20       Chase?

21  A.   I couldn't tell you.  That was when I worked

22       there.  Yeah, I haven't seen Richard Chase

23       since.

24  Q.   When was the last time you spoke to Carolyn

25       Haskell?

Exam./Maguschak - Weaber

1  A.   When she called me up on the telephone and told

2       me she sat my meeting up with this woman over

3       in community -- the exercise place, over the

4       telephone before I was terminated.

5  Q.   We talked about some documents regarding your

6       employment search that you said you were going

7       to look for and give to your attorney if you

8       have any.  Do you have any other documents at

9       your home that you think might be relevant to

10      your lawsuit?

11 A.   I have all my medical papers that I was sick.

12      I have all the papers from the first of '99

13      when this happened in February to me.  I have

14      all the tests and all that stuff they took.

15 Q.   Do you mean the medical stuff?

16 A.   Yeah.  I have all that stuff.

17 Q.   Do you keep a diary?

18 A.   No.

19 Q.   Do you have --

20 A.   I don't have time for that.

21 Q.   Do you have any handwritten notes or anything

22      from any of your conversations, for example,

23      with Carolyn Haskell?

24 A.   No.

25          MS. MAGUSCHAK:  Do you want to take about

Exam./Maguschak - Weaber

1       a five-minute break?  I think I'm almost done.

2           (Recess taken.)

3  BY MS. MAGUSCHAK:

4  Q.    Did you file federal tax returns in 1998?

5  A.    Yes, I did.

6  Q.    In 1999?

7  A.    Yes, I did.

8  Q.    And in 2000?

9  A.    Yes, I did.

10          MS. MAGUSCHAK:  That's all the questions I

11      have for now.  We're going to reserve the right

12      to re-call after we get the additional

13      discovery responses and additional information.

14          MR. OSTROWSKI:  Sure.  Okay.

15          MS. MAGUSCHAK:  We'll let you know if we

16      need to get together again.

17          MR. OSTROWSKI:  Okay.  I don't have any

18      questions.

19          (Whereupon, the deposition concluded at

20      4:10 p.m.)

21

22

23

24

25

175

```
 1          COMMONWEALTH OF PENNSYLVANIA)
                                       )  SS.
 2          COUNTY OF DAUPHIN          )

 3               I, Glenda S. Travitz, Registered
            Professional Reporter and Notary Public in and
 4          for the Commonwealth of Pennsylvania and County
            of Dauphin, do hereby certify that the
 5          foregoing testimony was taken before me at the
            time and place hereinbefore set forth and that
 6          it is the testimony of:

 7                    LINDA F. WEABER

 8               I further certify that said
            witness was by me duly sworn to testify the
 9          whole and complete truth in said cause; that
            the testimony then given was reported by me
10          stenographically and subsequently transcribed
            under my direction and supervision and that the
11          foregoing is a full, true and correct
            transcript of my original shorthand notes.

12
                 I further certify that I am not  counsel
13          for nor related to any of the parties to
            the foregoing cause, nor employed by them or
14          their attorneys and am not interested in the
            subject matter or outcome thereof.

15
                 Dated at Harrisburg, Pennsylvania, this
16          day of March 2002.

17
            ┌─────────────────────────────────┐
18          │         Notarial Seal           │
            │ Glenda S. Travitz, Notary Public│
19          │ Lower Paxton Twp., Dauphin County│
            │My Commission Expires Sept. 24, 2002│
            └─────────────────────────────────┘
            Glenda S. Travitz
19                                 Registered Professional Reporter
20                                 Notary Public

21               (The foregoing certification of this
            transcript does not apply to any reproduction
22          of the same by any means unless under the
            direct control and/or supervision of the
23          certifying reporter.)

24

25
```

# LAWYER'S NOTES

| PAGE | LINE | |
|------|------|---|
| | | |

**Hershey Chocolate U.S.A.**

A Division of
**Hershey Foods**

**INTEROFFICE
CORRESPONDENCE**

**Quality
Through
Excellence**

| | |
|---|---|
| **TO:** | Linda Weaber |
| **FROM:** | Darryl Bentz |
| **DATE:** | March 3, 1998 |
| **SUBJECT:** | *Personnel Action Memo* |

In 1997 we discussed, at length, the proper procedures when requesting days off or approval for vacation days/weeks. At that time, it was clearly stated that permission would be granted only when given by the Manager and/or the Manager's Secretary and must be obtained, at least, in advance of the event.

On 2/26 and 2/27 you requested vacation through Relief Supervisor, Ken Smith, which is not in compliance with the instructions given in 1997. Normally, there is little difficulty in meeting the needs of Kiss Supervisors due to the well trained Reliefs that are available to fill in as necessary. However, due to the many production schedule changes and performance factors that can negatively affect the business, it is deemed most important that appropriate communication exchanges are made and when you are not here, things may be missed.

Therefore, in the future, you are required to adhere to the proper procedures for reporting off and failure to comply will result in further disciplinary steps which may include time off and loss of pay.

*DARRYL BENTZ*

Waeber

**EXHIBIT**

## CONFIDENTIAL SEPARATION AGREEMENT

This Agreement, entered into this _____ day of _____, 1999, by and between Hershey Foods Corporation (the "Company") and LINDA F. WEABER ("Employee") regarding her separation of employment from the Company.

WHEREAS, Employee's employment has been involuntarily terminated;

WHEREAS, Employee wishes to receive benefits under the Company's Severance Benefits Plan, receipt of which is conditioned upon the execution of a waiver and release acceptable to the Company;

NOW, THEREFORE, in consideration of the mutual agreements and covenants hereinafter set forth and the payment of severance benefits to be made hereunder, the parties agree as follows:

1.     Employee's separation of employment from the Company shall occur and be effective on ___May 21, 1999___.  Until such time Employee shall perform such job duties as directed by her immediate supervisor, answer any questions regarding matters assigned to her prior to separation, and otherwise assist the Company in transferring her responsibilities to others within the Company.

2.     Employee shall receive severance benefits in accordance with the Company's Severance Benefits Plan.  These severance benefits shall be limited to those set forth in the attached document entitled "Severance Benefits".  Employee hereby agrees that these severance benefits are all the benefits that she is entitled to receive under the Company's Severance Benefits Plan.  In addition, Employee shall receive such additional benefits as set forth in the attached document entitled "Other Benefits".  Employee hereby agrees that these monies or benefits are all the monies or benefits Employee is entitled to receive under any other benefit plan or by law.

3.     Employee hereby forever releases and waives for herself, her attorneys, heirs, executors, administrators, successors and assigns fully and forever any claim of any kind which she has or might have in the future, whether currently known or unknown, against the Company, its subsidiaries, affiliates or divisions and any directors, officers, agents, employees, successors and assigns thereof, arising from events from the beginning of time up to the execution of this Agreement and arising out of her employment and the separation of such employment (except worker's or unemployment compensation or any claim under this Agreement).  Employee understands that acceptance of the terms of this Agreement constitutes a full settlement of all compensation due her for any reason and is a waiver and covenant not to sue for any employment-related claim under local, state or federal law, including but not limited to the Fair Labor Standards Act, the Equal Pay Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans With Disabilities Act, the Family and Medical Leave Act, and the Pennsylvania Human Relations Act and any tort or contract law claims based on her employment or separation from employment, including but not limited to wrongful discharge, breach of contract, or

14230_6

EXHIBIT
Weaber
2  2-22-02

defamation. Employee warrants and represents, with the understanding that such warranty and representation is material to this transaction, that no person or entity has asserted with any federal, state or local judicial or administrative agency any claim of any kind or character based on or arising out of or alleged to be suffered in or as a consequence of Employee's employment with the Company or her separation of employment and that she has no current intention to assert or cause to be asserted such a claim. In the event that any claim covered by this Agreement, waiver or release is asserted in the future by Employee, or any person or entity authorized by Employee to do so, Employee agrees that this Agreement shall act as a total and complete bar to her re-employment as a remedy in any legal action or to the recovery of any sum or amount whatsoever from the Company, whether designated as award, liability, damages, judgment, backpay, wages, or fine or otherwise resulting directly or indirectly from any lawsuit, remedy, charge or complaint whether brought privately by her or by anyone else, including any federal, state or local agency, whether or not on her behalf or at her request. Employee states and agrees that the Company has taken no action interfering with any right which she may have to file any charge, claim or other process with any federal, state or local judicial or administrative agency regarding her employment or the termination thereof or any right to contact or seek the guidance or intervention of any such agency.

Employee agrees that she will execute this Agreement no sooner than the last day of Employee's employment with the Company and no later than twenty-one (21) days after the termination of Employee's employment. Employee agrees in the event she fails to execute this Agreement within twenty-one (21) days after separation from employment, or if she executes the Agreement within that time period but revokes the Agreement in accordance with Paragraph 10 hereof, this Agreement and the offer to pay severance benefits contained herein shall be withdrawn by the Company. Employee agrees that in the event this Agreement is not executed or if executed, is revoked in accordance with Paragraph 10 hereof, Employee shall not be entitled to receive any severance benefits under the Company's Severance Plan. Employee agrees that severance benefits shall not be paid hereunder until ten (10) business days after the Company receives a fully-executed Agreement, which is not revoked by Employee. No revocation of this Agreement shall be effective unless made as specified in Paragraph 10 hereof.

4.    This Agreement is not an admission of liability with respect to any matter set forth herein and shall not be deemed or construed as such. Employee agrees not to use this Agreement in any fashion as such an admission and further agrees not to use this Agreement as evidence of any employment related claims which are referenced in the preceding paragraph. Employee agrees and admits that no representation of fact or opinion has been made by either party, or any representative thereof, to induce the execution of this Agreement. In the event Employee breaches this Agreement, Employee shall pay Company the full value of any severance benefits provided by Company hereunder within twenty (20) days after the breach, and immediately upon Employee's breach Company shall no longer be obligated to honor the remaining terms of this Agreement. Further, the Company shall be entitled to recover the full value of any severance benefits provided hereunder. To the extent Employee refuses to tender back such benefits to the Company within twenty (20) days of the breach, Employee will be deemed to have ratified this Agreement and will be foreclosed from pursing any action against the Company relative to matters covered by this Agreement.

14280_6

Alternatively, at the Company's sole election which Employee agrees the Company can make at any time, Company shall be entitled to recover the full value of any severance benefits provided hereunder via set-off against any recovery Employee may obtain, as well as attorney's fees, costs of suit and any other remedy provided by law. This Agreement shall be governed by and interpreted in accordance with the laws of the Commonwealth of Pennsylvania without regard to conflicts of law principles, the state and/or federal courts of Pennsylvania shall have sole jurisdiction over any dispute arising hereunder. Employee hereby waives her right to trial by jury. This Agreement shall constitute the entire and exclusive agreement between the parties with respect to the separation of Employee's employment from the Company and of any rights or duties owed as a consequence thereof.

5.    All payments or benefits to be paid to Employee under this Agreement or otherwise are subject to withholding from such payments or benefits in accordance with applicable plan provisions, laws and regulations. Employee agrees to return to the Company any Company property (ID card, keys, credit cards, computer disks, back-up disks, documents containing confidential information, etc.) which Employee may have in her possession on or prior to her separation date. If Employee does not return items of Company property in her possession by such date or attempts to reconstruct any Company confidential information, the Company, in addition to any other rights it may have under this Agreement or otherwise, may withhold any payments to be made to Employee to the extent of the value of such Company property, which value shall be determined in the sole judgment of the Company. This withholding shall not effect the validity of the other provisions of this Agreement. Employee agrees to provide prompt notice to the Company of any medical benefits offered or received from any other employer in accordance with the Severance Benefits Plan.

6.    Employee recognizes that her dealings in the matters in which she has been involved and with the personnel of the Company are confidential to the Company. "Confidential Information" means information (1) disclosed to or known by Employee as a consequence of or through her employment with the Company, (2) not generally known outside the Company, and (3) which relates to the Company's business. Employee agrees not to disclose any Confidential Information or other proprietary information of the Company or any information regarding the personnel of the Company, including information received in confidence by the Company from others, either during or after her employment with the Company, except upon written consent of the Company. It is understood that such Confidential Information and other proprietary information of the Company include matters that Employee has learned from other employees of the Company. Employee will not, except as the Company may otherwise consent or direct in writing, reveal or disclose, sell, use, lecture upon, or publish any Confidential Information or other proprietary information of the Company, or authorize anyone else to do these things at any time either during or subsequent to her employment with the Company. This clause shall continue in full force and effect with respect to any specific Confidential Information and other proprietary information and shall cease only with respect to and when that specific portion of the Confidential Information and other proprietary information becomes publicly known through no fault of Employee's. The terms of this Agreement shall be in addition to the terms of any Confidentiality Agreement previously executed by the Employee.

14280_6

-3-

Employee agrees that all ideas, inventions, trade secrets, know how, documents and data ("Creative Property") developed either during, in connection with, or pursuant to her employment with the Company, or in connection with, or pursuant to the terms and conditions of this Agreement shall remain and become the exclusive property of the Company. Employee agrees to provide all reasonable assistance to the Company in perfecting and maintaining its rights to the Creative Property. The Company shall have the right to use the Creative Property for any purpose without any additional compensation to Employee. To the extent not inconsistent with this Agreement, nothing herein shall in any way prevent Employee from utilizing her general business, management, financial, professional, and/or scientific skills, techniques and abilities.

Employee agrees that she shall not make any public statement(s) to the media concerning the Company, its business objectives, its management practices or its management personnel, and shall take no action which would cause the Company or its employees any embarrassment, humiliation, or otherwise cause or contribute to the Company or any employee being held in disrepute by the general public or the Company's employees, suppliers or customers, including, but not limited to, making disparaging comments about the Company in public or private.

7.      Employee agrees that during the life of this Agreement and for a period of twelve (12) months thereafter, she shall not participate in recruiting any Company employees or in the solicitation of Company employees; and she shall not communicate to any other person or entity, about the nature, quality of work, or any special knowledge or personal characteristics of any person employed by the Company without the consent of the Vice President - H. R. Operations. Employee also agrees that during the period covered by severance benefits, she shall not accept employment with or perform services on behalf of the following competitors of the Company: Nestle USA, Inc.; and Mars, Inc.; or any parent, subsidiary or affiliated company thereof. Employee acknowledges that the remedies at law for any breach by Employee of the provisions of this Agreement would be inadequate and that the Company shall be entitled to injunctive relief against Employee in the event of any such breach, in addition to any other remedy and damages available. Employee acknowledges that the restrictions contained herein are reasonable, but agrees that if any court of competent jurisdiction shall hold such restrictions unreasonable as to time, geographic area, activities, or otherwise, such restrictions shall be deemed to be reduced to the extent necessary in the opinion of such court to make them reasonable.

8.      As a specific condition to the performance of this Agreement by the Company, Employee agrees that she will not disclose, for any purpose, at any time, except as required by an order of a court of competent jurisdiction, the terms of this Agreement to any person except her spouse and personal/legal/tax/financial advisors. Any violation of the provisions of this Agreement will terminate any obligation on the part of the Company to make any payments.

9.      If any terms or provisions of this Agreement shall, to any extent and under any circumstance, be illegal, invalid or unenforceable, the remainder of this Agreement shall not be affected thereby and shall be valid and enforceable to the extent permitted by law.

14280_6                                    -4-

10.    EMPLOYEE STATES THAT SHE HAS READ CAREFULLY THIS AGREEMENT, KNOWS AND UNDERSTANDS THE CONTENTS THEREOF, AND THAT SHE EXECUTES SAME OF HER OWN FREE WILL.  EMPLOYEE AGREES THAT SHE HAS BEEN ADVISED BY THE COMPANY TO CONSULT WITH AN ATTORNEY PRIOR TO EXECUTING THIS AGREEMENT AND THAT SHE UNDERSTANDS THE BINDING EFFECT OF SIGNING THIS AGREEMENT. EMPLOYEE ACKNOWLEDGES THAT SHE HAS BEEN GIVEN A PERIOD OF AT LEAST TWENTY-ONE (21) DAYS WITHIN WHICH TO CONSIDER THIS AGREEMENT PRIOR TO EXECUTION THEREOF AND THAT THIS AGREEMENT WAS PRESENTED TO EMPLOYEE ON _May 21, 1999_.  FURTHERMORE, IT IS AGREED THAT EMPLOYEE SHALL HAVE THE RIGHT TO REVOKE THIS AGREEMENT BY WRITTEN NOTICE SENT TO THE COMPANY AT THE FOLLOWING ADDRESS:

GENERAL COUNSEL'S OFFICE
HERSHEY FOODS CORPORATION
100 CRYSTAL A DRIVE
HERSHEY, PA  17033

PROVIDED SUCH NOTICE IS SENT VIA PERSONAL DELIVERY, OVERNIGHT COURIER, OR MAIL, POSTAGE PAID AND PROVIDED SUCH NOTICE IS RECEIVED BY THE COMPANY WITHIN THE SEVEN (7) DAY PERIOD FOLLOWING THE EXECUTION OF THIS AGREEMENT.  EMPLOYEE FURTHER ACKNOWLEDGES THAT THE AGREEMENT SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL SUCH SEVEN (7) DAY PERIOD HAS EXPIRED.  IN THE EVENT THIS AGREEMENT IS REVOKED BY EMPLOYEE IN ACCORDANCE WITH THE PROVISIONS OF THIS PARAGRAPH, EMPLOYEE AGREES TO RETURN TO THE COMPANY ALL CONSIDERATIONS AND BENEFITS PROVIDED BY THE COMPANY TO WHICH EMPLOYEE WOULD NOT BE ENTITLED ABSENT THIS AGREEMENT.

EMPLOYEE                                           HERSHEY FOODS CORPORATION

By: _Linda F. Weaber_                   By: _____
LINDA F. WEABER

Dated: _May 25, 1999_               Dated: _May 21, 1999_

14280_6                                          -5-

## SEVERANCE BENEFITS

| | |
|---|---|
| **NAME:** | LINDA F. WEABER |
| **SOCIAL SECURITY NUMBER:** | 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 |
| **BIRTH DATE:** | 07/09/47 |
| **HIRE DATE:** | 08/12/68 |
| **SEVERANCE DATE:** | 05/18/99 |
| **BASE SALARY:** | $57,600 — 28.59 M. |

### LUMP SUM SEVERANCE PAYMENTS:

Equal to 5 weeks of base salary.  5 x ($57,600 / 52) = $5,538
(less applicable taxes).

## OTHER BENEFITS

### MEDICAL, DENTAL AND VISION COVERAGE:

Coverage for medical, dental and vision will be made available
under Cobra at the current Cobra premium rates for a period of 18
months from the date of termination.

### PENSION PLAN:

Vested and eligible to receive the entire HRA account balance in
accordance with the Plan provisions.

### SAVINGS PLAN:

Vested and eligible to receive the entire ESSIOP account balance
in accordance with the Plan provisions.

### VACATION:

Eligible to be paid for all unused vacation.

May 18, 1999

cc:  Employee Benefits Service Center
     Employee Relations
     HRA Shared Services
     Legal Department



Weaber
EXHIBIT
3  7-22-02

v:\intrainter\hrbenefits\severance\Weaber,L.doc          Page 1 of 1

FEB-21-2002 THU 03:58 PM                    FAX NO. 7175347549                    P. 02

 **Hershey Foods**

Hershey Foods Corporation
Corporate Headquarters
100 Crystal A Drive
P.O. Box 810
Hershey, PA 17033-0810
Phone: (717) 534-4233
Fax:   (717) 534-4055

KENNETH L. WOLFE
Chairman and
Chief Executive Officer

May 26, 1999

Dear Fellow Employee:

On May 6 at our first quarter Business Report Meeting I spoke about the state of our business.

I am writing now to insure all Hershey employees understand the seriousness of our situation and to inform you of specific actions we are taking to improve our performance.

As I mentioned at the Business Report Meeting, we have not met the expectations of our shareholders and the investment community for four quarters in a row, beginning with the second quarter of 1998. As a result our stock price and the corresponding value of our company have suffered. Our stock price has fallen from a high of approximately $76 a share in April 1998 to today's price in the mid-50s. We must get the performance of our company back on track.

The primary cause of our poor performance has been a slowdown in our sales that has resulted in first quarter 1999 sales being not only below plan but below last year. Secondly, our costs of doing business are too high given the lower sales volumes so our profitability has suffered from both lower sales and proportionately higher costs.

We are doing everything possible to restore our sales to plan levels and reduce operating costs. In the interim, however, we are taking the following actions designed to reduce administrative costs:

- All 1999 salary increases for senior management will be rescinded as of June 1, 1999.

- Spending controls for all administrative cost centers will be implemented immediately with the requirement of holding 1999 costs at or below 1998 cost levels. Measurement of progress will be by senior vice president area to allow some flexibility in cost control procedures.

- Similar cost controls will be established for manufacturing common costs.

- As part of this overall cost reduction effort an external hiring freeze has been instituted for all current and future openings. Current employment offers outstanding will be honored, but all unfilled and future openings must get approval of the Management Committee and will only be considered if costs are at or below 1998 levels.



Wenner
EXHIBIT
4   2-22-02

We are hopeful that sales will recover and that we get back on track to meet our 1999 annual financial targets. As mentioned at our first quarter Business Report Meeting, we need the total commitment of all Hershey employees working together as a team to get back on track.

We are determined to achieve our 1999 financial targets. If our current efforts to spur sales and reduce costs do not result in that kind of performance, we will implement additional measures to properly align our costs with sales.

I will keep you informed concerning our progress and again ask you for your best efforts to implement the cost reduction initiatives noted above and get our company back on the appropriate performance track.

Thanks for your commitment and support during these difficult times.

Ken Wolf

KLW:jf

COMMONWEALTH OF PENNSYLVANIA

GOVERNOR'S OFFICE

PENNSYLVANIA HUMAN RELATIONS COMMISSION

Linda F. Weaber,                                :

    Complainant                          :    0094659
                               :

           v.                              :    PHRC DOCKET No.
                               :

                               :    EEOC Charge No.
Hershey Chocolate USA,                    :    17FAO1558

    Respondent                            :

## COMPLAINT

1.    The Complainant herein is:

        Linda F. Weaber
        1716 S. Forge Rd.
        Palmyra, PA  17078

2.    The Respondent herein is:

        Hershey Chocolate USA
        19 E. Chocolate Ave.
        Hershey, PA  17033

        Hershey Foods
        Cynthia Lighty, Counsel
        100 Crystal A Drive
        Hershey PA  17033

3.    I allege the respondent violated § 5 of the Pennsylvania Human Relations Act, as
    follows:

Weaber
**EXHIBIT**
5  2-22-0?

June 24, 1999

To Whom It Concerns,

I would like to schedule a date and time to file a complaint on Hershey Chocolate On sexual discrimination and on age. I wored at Hershey Chocolate since August 12, 1968. May 12, 1999 I was called into my managers office and asked what time my K & M Operation team left on May 6,1999. I told Tom Soles at 3:00am. He told me that they left at 1:20 am. I told Tom that I asked the team what time is it and one team member said quarter off, and another employee said it's time to get out of here. I told Tom Soles, that I thanked them for a good meeting and I went back to my office. I talked to another employee there that was helping with the new SAP system that was to be with our team that night , at that time I told him it's time to get out of here, he said he has to stay and help to finish the report and I said ok. I watched them for a while and left. I told Tom there is no clock in the room and if they left at that time I will give them a pam and dock them. At that time Tom told me that I give anther employee 8hrs. pay when he only worked till 1:20am. I told Tom that I told his supervisor Tom Zidik that Mike only worked 4hrs. when I came into work today. Tom Zidik and I were in class in another building on Monday & Tuesday and Tom didn't speak to me.  Tom Soles said that pay period ended on Tuesday and that Mike will get 8hrs. pay since I told the relief supervisor at the first of the week. I told them , if this is so they may take it out of my pay if you want. I didn't look at a clock.  I told Tom Soles that Tom Zidik ( Mikes Boss ) said he would call pay roll but he didn't. I was Told That I couldn't  talk to anyone about the meeting. I told Tom Soles That Mike was told he was going to lose 4 hrs. pay . I when back to work and on May13,1999 Tom Soles called my by phone and asked me to come over to his office. I told him I would be right over and when I went into his office I went to close the door and said you don't need to do that were going down to Cindy Lightys Office. All Tom said this is about the good run we had on Wednesday night and when I got into Cindy Lightys office she said you know were talking about honesty and being truthful . That we were here before and I said yes and at that time I told he what I told Tom Soles and she said that I was going to be suspended . Cindy Lighty told me I couldn't talk or get in touch with anyone about this and that I was not allowed on the plant property.

At that time Tom Soles walked me back to my office  and told me to get what ever I need and to tell my relief was leaving . I done so and gave my keys to him and Tom and I left Tom asked me for my  pass , and I gave it to him. And I left the plant. On May 21,1999 I was called and asked to come in and meet with Cindy at 2:30pm. At that time she told me that I am terminated and handed me paper about severance benefits. Cindy told me that I was told not to talk to anyone about this and that I called people up and told the to lie for me. I told he that I didn't talk to anyone and who was this I was to talk to , she said it was none of my business. My manager (Tom Soles) or his manager (Larry W.) wasn't there, just security and benefit dept. They told me my insurance was drop as of the 21st. that day at 5:00pm. I said Thank you and walked out. This whole thing goes back to 1996 when Darryl Bentz became my manager and he didn't like me due he is my ex-husband friend  and Tom Zidik was a very close friend of Darryl. I had a relief supervisor working (Karen Keaton) for me and she done everything she could to me. Karen would get he self

into different things and then she would cry about everything and run to Darryl Bentz. They became very close and three different time her husband (Roy Keaton) pushed me in the hall . I told Darryl and called me a lire , so I went to his boss Larry about it . I told him what a employee told me from moulding room that Karens husband (Roy) is going to hurt me because she is always crying. The employee agreed to talk to Larry with out Darryl Bentz there and Larry agreed , when the employee met with Larry he had Darryl right there. I was called into Larrys office was was called a lire wants again and was given the right act about talking to employees. It came to the point I had went from a size 12 to a 8 & 6. I lost work , My nerves were so bad . I wasn't only scared for myself but for Karens husband (Roy). I told them that because of my brother, He don't care about anything and he had been on had drugs and drink a lot and very protective over me. Darryl Bentz lost his manager job and his supertentent job and they gave him job writing a supervisor manual. It did come out in Cindy Lighty's office what all he was doing to me and saying about me. Darryl did make Karen a supervisor before he lost his manager job. The supervisors involved in this mess now are all of Darryl Bentz Friends because they know that I was part of the cause he is no longer on his 2nd. Shift  supertentend job. I'am 51 years old almost 52 and have health problem and have been under medical care since I'am a diabetic.  I forgot that Tuesday was pay period, so I was terminated and I just had MRI for a bain scan for a light stroke on the left side. I could have retired at the age 55 if I would have chose to.  Every other supervisor had a warning if they done something wrong , I got nothing because I was so straight and proper , and I didn't play there little games. That is why Darryl Bentz didn't like me.Thank you.

*Linda F. Weaber*

Linda F. Weaber
1716 South Forge Rd.
Palmyra, pa. 17078

Ph. (717) 832-0726

COMMONWEALTH OF PENNSYLVANIA

GOVERNOR'S OFFICE

PENNSYLVANIA HUMAN RELATIONS COMMISSION

Linda F. Weaber,

    Complainant

        v.

Hershey Chocolate USA,

    Respondent

                             :
                             :   PHRC DOCKET No.
                             :
                             :   EEOC Charge No.

*Amended*

COMPLAINT

1.    The Complainant herein is:

        Linda F. Weaber
        1716 S. Forge Rd.
        Palmyra, PA  17078

2.    The Respondent herein is:

        Hershey Chocolate USA
        19 E. Chocolate Ave.
        Hershey, PA  17033

        Hershey Foods
        Cynthia Lighty, Counsel
        100 Crystal A Drive
        Hershey PA  17033

3.    I allege the respondent violated § 5 of the Pennsylvania Human Relations Act, as
    follows:

Weaber

**EXHIBIT**

10  7-22-0

a.  On or about May 13, 1999, Cynthia Lighty, corporate attorney, suspended me because of my age, 51 and or gender, female and or non-job related disability, diabetes and or perceived disability, mental.

  (1)  In August 1968, I was hired by the company.

  (2)  In 1983, I was promoted to plant supervisor.

  (3)  From February 1999 to March 1999, I was on sick leave due to my diabetes.

    (a)  Carolyn Haskell, head of the medical department, had denied my request for family medical leave.

    (b)  She stated that she denied my request because my condition was "mental" and that I needed counselling for my depression and weight gain.

      (i)  I had not been diagnosed with depression.

  (4)  In March 1999, I returned to work.

  (5)  In April & May 1999, per Ms. Haskell, I attended counselling sessions with a local psychologist.

  (6)  Thomas Soles, manager of molding and kisses, had accused me of allowing employees to leave at 1:30 pm on May 6, 1999.

    (a)  To my knowledge, none of employees left at 1:30 pm.

  (7)  About 1997, Gary Moyer, male plant supervisor, for a period of eight (8) months paid an employee at the rate of a relief supervisor.

    (a)  The company transferred Mr. Moyer, age early 40s, to another shift.

    (b)  I do not believe that management suspended him.

  (8)  Ms. Lighty told me that I was suspended for allowing employees to leave work at 1:30 pm rather than their quitting time of 3pm.

    (a)  She also told me that I paid an employee, Michael Tomei, for 8 hours when he should have been paid for four.

      (i)  As soon as possible, I told his supervisor that he should be paid for four hours but his supervisor, Tom Zidik, failed to contact pay roll about Mr. Tomei.

    (b)  She told me to have no contact with any of my employees.

b.  On May 21, 1999, Ms. Lighty fired me because of my age, 51 and or gender, female and or non-job related disability, diabetes and or perceived disability, mental.

  (1)  Ms. Lighty accused me of contacting some of my employees and asking them to lie for me.

    (a)  She stated that I did this while off for the suspension.

  (2)  Her allegation is false.

  (3)  I did not contact any of my employees; nor did I have any one else contact my employees.

  (4)  As noted above, Mr. Moyer paid an employee shift supervisor wages for a period of 8 months.

    (a)  I do not believe that Mr. Moyer has a disability or is perceived to have a disability.

Linda F. Weaber        v.        Hershey Chocolate USA

4.    The complainant prays that the respondent be required to provide all appropriate remedies under § 9 of the Pennsylvania Human Relations Act.

5.    This charge has been dual filed with EEOC.

I hereby verify that the statements contained in this complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities.

02/15/2000
(Date Signed)

Linda F. Weaber
Linda F. Weaber

- 3 -

EEOC0014

EEOC Form 161-B (10/96)

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

To: Linda F. Weaber
1716 S. Forge Rd.
Palmyra, PA 17078

From: Equal Employment Opportunity Commission
Philadelphia District Office
The Bourse
21 S. Fifth Street, Suite 400
Philadelphia, PA  19106-2515

[    ]    *On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
| --- | --- | --- |
| 17FA01558 | Genevieve Delaney, Investigator | (215) 440-2619 |

*(See also the additional information attached to this form.)*

### NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[ X ]    More than 180 days have passed since the filing of this charge.

[    ]    Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge.

[ X ]    The EEOC is terminating its processing of this charge.

[    ]    The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[ X ]    The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[    ]    The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Marie M. Tomasso*                                    2/13/01

Marie M. Tomasso, District Director                *(Date Mailed)*

Enclosure(s)
    Information Sheet

cc:    Hershey's Chocolate USA
       Andrew J. Ostrowski, Esquire, for Charging Party

Weaber
**EXHIBIT**
M
7-22-02

# Hershey Chocolate U.S.A.

A Division of
Hershey Foods

**Company Confidential**
**(Upon Completion)**

# PERFORMANCE MANAGEMENT

| | | | |
|---|---|---|---|
| **NAME:** | Linda Weaber | | |
| **MANAGER:** | Tom Soles | | |
| **DEPARTMENT:** | Kisses / Chips | **COST CENTER:** | 0916 |
| **DATE OF REVIEW PERIOD:** | January 1998 | **TO:** | December 1998 |

**INSTRUCTIONS:**

A Performance Management Form Reference Manual should be used to properly complete this form. Call HCUSA Human Resources if this Reference Manual is not readily available.

This form is to be completed for each employee.

1. Annually, during the period December 1 to February 28.

2. Upon the employee changing permanently from one job to another.

3. Upon the rater's change in job assignment, resulting in a new manager for the employee.

   Note:   Should any of the above happen within three months of an appraisal, it will not be necessary to complete a new appraisal.

   The manager retains the completed form, with copies given to the employee and to the HCUSA Human Resources Staffing and Development Department or your local Employee Relations office.



Weaber
**EXHIBIT**
8  2-22-02

| To be completed prior to 3/1 each year; refer to the Performance Management Reference Manual for complete instructions. |
|---|

## PERFORMANCE PLAN - PRODUCTION SUPERVISOR

| Priority | STANDARDS, OBJECTIVES, AND PERFORMANCE FACTORS | Rating |
|---|---|---|
| | **OBJECTIVE:** Contribute to the Hershey Plant 1998 safety objectives of 1,318,000 hours without a lost time accident. Achieve OSHA case rate of not more than 6.0 and a Lost Day case rate of note more than 0.75 within the KM&N Business Unit to meet the goal. | E |

**RESULTS EXPECTED:**

Plant exceeded 1,318,000 hrs. w/o Lost Time Accident. CC #1410 OSHA Rate was 11.1 and 3.5 in CC #1411. Lost Day Case was zero for both areas.

| | | |
|---|---|---|
| **OBJECTIVE:** Contribute to achieving the Plant Productivity goal of 110 lbs./labor hr. and area goal of 186.3 lbs./labor hr. for cost center 1410, 400 lbs./labor hr. for cost center 1411. | | E |

**RESULTS EXPECTED:**

| LINE | ACHIEVED | EXCEEDED | OUTSTANDING | 1998 ACTUAL | Rating |
|---|---|---|---|---|---|
| 1410 | | 190 | | | E |
| 1411 | | | 451.9 | | O |

Overall Plant Productivity goal rating: 106.5

| | | |
|---|---|---|
| **OBJECTIVE:** Contribute to achieving the Plant Rework goal of less than 3% rework and area goal of 1.46% rework for cost center 1410 and 1.58% rework for cost center 1411. | | E |

**RESULTS EXPECTED:**

| LINE | ACHIEVED | EXCEEDED | OUTSTANDING | 1998 ACTUAL | Rating |
|---|---|---|---|---|---|
| 1410 | | | 135.0 | | O |
| 1411 | | | 125.0 | | O |

Overall Plant Rework rating: 3.27

| | | |
|---|---|---|
| **OBJECTIVE:** Contribute to the reduction of waste Plantwide by $1 million and $500,000 in the packaging areas (includes raw materials, packaging, energy). Less than or equal to 0.23% for cost center 1410. Less than or equal to 0.65% for cost center 1411. | | A |

**RESULTS EXPECTED:**

| LINE | ACHIEVED | EXCEEDED | OUTSTANDING | 1998 ACTUAL | Rating |
|---|---|---|---|---|---|
| 1410 | | | | .34 | NFA |
| 1411 | | | .36 | | O |

Overall Plant Waste rating: .78

| | | |
|---|---|---|
| **OBJECTIVE:** Achieve a case fill rate of 98.5% within the KM&N Business Unit. | | E |

**RESULTS EXPECTED:**

| LINE | ACHIEVED | EXCEEDED | OUTSTANDING | 1998 ACTUAL | Rating |
|---|---|---|---|---|---|
| 1410 | A | E | | 98.9 | E |
| 1411 | A | | | 96.5 | NFA |

Overall Plant Case Fill rating: 99.19

| Priority | STANDARDS, OBJECTIVES, AND PERFORMANCE FACTORS | Rating |
|---|---|---|
| | | A |

**STANDARD - *OPERATIONS STANDARD*:** Maintain a solid understanding of the operations which are under the individual area of responsibility. Effectively manage and utilize available resources (i.e., equipment, materials, labor) in order to support goals and objectives set forth by Company and Plant Management.

**RESULTS EXPECTED:**

1. Identify and understand the Plant goals. Develop goals for yourself and your department which support these Plant goals and understand how daily operations impact these goals.

2. Know and understand key operational standards for your individual operations. Develop an understanding of the financial impact of these standards by reviewing key Plant variances on a monthly basis. (i.e., direct labor, material usage, overhead spending).

3. Know and understand the function of the equipment in your individual area at a level which enables you to make prompt and wise operational decisions.

4. Hold employees accountable for Hershey Plant and Division policies (Dress and Grooming, Union Contract/Department rules). Do this consistently and fairly utilizing the discipline outlined in the Supervisors Handbook.

5. Staff individual operations and effectively utilize available labor in a manner that ensures an efficient and cost effective use of labor.

6. Manage labor relations in individual areas of responsibility in a manner that promotes positive attitudes while still maintaining employee accountabilities. Provide an environment which is amenable to challenge and change and one which utilizes the skills and talents of our employees.

7. Be visible in your area of responsibility and be available to the needs of your employees in order to demonstrate commitment and interest in your operations and your people.

8. Recommend capital and expense funding for areas of responsibility which effectively utilizes available Plant funds. Provide information as necessary and support project implementation where appropriate.

9. Provide all required documents which support the above in a timely and accurate manner (i.e., absentee files, production reports, product disposition tickets, etc.)

10. Support Line Teams in your area of responsibility on leadership team or core team.

11. Understand key supplier/customer relationships within the business. Communicate with and utilize the supplier resources effectively to meet customer demand.

**RESULTS:**

Linda has done a good job in this area for 1998. She demonstrates a good working knowledge of the Kiss / Chip production process and utilizes equipment and personnel effectively. Linda does a good job enforcing GMP standards, but must remember consistency is a key to making this work best. Her efforts support the plant goals and she has a base understanding of all measurements, but this is an area of opportunity for the future to learn more detail about the Business process. She is well organized and has been timely with all documentation necessary.

| Priority | STANDARDS, OBJECTIVES, AND PERFORMANCE FACTORS | Rating |
|---|---|---|
| | **STANDARD - _QUALITY STANDARD_**: Ensure all products manufactured in the Kiss/Chip area meet all applicable quality requirements and the area is maintained in a clean, sanitary condition.<br><br>**RESULTS EXPECTED**:<br><br>1. Ensure that all CPOP's are documented completely and correctly and all out-of-tolerance conditions are properly documented in a Product Quality Incident Report.<br><br>2. Ensure compliance with GMP's in all areas of responsibility.<br><br>3. Utilize Defect Tracking to regularly (once per shift) inspect for consumer observable defects, identify defect trends and opportunities for improvement. Communicate results to line operators and others who affect finished product quality and develop and implement action plans to correct defects.<br><br>4. Maintain a clean, sanitary operation. Correct discrepancies on Food Safety, Housekeeping and Sanitation Awareness Team audits. Monitor audits for repeat discrepancies and develop and implement action plans to prevent their recurrence.<br><br>5. Support HACCP by conducting verification activities outlined in each HACCP plan in the area. Also, support and participate in the internal, semi-annual HACCP program audits.<br><br>6. Complete Product Quality Incident Reports thoroughly and in a timely manner. Particular attention must be paid to investigating and identifying the causes of the incident and the action planned or taken to prevent the incident from recurring.<br><br>7. Document and communicate to area Plant Q.A. representatives and/or the appropriate Division Packaging staff member all issues regarding quality of packaging materials, supplier support and follow-up, effects of packaging changes and the results of packaging trials and tests.<br><br>**RESULTS**:<br><br>Linda is active on the floor and supports quality initiatives very well. I feel we all need to be more attentive to CPOP's and develop a <u>Zero tolerance</u> for any CPOP failure. She is timely in her incident report investigations and communicates any necessary QA related issues on a regular basis. The Finishing area and Kisses did receive an excellent on the Lou Wilhelm audit this year and Linda was certainly a part of that effort. Linda heads the area Sanitation team and they did a great job of identifying ongoing issues, communicating the need, and helping to maintain a higher level of area sanitation. Kiss and Chip consumer complaints were down across the board for all items. The Kiss operation also made major improvements in wrap quality exceeding the company goal of a 50% improvement at the wrapper by October 1998. | E |

| Priority | STANDARDS, OBJECTIVES, AND PERFORMANCE FACTORS | Rating |
|---|---|---|
| | **STANDARD - *SAFETY STANDARD*:** Take responsibility for creating a safe working environment within your area of responsibility. | A |

**RESULTS EXPECTED:**

1. Support the Area Safety Team by prompt corrective action of safety audits and including safety issues/results in each monthly department meeting.

2. Implement safety training (i.e., BIPP) as identified for your department.

3. Communicate JSA information to employees as required.

4. Support and implement OSHA compliance recommendations for equipment in your area of responsibility.

5. Hold employees accountable for Hershey Plant Safety Rules compliance, using progressive discipline as required.

6. Complete Safety Incident Reports thoroughly and in a timely manner. Particular attention must be paid to investigating and identifying the causes of the incident and the action planned or taken to prevent the incident from reoccurring.

**RESULTS:**

Linda supports all safety efforts in this plant and in her area. She has been very good with follow up on necessary safety issues and does a good job of holding employees accountable for safety violations. The safety results for both First Aid and OSHA rate are slightly higher in Kisses and Chips than the plant goal for 1998, but lost time incidents were Zero. Linda heads the area support team for Safety and this group has also done a nice job on reporting on issues and communicating opportunities. I look for the efforts of these to have a more direct impact on area results in the future.

| Priority | STANDARDS, OBJECTIVES, AND PERFORMANCE FACTORS | Rating |
|----------|------------------------------------------------|--------|
|  | **STANDARD - *COMMUNICATION STANDARD*:**  Ensure effective communication with all levels and enhance the overall understanding of our Plant and Business Unit operations, policies and key measures. | A |
|  | **RESULTS EXPECTED:** |  |
|  | 1.  Assure the completion of 12 Department meetings with your employees throughout the year.  Communication will include department specific information, business education modules, QTE activities, as well as other key Hershey Plant and HCNA activities. |  |
|  | 2.  Effectively utilize and promote the visual environment in the workplace to enhance communication and the business education process. |  |
|  | 3.  Communicate daily with previous and following shift on operational information to maximize operational efficiencies and promote consistency between shifts. |  |
|  | 4.  Effectively communicate with Manager and Support Staff in a timely manner.  Communication means should be appropriate based on the situation.  Incorporate various forms of communication such as one-on-one discussions, written reports, Profs, etc.  Complete monthly reports as required by the Manager. |  |
|  | **RESULTS:** |  |
|  | Linda does a nice job in holding department meetings that are regular and consistent with the department agenda. Linda also does very well communicating with me. She is timely and has been accurate with her communications and has used good judgment on appropriate times. I still feel there is an opportunity to improve Shift to Shift communications. This has improved greatly over this year, but there is still some friction that needs to go away completely. |  |

| Priority | STANDARDS, OBJECTIVES, AND PERFORMANCE FACTORS | Rating |
|---|---|---|
| | **DEVELOPMENT PLAN:** | A |

Linda has a very thorough development plan for 1998 and the following is a summary of her results.

1. TEAM PLAYER BEHAVIOR, Linda had to consistently demonstrate the ability to effectively interact with both Employees and peers from all shifts in a positive and constructive manner. This greatly improved through the year, but must always remain a primary focus for Linda to continually rebuild trust and confidence from the people in her department. To aid this in 1998 Linda attended a seminar on Personal Change and also Conflict Resolution. She was very pleased with both seminars and is placing much needed effort to continue to improve in this area.

2. PERSONAL INTEGRITY, Linda had to make absolutely certain all interactions and behavior was both truthful and honest all year. This is also important that the perceptions of any friction in her personnel interactions is resolved. Again she showed effort in addressing this area. Her dealings with me were timely, accurate, and professional at all times. This is an absolute for Linda to maintain and continue this improvement in the future. To aid in this effort Linda attended a seminar, Communicating at Work which was designed to focus on clear and accurate communications.

3. PERSONAL LEADERSHIP, Linda had to demonstrate the ability to effectively communicate with all persons while maintaining complete self esteem. She must not manipulate or show any selective behavior in her personnel interactions. Linda improved very nicely in this area and this will take a continued effort on her part to be open and honest and address any issues immediately when they arise. This area has improved, but is not yet to a level where it can increase her personal productivity. She will continue to work on these issues and do the right things as they arise to rebuild the confidence and trust from others. To help Linda improve in this area she attended Covey's First things First seminar in 1998.

## Leadership Behaviors

The following behaviors define how managers of people are expected to perform as leaders in influencing employees to perform work and achieve results. While designed for managers with direct reports, several behaviors apply to personal leadership as well. All three critical QTE behaviors are incorporated.

During performance evaluation, place an "x" in the appropriate category indicating if the individual consistently behaves as expected, if further development would be beneficial, or if definite improvement is required. Category definitions are provided to assist in evaluation.

| The Hershey Leader (Critical Behaviors) | Consistently Delivers | Development Beneficial | Improvement Needed |
|---|---|---|---|
| • Displays strong resolve in support of business requirements by making necessary critical decisions that are the right decisions but not the most popular and may be personally uncomfortable.<br><br>RESULTS ACHIEVED | X | | |
| • Demonstrates commitment, understanding and support for the company's mission and vision by providing direction culminating in the delivery of value add results (professional and personal leadership).<br><br>RESULTS ACHIEVED | X | | |
| • Acts with utmost integrity in all interactions with customers, suppliers, and employees ensuring fairness and trustworthiness (integrity and teamwork).<br><br>RESULTS ACHIEVED | | | X |
| • Demonstrates self-confidence and trust by allowing subordinates freedom to perform and grow in accordance with their defined duties, competence, and commitment (empowerment).<br><br>RESULTS ACHIEVED | X | | |
| • Provides the appropriate resources, coaching and support necessary for each individual and team to realize performance objectives.<br><br>RESULTS ACHIEVED | X | | |

8

## Leadership Behaviors

The following behaviors define how managers of people are expected to perform as leaders in influencing employees to perform work and achieve results. While designed for managers with direct reports, several behaviors apply to personal leadership as well. All three critical QTE behaviors are incorporated.

During performance evaluation, place an "x" in the appropriate category indicating if the individual consistently behaves as expected, if further development would be beneficial, or if definite improvement is required. Category definitions are provided to assist in evaluation.

| The Hershey Leader (Critical Behaviors) | Consistently Delivers | Development Beneficial | Improvement Needed |
|---|---|---|---|
| • Supports growth initiatives by encouraging change, innovation and diverse thinking (professional and personal leadership). <br><br> RESULTS ACHIEVED | X | | |
| • Communicates openly and honestly and addresses differences by seeking first to understand the position of others and by managing conflict with tact, diplomacy and in pursuit of synergy (professional and personal leadership). <br><br> RESULTS ACHIEVED | | X | |
| • Demonstrates understanding of business needs by focusing on customer requirements, high value work and selection of staff members whose skills, knowledge, experience and inherent capabilities are closely aligned with critical success factors. <br><br> RESULTS ACHIEVED | X | | |
| • Supports the realization of a seamless organization by demonstrating collaborative behaviors both within the function and across process lines (integrity and teamwork). <br><br> RESULTS ACHIEVED | X | | |

## Leadership Behaviors

The following behaviors define how managers of people are expected to perform as leaders in influencing employees to perform work and achieve results. While designed for managers with direct reports, several behaviors apply to personal leadership as well. All three critical QTE behaviors are incorporated.

During performance evaluation, place an "x" in the appropriate category indicating if the individual consistently behaves as expected, if further development would be beneficial, or if definite improvement is required. Category definitions are provided to assist in evaluation.

| The Hershey Leader (Critical Behaviors) | Consistently Delivers | Development Beneficial | Improvement Needed |
|---|---|---|---|
| • Tasks employees to develop and maintain their skills and abilities at levels which enable them to continuously deliver superior performance and compete both internally and externally (professional and personal leadership). <br><br> RESULTS ACHIEVED | | X | |
| • Defines and clearly articulates expectations, accountability, and consequences for behavior and consistently supports with action (reward, coach, develop, recognize the expected behaviors). <br><br> RESULTS ACHIEVED | | X | |

Your overall assessment of each individual's performance as a leader must be reflected in the performance summary and the overall rating assigned. Any area that is identified for development should be included in the development plan for the following year. Any areas where definite improvement are required should be included as a personal objective in the performance plan the following year.

To be Completed 12/1 - 2/28 Upon Concluding the Final Review Period

## PERFORMANCE APPRAISAL SUMMARY

### 1. OVERALL EVALUATION

| | | | | |
|---|---|---|---|---|
| Employee Name: | Linda Weaber | Social Security #: | 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 | Job Grade: 208 |
| Job Title: | Production Supervisor | Department: | Kisses / Chips | |
| Date Employed: | 8/12/68 | Time in Position: | 14 Yrs. | Time under Mgr. 9 Mths. |
| Date of Last Appraisal: | January 1998 | Date of this review period: | January 1998 - December 1998 | |
| Type of Review: | X    Annual | Personnel Change | | Special |

**PERFORMANCE SUMMARY**    *Overall Performance Rating:* *Achieved.*  -

This has been a very challenging year for Linda. She experienced a much more focused approach to her development and a very specific agenda of things she had to accomplish. Linda did a very nice job keeping communications open and ongoing and addressing any and all issues that were discussed. There is a negative perception among many of her peers that she needs to remedy. To do this she must be consistent in all efforts and improve her overall dependability. She has to rebuild the trust and relationships with her coworkers and continue the efforts she started in 1998 towards improvements. Linda did an excellent job facilitating and coordinating the efforts of the Kiss area support teams for both Quality and Safety. These teams are organized, have good follow up, and are excellent in communication. In 1999 she must continue this positive effort and align these teams and goals with the area line teams.

### 2. PLANS FOR TRAINING AND DEVELOPMENT

In 1999 Linda will plan to attend Situational Leadership in 1999 since this was full and unavailable in 1998. Linda must continue all efforts on the development plan above and must restore trust and confidence of others. Linda must take her support groups to the next level and integrate them with line teams and line team goals. This was a nice positive in 1998 and should make an even better impact in 1999. — *Labor And Production Planning* — *Mca Amaker*

### 3. EMPLOYEE COMMENTS  (use the space below to record your comments your appraisal.)

| | | | | |
|---|---|---|---|---|
| * Employee: | Linda Weaber | **Signature *Linda Weaber* | Date | 1-21-99 |
| * Manager: | Tom Soles | Signature | Date | 1-21-99 |
| * Reviewer: | Larry Weinsheimer | Signature | Date | 2/8/99 |

* Please print or type

**Employee's signature is required.  It indicates only that you have had an opportunity to review this document with your manager.

# Hershey Chocolate U.S.A.

A Division of
Hershey Foods

Company Confidential
(Upon Completion)

# PERFORMANCE MANAGEMENT

| | |
|---|---|
| NAME: | Linda Weaber |
| MANAGER: | Darryl Bentz |
| DEPARTMENT: | Kisses | COST CENTER: 0916 |
| DATE OF REVIEW PERIOD: | January 1997 | TO: December 1997 |

INSTRUCTIONS:

A Performance Management Form Reference Manual should be used to properly complete this form. Call HCUSA Human Resources if this Reference Manual is not readily available.

This form is to be completed for each employee.

1. Annually, during the period December 1 to February 28.

2. Upon the employee changing permanently from one job to another.

3. Upon the rater's change in job assignment, resulting in a new manager for the employee.

Note: Should any of the above happen within three months of an appraisal, it will not be necessary to complete a new appraisal.

The manager retains the completed form, with copies given to the employee and to the HCUSA Human Resources Staffing and Development Department or your local Employee Relations office.



Weaber

EXHIBIT

9    2-22-02

To be completed prior to 3/1 each year; refer to the Performance Management Reference Manual for complete instructions.

## PERFORMANCE PLAN - PRODUCTION SUPERVISOR

| Priority | STANDARDS, OBJECTIVES, AND PERFORMANCE FACTORS | Rating |
|---|---|---|
| | **STANDARD - _OPERATIONS STANDARD_**: Maintain a solid understanding of the operations which are under the individual area of responsibility. Effectively manage and utilize available resources (i.e., equipment, materials, labor) in order to support goals and objectives set forth by Company and Plant Management. | A |

**RESULTS EXPECTED:**

1. Identify and understand the Plant goals. Develop goals for yourself and your department which support these Plant goals and understand how daily operations impact these goals.

2. Know and understand key operational standards for your individual operations. Develop an understanding of the financial impact of these standards by reviewing key Plant variances on a monthly basis. (i.e., direct labor, material usage, overhead spending).

3. Know and understand the function of the equipment in your individual area at a level which enables you to make prompt and wise operational decisions.

4. Hold employees accountable for Hershey Plant and Division policies (Dress and Grooming, Union Contract/Department rules). Do this consistently and fairly utilizing the discipline outlined in the Supervisors Handbook.

5. Staff individual operations and effectively utilize available labor in a manner that ensures an efficient and cost effective use of labor.

6. Manage labor relations in individual areas of responsibility in a manner that promotes positive attitudes while still maintaining employee accountabilities. Provide an environment which is amenable to challenge and change and one which utilizes the skills and talents of our employees.

7. Be visible in your area of responsibility and be available to the needs of your employees in order to demonstrate commitment and interest in your operations and your people.

8. Recommend capital and expense funding for areas of responsibility which effectively utilizes available Plant funds. Provide information as necessary and support project implementation where appropriate.

9. Provide all required documents which support the above in a timely and accurate manner (i.e., absentee files, production reports, product disposition tickets, etc.)

**RESULTS:**

Linda has an understanding of the process in making and bagging of Kisses and Chips and achieves the daily output of the operations as required. Generally the scheduling of various items is completed by the 1st shift and both 2nd and 3rd shifts setup the appropriate baggers and run as scheduled. Linda does a good job in holding her employees accountable for production, GMP and other plant policies and fully utilizes the relief supervisor in managing the department. Linda is also very knowledgeable concerning results that are achieved by the teams which she leads but at times lacks attention to what accomplishments are made by her fellow supervisors. At various times Linda has not been seen on the floor by her fellow employees for periods of time and departmental issues are left to the relief supervisor. During

| Priority | STANDARDS, OBJECTIVES, AND PERFORMANCE FACTORS | Rating |
|---|---|---|
| | 98 Linda will have to not only increase her visibility but also her interactions with hourly and salaried to assist with our ongoing efforts to improve efficiencies and safety within the Kiss and Chip areas. | |
| | **STANDARD – *QUALITY STANDARD*:** Ensure all products manufactured in the Kiss and Chip area meet all applicable quality requirements and the area is maintained in a clean, sanitary condition. | A |

**RESULTS EXPECTED:**

1. Ensure that all CPOP's are documented completely and correctly and all out-of-tolerance conditions are properly documented in a Product Quality Incident Report.

2. Ensure compliance with GMP's in all areas of responsibility.

3. Utilize Defect Tracking to regularly (once per shift) inspect for consumer observable defects, identify defect trends and opportunities for improvement. Communicate results to line operators and others who affect finished product quality and develop and implement action plans to correct defects.

4. Maintain a clean, sanitary operation. Correct discrepancies on Food Safety, Housekeeping and Methyl Bromide audits. Monitor audits for repeat discrepancies and develop and implement action plans to prevent their recurrence.

5. Support HACCP by conducting verification activities outlined in each HACCP plan in the area. Also, support and participate in the internal, semi-annual HACCP program audits.

6. Complete Product Quality Incident Reports thoroughly and in a timely manner. Particular attention must be paid to investigating and identifying the causes of the incident and the action planned or taken to prevent the incident from recurring.

7. Document and communicate to area Plant Q.A. representatives and/or the appropriate Division Packaging staff member all issues regarding quality of packaging materials, supplier support and follow-up, effects of packaging changes and the results of packaging trials and tests.

**RESULTS:**

The Kiss and Moulding Safety and Consumer Complaint committees have done an excellent job during the period in inspecting and recommending solutions to issues pertaining to Sanitation, Safety and GMP compliance issues. The area received an Excellent rating which reflects the attention given to improvement. The area continues to improve upon attention given to the importance of maintaining control point documentation and sanitation records. Linda has assisted the team and helped enhance their commitment through the involvement of representatives from Safety, Methyl Bromide/Sanitation and Consumer Relations Departments.

| Priority | STANDARDS, OBJECTIVES, AND PERFORMANCE FACTORS | Rating |
|---|---|---|
| | **STANDARD – *SAFETY STANDARD*:**  Take responsibility for creating a safe working environment within your area of responsibility. | A |

**RESULTS EXPECTED:**

1. Support the Area Safety Team by prompt corrective action of safety audits and including safety issues/results in each monthly department meeting.

2. Implement safety training (i.e., BIPP) as identified for your department.

3. Communicate JSA information to employees as required.

4. Support and implement OSHA compliance recommendations for equipment in your area of responsibility.

5. Hold employees accountable for Hershey Plant Safety Rules compliance, using progressive discipline as required.

6. In a timely manner, communicate all serious employee accidents to the Manager and appropriate support staff (i.e., Health Services and Safety Department).

**RESULTS:**

All K&M Business Unit hourly employees attended BIPP safety training in 1997.  In addition, presentations during department meetings were held, safety updates were routinely posted and JSAs were completed and included within operational procedures.  During 1998, a concerted effort will be required for training, counseling and disciplinary actions to eliminate further accidents.  Personal responsibility for one's own safety will be a #1 priority.

| Priority | STANDARDS, OBJECTIVES, AND PERFORMANCE FACTORS | Rating |
|---|---|---|
| | **STANDARD - _COMMUNICATION STANDARD_**: Ensure effective communication with all levels and enhance the overall understanding of our Plant and Business Unit operations, policies and key measures. | A |

**RESULTS EXPECTED:**

1. Assure the completion of 12 Department meetings with your employees throughout the year. Communication will include department specific information, business education modules, QTE activities, as well as other key Hershey Plant and HCNA activities. Supervisors will receive feedback at a minimum of at least once per year from the employees on their likes/dislikes and what they want to hear by utilizing standard written survey provided by Manager.

2. Communicate results Employee Opinion Survey. Develop and implement action plans to address critical issues.

3. Effectively utilize and promote the visual environment in the workplace to enhance communication and the business education process.

4. Communicate daily with previous and following shift on operational information to maximize operational efficiencies and promote consistency between shifts.

5. Effectively communicate with Manager and Support Staff in a timely manner. Communication means should be appropriate based on the situation. Incorporate various forms of communication such as one-on-one discussions, written reports, Profs, etc. Complete monthly reports as required by the Manager.

**RESULTS:**

Department meetings were conducted by Linda and/or her relief supervisor. Linda discussed results of internal customer feedback assessment with Tim Daniels, training department, in order to learn more about her interpersonal strengths and weaknesses. No feedback was required by the manager due to the contract and pending issues but in 98 the personal survey results, as well as the departmental attitude survey, will be revisited and action plans will be implemented, where appropriate, to assure interdepartmental issues are addressed with the goal of better working relationships with peers and hourly employees alike.

| Priority | STANDARDS, OBJECTIVES, AND PERFORMANCE FACTORS | Rating |
|---|---|---|

**PERFORMANCE FACTORS**: Model principles of leadership through being a Team player, developing others and exhibiting personal integrity and personal leadership.

*TEAM PLAYER*

Rating: **NFA**

**RESULTS EXPECTED**: Each employee is encouraged to cooperate, communicate, and create value to our business by focusing on customer needs and creating a Teamwork environment.

**RESULTS**:

| | Consistently Demonstrates | Occasionally Demonstrates | Development Needed |
|---|---|---|---|
| Create & add value to the business | X | ☐ | ☐ |
| Flexible - adapt to change | ☐ | X | ☐ |
| Work to resolve conflicts | ☐ | ☐ | X |
| Share resources | X | ☐ | ☐ |
| Share information | X | ☐ | ☐ |
| Meet or exceed customer needs | X | ☐ | ☐ |

**SUMMARY**:

Linda has been previously counseled by the manager that, while she attends to certain aspects of the job, her teamwork is very selective. This not only applies to supervision but also hourly employees which affects the unity within the K&M business unit. While Linda communicates well on important issues that affect the operations, the routine interrelationships and communications are lacking. Improvement in this area must be made during the next reporting period in order that the effort to improve efficiencies of the department are not hindered.

*INTEGRITY*

Rating: **NFA**

**RESULTS EXPECTED**: Each employee is expected to value the diversity of our workforce by remaining open, honest, and fair, and treating others the way we expect to be treated.

**RESULTS**:

| | Consistently Demonstrates | Occasionally Demonstrates | Development Needed |
|---|---|---|---|
| Deals truthfully, openly & honestly with others | ☐ | ☐ | X |
| Keep commitments | X | ☐ | ☐ |
| Show respect for others | ☐ | X | ☐ |

**SUMMARY**:

Linda has shown some improvement in this area after her return to work after a period of extended absences. At mid year we addressed the need to improve upon dealing with subordinates, peers and fellow supervisors in a fair, honest and respectful manner. Further attention and focus is required to improve communications and undo the perceived division between Linda and some of her fellow Supervisors and teammates.

| Priority | STANDARDS, OBJECTIVES, AND PERFORMANCE FACTORS | Rating |
|---|---|---|
| | *PERSONAL LEADERSHIP* | NFA |

**RESULTS EXPECTED:** Each employee is responsible to take a leadership role. This will be demonstrated by showing initiative, commitment, and using effective interaction skills in dealing with others.

**RESULTS:**

| | Consistently Demonstrates | Occasionally Demonstrates | Development Needed |
|---|---|---|---|
| Demonstrates excellence, commitment, energy, enthusiasm | ☐ | X | ☐ |
| Show initiative - accept responsibility | ☐ | X | ☐ |
| Coach, encourage, recognize, listen | ☐ | X | ☐ |
| Learn and profit from experience | ☐ | ☐ | X |

**SUMMARY:**

Linda supervises her people well at times and is often selective on how approaches are made in pointing out a fault or demand with peers and subordinates. In the past we have discussed that intimidation and hard fisted tactics, such as using loud profane and aggressive responses, in that these are not effective and proper methods in building an effective and cooperative team. Simply stated, good leadership is obtained when we can communicate requirements and accomplish the goal as efficiently as possible while preserving the respect of those assigned the task. Obviously, this is not accomplished without proper coaching and training so that there is a good understanding of the desired result. Disciplinary action, when appropriate, can be used but is not the major impetus in getting the task accomplished. During 98 Linda must demonstrate improvement in this area in order to retain her present position as supervisor.

It should be further noted that Linda's own personal assessment of her performance was listed as Outstanding, which clearly indicates her perception of performance is far beyond the actual level of performance as listed herein. Furthermore, it is imperative that Linda realize that with the implementation of Line Team(s) in 1998, relationships at all levels must move away from traditional boss/subordinate style and become relationships of colleagues or co-workers.

| Priority | STANDARDS, OBJECTIVES, AND PERFORMANCE FACTORS | Rating |
|---|---|---|
| | *DEVELOPMENT OF OTHERS* | A |

**RESULTS EXPECTED**:  Management is expected to encourage the growth and development of employees by providing opportunities to enhance their skills, knowledge and abilities.  It is important for all employees to remain competitive in today's business.

**RESULTS**:

| | Consistently Demonstrates | Occasionally Demonstrates | Development Needed |
|---|---|---|---|
| Provide toward stretch assignments and goals | ☐ | X | ☐ |
| Provide development opportunities in line with skills | ☐ | X | ☐ |
| Enhance understanding of our customers and business | X | ☐ | ☐ |
| Support education through on-going training efforts | ☐ | X | ☐ |

**SUMMARY**:

Linda is supportive of the development of others through training, delegation and empowerment.

| Priority | STANDARDS, OBJECTIVES, AND PERFORMANCE FACTORS | Rating |
|---|---|---|
| | **STANDARD:** Contribute to the overall Hershey Plant Performance measures by understanding how the area is measured, measure the operations performance and continuously improve the operations. | |
| | **OBJECTIVE:** Contribute to the Hershey Plant 1997 safety objectives of 1,318,000 hours without a lost time accident. Achieve 100 consecutive workdays without a lost time accident during the period of 4/1/97 - 12/31/97 within your Operating Team. | A |

**RESULTS EXPECTED:**

| LINE | ACHIEVED | EXCEEDED | OUTSTANDING | 1997 ACTUAL | Rating |
|---|---|---|---|---|---|
| | 100 Workdays | 150 Workdays | 200 Workdays | 100 | |

Excellent effort: Safety training given. JSA's updated and Safety Team held inspections.

| Priority | STANDARDS, OBJECTIVES, AND PERFORMANCE FACTORS | Rating |
|---|---|---|
| | **OBJECTIVE:** Contribute to achieving the Plant Productivity goal of 105 lbs./labor hr. and area goal of 187 lbs./labor hr. for cost center 1410 and 354 lbs./labor hr. for cost center 1411. | E |

**RESULTS EXPECTED:**

| LINE | ACHIEVED | EXCEEDED | OUTSTANDING | 1997 ACTUAL | Rating |
|---|---|---|---|---|---|
| 1410 | 185.5 | | | 185.5 | |
| 1411 | | | X | 383.2 | |

Overall Plant Productivity goal rating: E - Achieved 106.9 lbs./hr. Plantwide (+4.6% vs. 1996)

| Priority | STANDARDS, OBJECTIVES, AND PERFORMANCE FACTORS | Rating |
|---|---|---|
| | **OBJECTIVE:** Contribute to achieving the Plant Rework goal of less than 3% rework and area goal of 1.70% rework for cost center 1410 and 1.58% rework for cost center 1411. | E |

**RESULTS EXPECTED:**

| LINE | ACHIEVED | EXCEEDED | OUTSTANDING | 1997 ACTUAL | Rating |
|---|---|---|---|---|---|
| 1410 | | X | | 1.52 | |
| 1411 | X | | | 1.60 | |

Overall Plant Rework rating: E - Rework was reduced to 3.09% Plantwide (-6% vs. 1996)

| Priority | STANDARDS, OBJECTIVES, AND PERFORMANCE FACTORS | Rating |
|---|---|---|
| | **OBJECTIVE:** Contribute to the reduction of waste Plantwide by $1 million and $500,000 in the packaging areas (includes raw materials, packaging, energy). Less than or equal to 0.2375% for cost center 1410 and less than or equal to 0.89% for cost center 1411. | E |

**RESULTS EXPECTED:**

| LINE | ACHIEVED | EXCEEDED | OUTSTANDING | 1997 ACTUAL | Rating |
|---|---|---|---|---|---|
| 1410 | X | | | .24 | |
| 1411 | | | X | .68 | |

Overall Plant Waste rating: E - Waste was reduced Plantwide by $1,184,000 and $529,000 in packaging areas.

| To be Completed 12/1 - 2/28 Upon Concluding the Final Review Period | | | | | | |
|---|---|---|---|---|---|---|
| PERFORMANCE APPRAISAL SUMMARY | | | | | | |

## 1. OVERALL EVALUATION

| Employee Name: | Linda Weaber | | Social Security #: | 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 | Job Grade: | 207 |
|---|---|---|---|---|---|---|
| Job Title: | Production Supervisor | | Department: | Kiss Department | | |
| Date Employed: | 8/12/68 | | Time in Position: | 13 Years | Time under Mgr. | 1.5 Years |
| Date of Last Appraisal: | January 1997 | | Date of this review period: | January 1997 - December 1997 | | |
| Type of Review: | X | Annual | | Personnel Change | | Special |

| PERFORMANCE SUMMARY | *Overall Performance Rating:* | NOT FULLY ACHIEVED |
|---|---|---|

During 1997, Linda has not achieved the level of performance required to fully support the performance objectives as established in the areas of personal leadership, integrity and teamwork. Through various sources it has been verified that Linda periodically has utilized profanity and intimidation tactics to get hourly personnel to do their jobs and/or has fabricated untruths in an attempt to establish her point of view. She was counseled by Larry Weinsheimer and D.K. Bentz during 1997 for the above, at which time corrections in behavior were clearly stipulated. It should be mentioned that Linda has the ability to do excellent work and perform her job very well using proper behavior. However, as previously mentioned, her behavior is selective to those that she likes and others, otherwise, as listed above. As a result, it is absolutely imperative that Linda make marked improvements in her behavior during 1998 if she desires to remain a Supervisor.

## 2. PLANS FOR TRAINING AND DEVELOPMENT

Linda's performance will be monitored on an on-going basis by the Manager and appropriate counseling and/or disciplinary steps will be taken.

## 3. EMPLOYEE COMMENTS  (use the space below to record your comments your appraisal.)

| * Employee: | Linda Weaber | **Signature | *Linda L. Weaber* | Date 2/9/98 |
|---|---|---|---|---|
| * Manager: | Darryl Bentz | Signature | *Darryl K. Bentz* | Date 2/29/98 |
| * Reviewer: | Larry Weinsheimer | Signature | *Larry Weinz* | Date 2/30/98 |
| * Please print or type | | | | |

**Employee's signature is required.  It indicates only that you have had an opportunity to review this document with your manager.

②

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . .
LINDA F. WEABER,            .
            Plaintiff  .
                          . Civil Action
        vs.               . Number 1:CV-01-0856
                          .
HERSHEY FOODS CORPORATION,.
            Defendant  .
. . . . . . . . . . . . . .


  Videotaped
  Deposition  of:  LARRY WEINSHEIMER

  Taken by      :  Plaintiff

  Date          :  April 5, 2002, 1:16 p.m.

  Place         :  4311 North Sixth Street
                   Harrisburg, Pennsylvania

  Video
  Operator      :  Crystal M. Lyde

  Reporter      :  Glenda S. Travitz
                   Registered Professional Reporter



APPEARANCES:

        ANDREW J. OSTROWSKI, ESQUIRE

            For - Plaintiff

        McNEES WALLACE & NURICK LLC
        By:  BRIAN F. JACKSON, ESQUIRE

            For - Defendant

5

Exam./Ostrowski - Weinsheimer

1          MS. TRAVITZ:  Glenda Travitz, with Filius

2      & McLucas court reporting.

3          MR. OSTROWSKI:  And Andy Ostrowski,

4      counsel for Plaintiff.

5          MS. LYDE:  Thank you.

6                    EXAMINATION

7   BY MR. OSTROWSKI:

8   Q.  Your last name, I asked someone the other day

9       how to pronounce it, and they pronounced it

10      with an S-H sound, Weinsheimer.

11  A.  Well, the H is actually silent.  It's

12      Weinsheimer.

13  Q.  Weinsheimer.  Okay.  Mr. Weinsheimer, my name

14      is Andy Ostrowski.  I believe we met before.

15      We may have met at the Pennsylvania --

16  A.  Yes.

17  Q.  -- Human Relations Commission.

18          You understand you're here today to give a

19      deposition in connection with a lawsuit that

20      Linda Weaber has brought against Hershey Foods?

21  A.  Yes.

22  Q.  And have you given a deposition before?

23  A.  No, I have not.

24  Q.  Okay.  I'm sure --  Well, I'm not sure, but I'm

25      fairly certain that you would have reviewed

6

Exam./Ostrowski - Weinsheimer

1    some of the ground rules of what we'll be going

2    over today with your counsel before the

3    deposition.  But just to fill you in by way of

4    background, you've been identified as a witness

5    who we believe has knowledge or information

6    relevant or material to our lawsuit.

7         Under the rules governing the deposition

8    process -- or the litigation process, we're

9    entitled to call witnesses in and get their

10   depositions under oath.  You note we have a

11   court reporter here and also video and

12   audiotape that will be recording everything we

13   go over today.

14        It's primarily a question-and-answer

15   session, relatively informal.  But I will be

16   asking you questions to which you will be

17   responding truthfully and accurately, of

18   course.  And I just --  Just to be sure that --

19   When you answer a question, be sure that you've

20   heard and understood my question.  So that if

21   there's anything that you don't understand or

22   any way I can make my question clearer, feel

23   free to stop and ask before you answer.

24 A.  Okay.

25 Q.  And, also, as we proceed through the

7

Exam./Ostrowski - Weinsheimer

1    deposition, I mean you're free to consult with

2    your counsel at any time.  I don't have any

3    problem whatsoever.  If you have any questions

4    about anything that I'm asking or anything you

5    want to ask me at all about the case or my

6    questions, feel free to ask me, and I'll try to

7    assist you.  Okay?

8  A.    Okay.

9  Q.    How are you currently employed?

10  A.    Do you mean my title or --

11  Q.    Your title.

12  A.    My title.  I'm the manufacturing manager at the

13        Hershey chocolate plant.

14  Q.    Okay.  And how long have you been manufacturing

15        manager at the Hershey chocolate plant?

16  A.    The exact --  About six years; six, seven

17        years.

18  Q.    Okay.  And how long have you been with Hershey

19        Foods?

20  A.    Since November of 1980.

21  Q.    Okay.

22  A.    So about 20, 21 years.

23  Q.    Just give me the progression of how you worked

24        through Hershey Foods from 1980 through the

25        present.

8

Exam./Ostrowski - Weinsheimer

1   A.    In 1980 I started as an industrial engineer in

2        the plant.  And then a few years later then I

3        went into production supervision, was a

4        production supervisor.  I went into production

5        management as a production manager.  At the

6        time it was called general supervisor.

7            And then at one point I became manager of

8        industrial engineering in the plant and then

9        came back out in the plant as manufacturing

10       manager in both processing and currently the

11       packaging area, which is my current position.

12   Q.    Okay.  Could you describe for me what the

13        hierarchy is within the plant?  I believe that

14        the plant manager would be the top position.

15   A.    Correct.

16   Q.    And then on down from plant manager?

17   A.    Well, I report to the plant manager.  The plant

18        manager has a staff of six, eight -- say six or

19        eight individuals.  And I'm one of the

20        manufacturing managers.  There are two

21        manufacturing managers.

22   Q.    Okay.  And who are the other persons under the

23        plant manager?

24   A.    Okay.  We have Roger Carpenter, who is

25        manufacturing manager in the grocery and

Exam./Ostrowski - Weinsheimer

1    processing area.

2    Q.    So he's the other manufacturing manager?

3    A.    Yes.

4    Q.    Okay.

5    A.    There's Kim Estock, who is the manager of

6          administrative services.

7          Bob Repko is the manager of tech services,

8          technical services engineering.

9          John Ames is the manager of quality

10         assurance.

11         Tom Kettering is the manager of Employee

12         Relations.

13         Those are the --  Right now we don't have

14         a superintendent position that's reporting

15         directly, I think.  Unless I'm missing one,

16         that would be it, I think.

17   Q.    Okay.  What did you say about superintendent?

18   A.    The superintendent positions, through our

19         recent reorganization, do not report directly

20         to the plant manager anymore.  They had at some

21         point.  That does not occur anymore.

22         The superintendent positions are now new

23         positions.  They're called production

24         manager/superintendent.  So they don't report

25         directly to the plant manager anymore.  One

10

Exam./Ostrowski - Weinsheimer

1       reports currently to me, and then one reports

2       to Roger Carpenter in that position.  So that's

3       a recent change within this last year.

4  Q.  And when was that change?

5  A.  I would say in the last two or three months.

6  Q.  Okay.  Were there positions of superintendent

7       prior to two, three months ago?

8  A.  Yes.

9  Q.  Were they shift superintendents?

10 A.  Yes.  There was a second and a third shift

11      superintendent position.

12 Q.  Okay.  What was the change?

13 A.  Well, the change is with the recent

14      reorganization the second and third shift

15      superintendent positions actually picked up

16      more responsibility on other shifts as a

17      production manager/production superintendent.

18      And they --  So they picked up more

19      responsibility, and in addition to that, they

20      now do not report right to the plant manager.

21        MR. OSTROWSKI:  I'm sorry.  If we can just

22      go off the record.

23        MS. LYDE:  It's 1:22 p.m.  Take a short

24      break.

25        (Recess taken.)

Exam./Ostrowski - Weinsheimer

1          MS. LYDE:  It's 1:26 p.m.  We're back on

2      video, audio, and the record.

3          MR. OSTROWSKI:  Again, I apologize for the

4      distraction there.

5   BY MR. OSTROWSKI:

6   Q.   Below the level of manufacturing manager,

7        what's the hierarchy down that line?

8   A.   Then there are production managers and then

9        maintenance manager reporting to the

10       manufacturing manager.

11  Q.   Production manager is reporting to each

12       manufacturing manager?

13  A.   Yes.

14  Q.   And as I understand it, each manufacturing

15       manager has a separate area of responsibility.

16  A.   Correct.

17  Q.   What are the two separate areas?

18  A.   The one area is processing and grocery, and

19       then the other area that I'm responsible for is

20       considered packaging.

21  Q.   And what is processing and grocery?

22  A.   Processing would be more the raw materials of

23       chocolate and peanuts and almonds and things

24       like that.  Processing within the plant would

25       be considered processing of the raw material,

12

Exam./Ostrowski - Weinsheimer

1      of the intermediate product.

2          Grocery is cocoa finished goods, cocoa

3      can, and then syrup finished goods, syrup

4      bottle.

5          And then I have packaging, which is all

6      the other finished goods operations of the

7      plant.

8  Q.  Okay.  Which is what?  The candies and --

9  A.  Yeah.  Kisses, miniatures, milk and almond

10     bars, Rolo, different ones.

11 Q.  When you say packaging, is the production

12     actually done at a different area?

13 A.  No.  When I say --  In the area of the plant,

14     we get the chocolate and almonds or whatever

15     from the processing area pumped to us, and we

16     mold the product or deposit it for Kisses and

17     things like that, and we package it into the

18     finished goods which you see in the store.

19 Q.  Okay.  Processing and grocery and packaging,

20     are they done in two separate areas?

21 A.  Yes, two separate areas of the plant.

22 Q.  All in the plant, though?

23 A.  Yes.  Uh-huh.

24 Q.  Then does each manufacturing manager have a

25     separate staff of production managers?

13

Exam./Ostrowski - Weinsheimer

1   A.   Yes.

2   Q.   How many total production managers are there?

3   A.   If you don't include those new positions of the

4        superintendents which are part production

5        managers, I have four.  There are --  If I

6        recall correctly, it would be three in the

7        grocery and processing area.

8   Q.   Okay.  And that was Roger Carpenter?

9   A.   Yes.

10  Q.   So there's four that report to you, three that

11       report to Roger Carpenter?

12  A.   Yeah, if I remember right.

13  Q.   Now, do you maintain any day-to-day supervisory

14       responsibilities over the three production

15       managers who report to Roger Carpenter?

16  A.   I have no responsibility on what reports to

17       him.

18  Q.   Okay.  Who are the four production managers

19       that currently are under you?

20  A.   Reporting to me?  Tom Soles, Vince Castelli,

21       Brad White, Vern Croxall.  And then I have a

22       maintenance manager also, Steve Brandt, that

23       reports to me.

24  Q.   Who was the gentleman after Brad White?

25  A.   Vern Croxall.

14

Exam./Ostrowski - Weinsheimer

1  Q.   And then the maintenance manager?

2  A.   Steve Brandt.

3  Q.   Okay.  And why do you --  You seem to separate

4       -- because that's five.

5  A.   It's maintenance.  Because he's considered a

6       maintenance manager.  He's responsible for the

7       maintenance functions within my area.  The

8       production managers have only the production

9       employees reporting to them.

10 Q.   Okay.  And of those four other production

11      managers--Mr. Soles, Mr. -- was it Castelli,

12      Mr. White, and Mr. Croxall--how long have each

13      of them been there?

14 A.   I would say that Mr. Soles has been there

15      approximately three to four years.  Do you mean

16      in their current position?

17 Q.   In their current position, yeah.

18 A.   Mr. Castelli, I don't know for sure, but I

19      would guess somewhere in the neighborhood of

20      probably about eight years.  Mr. White, one

21      year.  Mr. Croxall, also about three to four

22      years.

23 Q.   Okay.  Who was in the production manager

24      position that is currently filled by Mr. White

25      prior to Mr. White?

15

Exam./Ostrowski - Weinsheimer

1    A.    Merle Meashey.

2    Q.    How do you spell Meashey?

3    A.    M-E-A-S-H-E-Y.

4    Q.    Okay.  And do each of those four production

5          managers then have separate areas of

6          responsibility?

7    A.    Yes, they do.

8    Q.    How are those broken down?

9    A.    Well, by area.  Tom Soles has what we consider

10         second floor wrapping of the packaging area.

11               Vince Castelli has --  They call that

12         confecto/pan, but it's confectionary department

13         and panning department.

14               Brad White has miniatures.  And we call

15         third and fourth floor Jensen lines.

16   Q.    Jensen?

17   A.    Jensen, J-E-N-S-E-N.  It's a molding line.

18   Q.    What did you say it was?  A molding line?

19   A.    Yeah.  It means they mold bars.

20   Q.    Okay.

21   A.    And then Vince Castelli --  Who is left?  Oh,

22         Vern Croxall.  Vern Croxall has Kisses and

23         chips and Nuggets operations in the molding

24         department.

25   Q.    Okay.  Now, are these --  You identified these

16

Exam./Ostrowski - Weinsheimer

1        areas in terms of floors.  Are they operations

2        that are conducted on separate floors?

3   A.   Well, sometimes they overlap on different

4        floors.  But they're usually broke down by

5        their departments or operations.

6   Q.   Okay.  And are each of those production

7        managers, are they -- do they work the same

8        shift that you work?

9   A.   Yes, they do.

10  Q.   Is that daylight shift?

11  A.   Usually daylight, yes.

12  Q.   And then from what I understand from Mr. Soles'

13       deposition is the superintendents then serve in

14       somewhat the supervisory/management capacity on

15       the night and --

16  A.   Second shift and third shift.  Yes, that's

17       true.

18  Q.   Okay.  Now, below the level of production

19       manager, what do you -- how many -- what is the

20       position?

21  A.   There are production supervisors below each

22       production manager and maintenance manager.

23       Production for the production supervisors, and

24       there's maintenance supervisors under the

25       maintenance manager.

17

Exam./Ostrowski - Weinsheimer

1  Q.   Okay.  How many production supervisors under

2       Mr. Soles?

3  A.   Twelve.  Well, that --  I'm sorry.  There were

4       just some recent retirements.  Right now there

5       would be nine.

6  Q.   Nine.  Are there three vacancies?

7  A.   Well, there are three positions that we're not

8       filling now with the reorganization.  We will

9       end up with nine.

10 Q.   When did those vacancies occur?

11 A.   Just this year.

12 Q.   Okay.  Prior to that then there were 12

13      positions?

14 A.   Correct.

15 Q.   And how long were there 12 positions under

16      Mr. Soles?

17 A.   As long as I can --  As long as he has been in

18      the position, as I recall.

19 Q.   Okay.  Then under Mr. Castelli?

20 A.   He would have, if I remember, five, I think.

21 Q.   Okay.  Then Mr. White?

22 A.   He would have five.

23 Q.   And Mr. Croxall?

24 A.   Seven.

25 Q.   Seven.  Okay.  Are there production --

18

Exam./Ostrowski - Weinsheimer

1       maintenance supervisors then?

2   A.  Yes.

3   Q.  How many maintenance supervisors?

4   A.  Nine, I think.

5   Q.  Okay.  So 30, 38?

6   A.  Sounds about right.

7   Q.  So you have 35 right now as of today?

8   A.  That sounds about right.

9   Q.  And in what line --  Under which production

10      manager was Linda Weaber assigned?

11  A.  Well, at the time Tom Soles was her manager.

12      At the time he had the Kisses and chips

13      operation that currently Vern Croxall has.  But

14      at the time he had that operation.

15  Q.  Okay.  So they just switched?

16  A.  Yeah.  He came from the grocery area, and we

17      made some movement.  We move the managers

18      around, sometimes give them different

19      responsibilities.  So at the time Tom Soles had

20      what Vern Croxall currently has.

21  Q.  That's --

22  A.  Kisses and chips and molding and Nuggets.

23  Q.  Is that what you said was the Jensen line?

24  A.  No, that wasn't the Jensen line.

25  Q.  Okay.  I missed something then because I --

Exam./Ostrowski - Weinsheimer

1 A.    You have Vern Croxall.

2 Q.    I wrote Jensen down next to him.

3 A.    That would be Brad White.

4 Q.    Okay.  And I wrote miniatures down next to him.

5 A.    That's right.  We had miniatures and Jensen

6        lines.  I guess maybe I might have said that

7        molding department which has sort of the

8        molding end of the jensen lines.  I might have

9        said that.

10 Q.   Okay.  So then Vern Croxall has Kisses and

11       chips?

12 A.   And Nuggets and molding department, yes.

13 Q.   Okay.  Nuggets.

14           And who -- Because you also -- You

15       identified both Mr. Soles and Mr. Croxall as

16       having been under your supervision for three to

17       four years.

18 A.   Uh-huh.

19 Q.   Did they both come in around the same time?

20 A.   They come into the plant around the same time.

21       Yes, they did.

22 Q.   Okay.  But when Mr. Soles came in, he came in

23       for Kisses, chips, Nuggets, and molding?

24 A.   Yes.  Correct.

25 Q.   And there were seven production supervisors?

③

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . .
LINDA F. WEABER,                    .
                    Plaintiff   .
                                    . Civil Action
            vs.                     . Number 1:CV-01-0856
                                    .
HERSHEY FOODS CORPORATION,.
                    Defendant   .
. . . . . . . . . . . . .


    Videotaped
    Deposition  of:  THOMAS E. SOLES

    Taken by      :  Plaintiff

    Date          :  April 1, 2002, 12:38 p.m.

    Place         :  4311 North Sixth Street
                     Harrisburg, Pennsylvania

    Video
    Operator      :  Crystal M. Lyde

    Reporter      :  Glenda S. Travitz
                     Registered Professional Reporter


APPEARANCES:

        ANDREW J. OSTROWSKI, ESQUIRE

            For - Plaintiff

        McNEES WALLACE & NURICK LLC
        By:  ELIZABETH A. MAGUSCHAK, ESQUIRE

            For - Defendant

ALSO PRESENT:

        LINDA F. WEABER

18

Exam./Ostrowski - Soles

1  A.    He asked for someone to do something.  They

2        didn't do it, and he snapped.

3  Q.    What?  Inappropriate language or --

4  A.    No.  Just behavior.  Just loud and degrading.

5  Q.    Okay.  And what was the result of that

6        situation?

7  A.    Same thing.  It was counseling.  I don't recall

8        if it was written or verbal.

9  Q.    Okay.  And then the third situation?

10 A.    The third would have been Linda's situation.

11 Q.    Okay.  We'll talk about that a little bit more

12       then.

13            When you came to the Hershey plant as a

14       production manager, what did you do to --  I

15       mean was there any orientation or training for

16       you for your new position?

17 A.    No.  I believe it was expected that I was

18       qualified for that position when I got there.

19 Q.    Okay.  But there were some differences.  You

20       had to learn personnel and learn different

21       production --

22 A.    Yeah.  You had to learn the personnel that you

23       had and just orientation at the plant, the size

24       of it.  It's a huge building.

25 Q.    Okay.  But there was no formal program or

19

Exam./Ostrowski - Soles

1       anything?

2   A.   No.  When you're hired salary, you actually get

3        an orientation more up-front as a supervisor,

4        which I had had 10 years prior or seven years

5        prior, somewhere in that time frame.  But no.

6        I mean you sort of just learn on the fly.

7   Q.   Okay.  Who were the other production managers

8        when you were production manager?  I mean when

9        Linda was still there.  Excuse me.

10  A.   Merle Meashey is production manager of the flex

11       area.  Vince Castelli was the production

12       manager of the confecto/pan area.  I think when

13       I first got hired Roger Carpenter was the

14       production manager of the wrapping area.  Steve

15       Brandt was the production manager of the Area 1

16       maintenance area.  And I would have been the

17       fifth.  I believe that's everybody.

18  Q.   And how are --  Are there regularly scheduled

19       production managers meetings?

20  A.   Yeah.  They have a weekly staff Thursday

21       mornings.

22  Q.   Okay.  And what types of matters are addressed

23       at the weekly staff meetings?

24  A.   Typically operational, quality, safety,

25       training, and sometimes staffing.

20

Exam./Ostrowski - Soles

1  Q.  Do you know if Linda Weaber was ever the topic

2      of discussion at a weekly scheduled managers

3      meeting?

4  A.  Not in my tenure.  She was not.  We did not

5      discuss personnel.

6  Q.  Okay.  Now, what about meetings --  Did you

7      have regularly scheduled meetings or periodic

8      meetings with either the manufacturing manager

9      or plant manager apart from the production

10     manager meetings?

11 A.  Yes.  Not plant manager.  Manufacturing

12     manager, I had biweekly one-on-one meetings.

13     So it was just a private meeting scheduled

14     biweekly for one hour.

15 Q.  Okay.  And that was --  During Linda Weaber's

16     time when you were also there, that was Larry

17     Weinsheimer?

18 A.  Yes.

19 Q.  Is it --

20 A.  Weinsheimer.

21 Q.  Weinsheimer.  And what types of things were

22     addressed at those meetings?

23 A.  Well, properly be discussed.  But it was

24     anything, again, from operations, new items,

25     quality, safety, incidents, issues, and

21

Exam./Ostrowski - Soles

1      personnel.

2   Q.  And did you and Mr. Weinsheimer ever discuss

3      Linda Weaber in any of your biweekly meetings?

4   A.  Yeah.  We would discuss Linda or any of my

5      staff at those meetings.

6   Q.  How many different times did you discuss Linda

7      Weaber during any of those meetings?

8   A.  Probably not more than a few.  It was very

9      common to discuss any of your staff, depending

10     any development.

11  Q.  Okay.  Do you remember any topics that you

12     addressed as it relates to Linda Weaber?

13  A.  No, I don't recall any specific topic.

14  Q.  When was your start date at the Hershey plant?

15  A.  March 2nd.

16  Q.  Of '98?

17  A.  Yes, I think.  I get a little gray on some of

18     the years sometimes.

19  Q.  And when did you first meet Linda Weaber?

20  A.  I would say within a week after my start date.

21  Q.  Did you have a meeting with your plant

22     supervisor, production supervisors to introduce

23     yourself to them and vice versa?

24  A.  Yes.  Very quickly into my start date I had

25     what we call an off-site, which was an

22

Exam./Ostrowski - Soles

1       agendaed meeting planned on both introduction

2       of myself to my staff and --  Again, you're

3       expected to take over this job and start in the

4       job.  So it had anything to do with goals, open

5       discussion for them about me.  And, yes, that

6       started.

7           Then you also set up one-on-ones with the

8       next tier down.  So I would have one-on-one

9       meetings with my immediate staff.

10  Q.   Okay.  Did you have any --  Do you recall

11      specifically having a one-on-one with Linda?

12  A.   Oh, I had many one-on-ones.  But how quickly

13      from when I got hired to when I had it, I don't

14      know.

15  Q.   Okay.  You said quite frequently you had

16      one-on-one meetings with her?

17  A.   They were scheduled monthly.

18  Q.   Okay.  And what were the topics that you and

19      she discussed at your monthly face-to-face

20      meetings?

21  A.   It would have started with, I think, anything

22      operational, anything going on in the area to

23      personnel on her level, issues she may have

24      with personnel on her level and just may want

25      feedback on, training, development,

Exam./Ostrowski - Soles

1        performance, performance appraisals, a process,

2        a question.  It was very open-ended because

3        you're trying to get to learn to know each

4        other.

5   Q.   And were you then actually responsible for

6        doing the performance appraisal for Linda?

7   A.   Yes, for two years.

8   Q.   Okay.  Ninety-eight and '99?

9   A.   My guess is I started at the Hershey plant in

10       March of '99.  I think I accepted the job in

11       November of '98.  But I get a little confused

12       here, dates.  I've been there four years March.

13       So that would have put me in '99, I believe.

14       No.  Ninety-eight would have been right.

15  Q.   I'm going to show you one of the performance

16       evaluations which covers the period December

17       '98 to -- or January '98 to December '98, and

18       your name --

19  A.   Yes, then that would be --

20  Q.   -- does appear on here.

21            (Document entitled Performance Management,

22       January 1998 to December 1998, 11 pages, was

23       produced and marked Exhibit 1.)

24  BY MR. OSTROWSKI:

25  Q.   Just go ahead and review that document just to

24

Exam./Ostrowski - Soles

1      make sure you're familiar with its contents.

2   A.  Yes.

3   Q.  Before I ask you more specific questions, did

4      you review any documents in preparation for

5      your deposition today?

6   A.  Did I review any documents?

7   Q.  Yeah.

8   A.  The only thing I reviewed was notes I had of

9      the investigation with Linda.

10  Q.  Okay.  Just so I don't have to mark it, I'll

11     ask you.  If I show you this document, is that

12     your handwriting on there?

13  A.  No.

14  Q.  What notes did you have?  Were they handwritten

15     notes?

16  A.  No.

17  Q.  How about on the back of here, is any of that

18     your handwriting?

19  A.  No.

20  Q.  What notes did you have?

21  A.  I just had a Word document.

22  Q.  Oh, you had something typed up?

23  A.  Uh-huh.

24  Q.  Okay.  I think I probably have that.  This

25     document, Exhibit Number 1, throughout the

④

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . .
LINDA F. WEABER,                .
                Plaintiff   .
                            . Civil Action
            vs.             . Number 1:CV-01-0856
                            .
HERSHEY FOODS CORPORATION,.
                Defendant   .
. . . . . . . . . . . . . .


   Videotaped
   Deposition  of:  CAROLYN A. HASKELL

   Taken by      :  Plaintiff

   Date          :  April 1, 2002, 3:12 p.m.

   Place         :  4311 North Sixth Street
                    Harrisburg, Pennsylvania

   Video
   Operator      :  Crystal M. Lyde

   Reporter      :  Glenda S. Travitz
                    Registered Professional Reporter


APPEARANCES:

       ANDREW J. OSTROWSKI, ESQUIRE

            For - Plaintiff

       McNEES WALLACE & NURICK LLC
       By:  ELIZABETH A. MAGUSCHAK, ESQUIRE

            For - Defendant

ALSO PRESENT:

       LINDA F. WEABER

5

Exam./Ostrowski - Haskell

EXAMINATION

BY MR. OSTROWSKI:

Q.    Ms. Haskell, my name is Andy Ostrowski.  We
      haven't been introduced, so I'll introduce
      myself now.

           You understand that you're here today to
      give a deposition in connection with a lawsuit
      that Linda Weaber has brought against Hershey
      Foods?

A.    Yes.

Q.    Have you ever given a deposition before?

A.    Yes.

Q.    Unless you have anything you want to address
      with me, I'm just going to assume you know the
      ground rules and go ahead and --

A.    If I don't, I'll ask questions.

Q.    Okay.  How are you currently employed?

A.    I work for General Electric.  I manage health
      and disability benefits for General Electric.

Q.    You manage --

A.    Health, disability benefits for General
      Electric.

Q.    Okay.  And how long have you been with General
      Electric?

A.    Since the day I left Hershey Foods.  Let's see.

6

Exam./Ostrowski - Haskell

1      September 1st, 198 -- I mean 2000, '99 or 2000.

2      Ninety-nine.  I had to think for a minute.

3      Ninety-nine.

4  Q.   Okay.  And why did you leave Hershey Foods?

5  A.   Better job opportunity.

6  Q.   Okay.  And where is General Electric located?

7  A.   I actually work for GE Plastics, which is

8       located in Pittsfield, Massachusetts.

9  Q.   And what's your current residence address?

10     Just so you know, I have no intention of

11     contacting you unless for some reason I need to

12     track you down and need to get you for a

13     hearing.

14 A.   Right now I live at 34 Clover Drive, Lebanon,

15     Pennsylvania.

16 Q.   And the telephone number?

17 A.   717-273-9336.

18 Q.   Okay.  How long did you work for Hershey Foods?

19 A.   About four and a half years.  I started there

20     December of either '94 or '95.  I guess '94.

21 Q.   What was your position with Hershey when you --

22     as of the day you left, the day before you

23     left?

24 A.   My title was manager of Health Services, and I

25     was responsible for Health Services and

7

Exam./Ostrowski - Haskell

1          disability programs and occupational medicine

2          for all of Hershey Foods Corporation.

3    Q.    What's your --  Where did you work before you

4          worked for Hershey Foods?

5    A.    Do I have to give an entire list of where I

6          worked?

7    Q.    Why don't you --  Where were you right before

8          Hershey?

9    A.    I worked at Hershey Med Center right before I

10         came to Hershey Foods.

11   Q.    How long were you with Hershey Med Center?

12   A.    I was only there for an interim period of time.

13         I think about 10 months.  I had just retired

14         from the military.

15   Q.    Okay.  You have a military background?  Is that

16         your prior experience?

17   A.    Twenty-three years in the army.

18   Q.    Okay.  What did you do in the army?

19   A.    It would be easier to tell you what I didn't

20         do.  I was like an assistant director of

21         nursing for a combat support hospital in

22         Mogadishu, Somalia.  I was the head nurse of

23         various types of units.  I managed nursing

24         education training departments.  I was nursing

25         supervisor, worked in the emergency room.

8

Exam./Ostrowski - Haskell

1      Pretty much --

2  Q.   So you are a nurse?

3  A.   Right.  I'm a nurse practitioner.

4  Q.   And does that --  Is that an R.N. with an

5      additional qualification to be a practitioner?

6  A.   Yes.  It's a different licensure.  You have to

7      have an R.N. license in order to get the nurse

8      practitioner licensure.

9  Q.   Okay.  And you're currently a nurse

10     practitioner?

11  A.   Yes.

12  Q.   And how long have you --  What's the

13     certification called to be a nurse

14     practitioner?

15  A.   It's called nurse practitioner in the state of

16     Pennsylvania.  It varies from state to state.

17     But a nurse practitioner in the state of

18     Pennsylvania, it's C.R.N.P., Certified

19     Registered Nurse Practitioner.

20  Q.   Okay.  And how long have you had that

21     certification?

22  A.   Let's see.  I got married in '77.

23     Seventy-eight, since 1978.

24  Q.   What's the name of your --  What was your

25     title, again, with --  Did you have the same

⑤

# HERSHEY PLANT Production Supervisors 1/1/99

| Name | Department Descr | Dept ID | Age as of 1/1/99 | Annual Rate | Full/Part | Hire Date |
|---|---|---|---|---|---|---|
| Arriola,Meliton C | 1221 HPlant - Processing Admin | 0815 | 48 | 50,000.00 | F | 1993-12-28 |
| Baker,John S | 1222 HPlant - Packaging Admin | 0820 | 36 | 49,700.08 | F | 1990-06-20 |
| Barr,Patrick L | 1222 HPlant - Packaging Admin | 0823 | 47 | 57,500.00 | F | 1980-12-22 |
| Bates,Jeffrey E | 1222 HPlant - Packaging Admin | 0820 | 34 | 45,500.00 | F | 1990-09-05 |
| Brandt,James M | 1222 HPlant - Packaging Admin | 0822 | 40 | 47,400.16 | F | 1989-08-16 |
| Brown Jr,George E | 1222 HPlant - Packaging Admin | 0820 | 44 | 48,000.00 | F | 1991-07-22 |
| Buck,Connie G | 1222 HPlant - Packaging Admin | 0821 | 57 | 66,500.00 | F | 1966-08-08 |
| Ceresini,Edward P | 1787 Prod Mgr, Shipping/Rec | 0818 | 48 | 66,500.00 | F | 1966-08-08 |
| Coleman,Arletha M | 1222 HPlant - Packaging Admin | 0823 | 57 | 49,200.08 | F | 1981-07-20 |
| Conz,George S | 1221 HPlant - Processing Admin | 0817 | 57 | 60,900.00 | F | 1962-09-10 |
| Corrado,Richard A | 1229 HPlant - Engineering | 0857 | 59 | 66,100.16 | F | 1963-08-26 |
| Deaven,Keith L | 1221 HPlant - Processing Admin | 0815 | 58 | 64,900.16 | F | 1963-08-26 |
| Deiter,Michael L | 1221 HPlant - Processing Admin | 0815 | 44 | 58,100.00 | F | 1978-07-05 |
| Dickason Jr,Sidney A | 1228 HPlant - Sanitation | 0844 | 44 | 49,000.16 | F | 1980-07-07 |
| Ebersole,Mark R | 1222 HPlant - Packaging Admin | 0822 | 39 | 49,400.00 | F | 1984-02-01 |
| Ehrhorn,William R | 1221 HPlant - Processing Admin | 0817 | 47 | 58,900.00 | F | 1978-08-07 |
| Engle,Suzette M | 1222 HPlant - Packaging Admin | 0820 | 45 | 45,500.00 | F | 1982-08-02 |
| Fies Sr,Thomas P | 1221 HPlant - Processing Admin | 0817 | 53 | 57,500.00 | F | 1976-08-16 |
| Fisher,Denise L | 1222 HPlant - Packaging Admin | 0820 | 37 | 52,200.08 | F | 1980-08-11 |
| Fogleman,Judy L | 1222 HPlant - Packaging Admin | 0820 | 35 | 47,200.00 | F | 1982-08-17 |
| Fortna,David S | 1222 HPlant - Packaging Admin | 0821 | 45 | 57,400.00 | F | 1982-08-02 |
| Getz,Edward G | 1222 HPlant - Packaging Admin | 0821 | 45 | 63,800.16 | F | 1976-08-16 |
| Grumbein Jr,Lloyd E | 1221 HPlant - Processing Admin | 0815 | 54 | 70,500.00 | F | 1966-08-03 |
| Hammer,Jeffrey L | 1222 HPlant - Packaging Admin | 0820 | 41 | 45,500.00 | F | 1990-10-16 |
| Hartman,Wade I | 1228 HPlant - Sanitation | 0844 | 52 | 48,900.08 | F | 1965-08-30 |
| Holst,John M | 1787 Prod Mgr, Shipping/Rec | 0818 | 56 | 68,200.08 | F | 1970-11-01 |
| Hopple Jr,John C | 1228 HPlant - Sanitation | 0844 | 50 | 56,400.16 | F | 1966-10-06 |
| Keaton,Karen L | 1222 HPlant - Packaging Admin | 0821 | 50 | 51,000.00 | F | 1980-12-22 |
| Kettering,Thomas J | 1221 HPlant - Processing Admin | 0815 | 40 | 61,400.00 | F | 1989-09-13 |
| King,Nancy A | 1222 HPlant - Packaging Admin | 0821 | 55 | 55,700.08 | F | 1979-08-20 |
| Klahr,Deborah A | 1789 Manufacturing Manager | 0807 | 49 | 52,600.08 | F | 1979-06-18 |
| Kowker,Leonard V | 1222 HPlant - Packaging Admin | 0823 | 57 | 49,800.00 | F | 1959-11-02 |
| Landis,Douglas W | 1222 HPlant - Packaging Admin | 0822 | 42 | 54,200.00 | F | 1979-05-14 |

D 1391

## HERSHEY PLANT Production Supervisors 1/1/99

| Name | Department Descr | Dept ID | Age as of 1/1/99 | Annual Rate | Full/Part | Hire Date |
|---|---|---|---|---|---|---|
| Livering,Kevin J | 1222 HPlant - Packaging Admin | 0820 | 35 | 52,200.16 | F | 1985-10-03 |
| Luckenbill,Corinne M | 1222 HPlant - Packaging Admin | 0822 | 48 | 44,200.00 | F | 1982-07-12 |
| MacDonald III,Donald J | 1789 Manufacturing Manager | 0807 | 37 | 48,600.00 | F | 1992-04-06 |
| May,Hughey E | 1229 HPlant - Engineering | 0854 | 47 | 55,100.16 | F | 1981-07-27 |
| Miller,Barbara A | 1222 HPlant - Packaging Admin | 0820 | 50 | 60,300.16 | F | 1979-07-09 |
| Miller,Thomas J | 1222 HPlant - Packaging Admin | 0821 | 44 | 49,000.16 | F | 1989-08-21 |
| Moyer,Gary L | 1221 HPlant - Processing Admin | 0817 | 50 | 57,900.08 | F | 1966-06-01 |
| Nardi,Adolph J | 1787 Prod Mgr, Shipping/Rec | 0818 | 51 | 46,000.00 | F | 1993-07-28 |
| Neidig,Paul R | 1222 HPlant - Packaging Admin | 0819 | 53 | 57,600.16 | F | 1970-03-02 |
| Noll,Robert A | 1222 HPlant - Packaging Admin | 0819 | 41 | 61,000.00 | F | 1979-03-26 |
| Noullet,Frederick B | 1221 HPlant - Processing Admin | 0817 | 48 | 52,100.16 | F | 1991-05-01 |
| Nye,Randy D | 1221 HPlant - Processing Admin | 0817 | 41 | 52,900.00 | F | 1980-12-02 |
| O'Donnell,Patrick J | 1222 HPlant - Packaging Admin | 0819 | 44 | 48,200.00 | F | 1987-08-17 |
| Rodriguez,Bentura G | 1222 HPlant - Packaging Admin | 0823 | 49 | 57,000.00 | F | 1982-07-19 |
| Ryland,Thomas W | 1222 HPlant - Packaging Admin | 0819 | 50 | 63,400.08 | F | 1978-08-14 |
| Santana Jr,John | 1222 HPlant - Packaging Admin | 0820 | 51 | 55,700.00 | F | 1982-07-26 |
| Selvey,Carolyn E | 1222 HPlant - Packaging Admin | 0820 | 49 | 51,400.08 | F | 1970-10-12 |
| Sewinsky,Carole C | 1222 HPlant - Packaging Admin | 0823 | 54 | 53,200.00 | F | 1979-03-27 |
| Shadle Jr,Irvin G | 1221 HPlant - Processing Admin | 0817 | 53 | 59,200.16 | F | 1980-08-17 |
| Smith,Kenneth R | 1222 HPlant - Packaging Admin | 0842 | 55 | 50,900.16 | F | 1964-09-09 |
| Speicher,William F | 1222 HPlant - Packaging Admin | 0823 | 59 | 52,100.00 | F | 1963-09-02 |
| Strangarity,Michael F | 1222 HPlant - Packaging Admin | 0819 | 40 | 62,500.00 | F | 1962-07-30 |
| Thomas,Gerald A | 1221 HPlant - Processing Admin | 0815 | 35 | 51,900.00 | F | 1976-07-19 |
| Tilberg,Frederick J | 1787 Prod Mgr, Shipping/Rec | 0818 | 54 | 60,700.16 | F | 1990-10-31 |
| Vajdic,Mark W | 1221 HPlant - Processing Admin | 0815 | 40 | 56,600.08 | F | 1976-08-16 |
| Walmer,David S | 1221 HPlant - Processing Admin | 0822 | 38 | 60,100.08 | F | 1980-10-06 |
| Weaber,Linda F | 1222 HPlant - Packaging Admin | 0821 | 51 | 55,400.00 | F | 1978-07-17 |
| Weaver,Clark E | 1222 HPlant - Packaging Admin | 0822 | 36 | 51,000.00 | F | 1968-08-12 |
| Weaver,Earl R | 1222 HPlant - Packaging Admin | 0820 | 51 | 51,700.00 | F | 1980-12-02 |
| White,Bradley S | 1787 Prod Mgr, Shipping/Rec | 0818 | 35 | 51,000.00 | F | 1987-09-08 |
| Wilson,Carl E | 1222 HPlant - Packaging Admin | 0823 | 51 | 52,000.00 | F | 1980-07-21 |
| Woodward,Gerard M | 1787 Prod Mgr, Shipping/Rec | 0818 | 43 | 55,400.00 | F | 1979-08-20 |
| Zidik,Thomas J | 1222 HPlant - Packaging Admin | 0821 | 45 | 53,000.00 | F | 1982-10-11 |

D 1392



# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LINDA F. WAEBER          : CIVIL ACTION NO. 1:01-CV-856
        Plaintiff              :
                           :
       v.                       : JUDGE RAMBO
                           :
HERSHEY FOODS CORP.,       :
        Defendant        : JURY TRIAL DEMANDED

### PLAINTIFF'S ANSWERS TO INTERROGATORIES

Submitted by,

Andrew J. Ostrowski, Esquire
I.D. No.  66420
Suite 201, 2080 Linglestown Road
Harrisburg, PA 17110
(717) 540-9170
Attorney for Plaintiff

Dated:  February 20, 2002

## INTERROGATORIES

1.    Describe the factual basis for each element of damages <u>you</u> contend <u>you</u> are seeking in this action and <u>identify</u> each <u>person</u> with personal knowledge thereof.

<u>ANSWER:</u>

1.    Plaintiff is seeking damages for all injuries for which damages are recoverable at law under the claims raised in her complaint.  Specifically Plaintiff and seeking all back pay and benefits and, in lieu of reinstatement, an appropriate from pay award to reflect the difference between what she would have earned had she remained employed by Defendant and which she has and will continue to earn through her alternative employment.  Plaintiff also seeks general compensatory damages for her physical and emotional suffering, humiliation, and aggravation as well as costs and attorney's fees as permitted by law.

2.      If, in support of any of your claims in this action, you rely on any communication which you contend directly evidences such claim(s), identify each such communication and each person with personal knowledge thereof.

ANSWER:


2.      Plaintiff will prove her case largely through circumstantial evidence, but submits that her discussions with Carolyn Haskell in March 1999 wherein Haskell told her that she was going to lose her supervisor job, and that her FMLA would be denied through placing unauthorized conditions on Plaintiff's ability to use her leave directly evidence Plaintiff's FMLA and ERISA claims.  Plaintiff reserves the right to supplement this response as discovery proceeds.

3.    Identify every person whom you know or believe to have personal knowledge of any of the facts alleged in your Complaint and with respect to each person, summarize the factual knowledge of each such person.

ANSWER:

Tom Soles - conversations in 1998 and 1999 with Plaintiff and her husband regarding work performance issues and difficulties with Darryl Bentz

Darryl Bentz - history of hostility toward Plaintiff resulting from Plaintiff confronting him about sexual harassment issues, Sam Selvy and Ed Getz also have knowledge of the matters regarding the sexual harassment investigation

Larry Weinsheimer - conversations about ongoing problems with Bentz as well as issues regarding being pushed by Roy Keeton

Richard Chase - told Plaintiff that Roy Keeton was going to hurt Plaintiff

Ken Smith and Greg Marks - aware of Bentz' plan to try to get Plaintiff fired

Tom Kettering - facts and circumstances regarding Plaintiff's health and events leading to her termination

Carolyn Haskell - conversations regarding Plaintiff's health and request for FMLA in 1999

Cindy Lighty - all matters raised in Plaintiff's Complaint

Pat Kilgore -

Gordon Swinehart and Ray Warble - present when Plaintiff fired

Dr. Giaconne - physician who provided cardiac services in 1999

Dr. Dysler - physician regarding Plaintiff's diabetes

Dr. Barton - plaintiff's family physician

Dr. Daduke - physician regarding Plaintiff's strokes

4. <u>Identify</u> each and every fact upon which <u>you</u> rely in support of <u>your</u> allegations contained in Paragraph 8 of <u>your</u> Complaint.

<u>ANSWER</u>:

4. This allegation is based upon conversations between Plaintiff and Carolyn Haskell

5.      <u>Identify</u> each and every fact upon which <u>you</u> rely in support of <u>your</u> allegations contained in Paragraph 15 of <u>your</u> Complaint.

<u>ANSWER:</u>

5.      These allegations are based upon the fact that Plaintiff was a highly compensated employee with and was known to have an extensive and costly medical history and that, in 1999, Defendant was incurring ongoing earnings losses. The allegations are based largely upon information and belief and will be further determined through discovery as permitted by law.

6.    Identify each and every fact upon which you rely in support of your allegations contained in Paragraph 16 of your Complaint.

ANSWER:

6.    The pecuniary losses suffered by Plaintiff are readily discernible from a comparison of her past and continuing wages and benefits, and Plaintiff, her husband and daughter will testify to the continuing deleterious effect this matter has had on her physical and emotional well-being.

7.    Identify each and every fact upon which you rely in support of your allegations contained in Paragraph 20 of your Complaint.

ANSWER:

7.    These allegations are based upon the fact that Plaintiff was a highly compensated employee with and was known to have an extensive and costly medical history and that, in 1999, Defendant was incurring ongoing earnings losses.  The allegations are based largely upon information and belief and will be further determined through discovery as permitted by law.

8.    <u>Identify</u> each and every fact upon which <u>you</u> rely in support of <u>your</u> allegations contained in Paragraph 21 of <u>your</u> Complaint.

<u>ANSWER:</u>

8.    The pecuniary losses suffered by Plaintiff are readily discernible from a comparison of her past and continuing wages and benefits, and Plaintiff, her husband and daughter will testify to the continuing deleterious effect this matter has had on her physical and emotional well-being.

9.  Identify each and every fact upon which you rely in support of your allegations contained in Paragraph 22 of your Complaint.

ANSWER:

9.  Plaintiff will testify to the continuing deleterious effect that the matters of which she complains have had on her health and well-being which will be substantiated through her medical records and possible testimony from her physicians.

10.    <u>Identify</u> each and every fact upon which <u>you</u> rely in support of <u>your</u> allegations contained in Paragraph 31 of <u>your</u> Complaint.

<u>ANSWER:</u>

10 and 11.    Plaintiff's diabetes has caused her complications through the years and Carolyn Haskell told her that she perceived my ongoing problems as being mental and told me that I would have to go to counseling.

11.    <u>Identify</u> each and every fact upon which <u>you</u> rely in support of <u>your</u> allegations contained in Paragraph 32 of <u>your</u> Complaint.

<u>ANSWER:</u>

12.     <u>Identify</u> each and every prospective employer from which <u>you</u> sought employment from 1999 to the present.  As to each prospective employer, provide the following information:

      a.      The date and manner in which <u>you</u> first contacted the prospective employer about a potential or actual employment opportunity;

      b.      The means or procedure by which <u>you</u> identified the prospective employer;

      c.      Whether <u>you</u> were interviewed by the prospective employer;

      d.      The compensation and benefits associated with the position or positions for which <u>you</u> applied or were considered;

      e.      Whether an offer of employment was extended to <u>you</u> and, if an offer was not extended, <u>your</u> understanding of why an offer was not extended;

      f.      Whether <u>you</u> turned down an offer of employment and, if so, all the reasons why <u>you</u> did so;

      g.      <u>Identify</u> any document which relates to the employment opportunity, including but not limited to want ads, applications, etc.

<u>ANSWER:</u>

applied to ASK Kettering and submitted applications online and worked with the unemployment office

18

13.    Identify any period of time in which you were unable to work and/or look for alternative employment for any reason, and, for each such period, identify the reason for your inability and any documents which relate thereto.

ANSWER:

13.    N/A

14.    <u>Identify</u> each and every means and/or processes by which <u>you</u> sought to identify employment opportunities (including self-employment opportunities) during the period 1999 to the present, including but not limited to periodic review of specific newspaper advertisements, referral sources, etc., and each and every <u>document</u> that relates or pertains to such means and/or process.

<u>ANSWER:</u>

See answer to 12

15.    Identify each and every employer (including self-employment) from which you received compensation or payment of any kind during the period 1998 through the present.  As to each such employer provide the following information:

     a.     Your earnings from the employer, broken down by type of earning (e.g., salary, commission, bonus, stock options etc.), and year of receipt of such earnings;

     b.     A description of the benefits to which you were entitled by virtue of your employment, regardless of whether you opted for such benefits;

     c.     Your dates of employment;

     d.     If your employment terminated for any reason, provide the reason for such termination;

     e.     If you were disciplined and/or counseled for any reason, provide the reason for such discipline and/or counseling and describe the events related to such discipline and/or counseling.

     f.     Whether there was any period you were unable to work, and, if so, the reason you were unable to work for each such period;

     g.     Identify all documents which relate or pertain to your employment and/or to the information provided in response to this Interrogatory.

ANSWER:

1. 2/00 - 4/00 Bayer Aspirin (through Ostin's temp agency) $10/hr 40 hrs/wk
2. 9/00 - 9/01 Verdelli's &10/hr apprx 68 hrs/2 wks
3. 9/01 - present Warrell Corp. $11.70/hr 40hrs/wk

Plaintiff will provide financial information.

16.    Identify each and every (i) application for benefits you, or someone acting on your behalf, made to, and/or (ii) receipt of benefits from, any governmental program, including but not limited to unemployment, workers' compensation, and social security, or insurance program, including but not limited to life insurance, short or long-term disability insurance, and auto insurance, during the period 1999 to the present.  As to each such application and/or receipt of benefits, provide the following information:

a.    Identify all documents related or pertaining to such application and/or receipt of benefits;

b.    Provide the dates of such application and/or receipt of benefits;

c.    Identify each person with knowledge relating to your application and/or receipt of benefits;

d.    Identify the amount of benefits you received and provide an explanation of how you spent any benefits received;

e.    If you were denied benefits, provide the reason given for the same, whether you appealed the denial in any way, and identify any documents related to such denial and/or appeal;

f.    Provide the factual basis for your eligibility for any such benefits you received or for which you applied.

ANSWER:

Plaintiff will provide all such information.

22

17.    <u>Identify</u> each and every fact upon which <u>you</u> rely in support of <u>your</u> allegation that <u>you</u> acted with reasonable diligence in seeking to mitigate <u>your</u> alleged damages for which <u>you</u> are seeking relief in this action, and any <u>documents</u> which <u>you</u> contend directly or indirectly evidence such allegation.

<u>ANSWER:</u>

See answers to 12, 14 and 15.

Plaintiff will provide all such information.

18.    Identify each physical or mental condition for which you sought treatment from, and/or were treated by, a licensed or unlicensed health care provider, including but not limited to a counselor, therapist, physician, psychologist, psychiatrist, faith healer, etc., during the period 1985 to the present, and, as to each such mental or physical condition, provide the following information:

    a.    the date you first sought treatment and/or were treated for such condition;

    b.    the temporal period in which you sought treatment for the condition;

    c.    the duration of the condition;

    d.    whether the condition was resolved, and, if so, how and when it was resolved;

    e.    any diagnosis given for the condition;

    f.    identify any and all documents relating or pertaining to the condition;

    g.    identify each and every person with knowledge of the condition.

ANSWER:

Plaintiff will provide relevant medical records or releases for reasonable requests for records.

19.    State whether you ever made any complaint to a managerial or supervisory employee of Defendant concerning your belief that you had been subject to discrimination. If so, describe in detail each such complaint, including the name of the person to whom the complaint was made, the date of each such complaint, and the result of your complaint. Identify each person who witnessed your reporting of the complaint and each document which refers or relates thereto or upon which you relied with respect to your answers to this Interrogatory.

ANSWER:

Talked to Larry Weinsheimer and Tom Soles about ongoing problems with Daryl Bentz

**CERTIFICATE OF SERVICE**

I hereby certify that I have this date served a copy of the foregoing document, by hand-delivery, upon the following:

Andrew J. Ostrowski, Esquire
4311 North Sixth Street
Harrisburg, PA  17110

_____
Brian F. Jackson

Date:  April 30, 2002